# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

MARCQUISE MURPHY and
RATANYA ROGERS, individually and
on behalf of all others similarly situated,

                Plaintiffs,

v.

LABOR SOURCE, LLC d/b/a
CATSTAFF d/b/a ONE SOURCE
STAFFING AND LABOR, and BLUSKY
RESTORATION CONTRACTORS,
LLC,

                Defendants.

Case No. 19-cv-1929 (MJD/ECW)

**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant Labor Source, LLC d/b/a Catstaff d/b/a One Source Staffing and Labor's ("One Source" or "Labor Source") and BluSky Restoration Contractors, LLC's ("BluSky") (collectively, "Defendants") Partial Motion to Dismiss (Dkt. 33). Defendants bring their motion under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends granting in part and denying in part the partial motion to dismiss. However, the Court also recommends permitting Plaintiffs to file an amended complaint with respect to the recommendation for dismissal under Rule 12(b)(6).

# I.    FACTUAL AND PROCEDURAL HISTORY

On July 23, 2019, Plaintiffs Marcquise Murphy ("Murphy") and Ratanya Rogers ("Rogers") (collectively, "Plaintiffs") brought this putative collective and class action on behalf of themselves and other similarly situated individuals who have worked for One Source and BluSky as non-exempt manual laborers.  (Dkt. 1 ¶ 1.)

Murphy is a resident of Chicago, Illinois, and worked for Defendants as a manual laborer and non-commercial driver in Minnesota and Illinois from approximately August 2017 to October 2017.  (*Id.* ¶ 14.)  Rogers, also a resident of Chicago, Illinois, worked for Defendants as a manual laborer in Minnesota from approximately August 2017 to November 2017.  (*Id.* ¶ 15.)

One Source, a Kansas limited liability company, is a staffing agency that provides unskilled and semi-skilled workers in the construction, manufacturing, fulfillment, and disaster restoration industries.  (Dkt. 36 ¶ 3.)  One Source's principal place of business is located in Olathe, Kansas.  (Dkt. 1 ¶ 18.)  One Source operates in various states across the country, including Minnesota, Kansas, Illinois, Texas, Colorado, and New York.  (*Id.* ¶ 28.)

BluSky, also a foreign limited liability company, provides manual labor services for restoration and environmental services.  (*Id.* ¶ 29.)  BluSky's principal place of business is located in Centennial, Colorado.[1]  (*Id.* ¶ 19.)  BluSky contracted with One

---

[1]    The Complaint does not allege the state of BluSky's formation.

Source to obtain manual laborers for restoration projects at various work sites, including one in Minnesota. (*Id.* ¶ 29.)

According to the Complaint, Defendants' work sites are supervised by a lead boss, who tracks the hours worked by Plaintiffs and the putative class and collective members and requires them to sign a timesheet at the end of their shift.[2] (*Id.* ¶ 31.) At all times material to the Complaint, the work performed by Plaintiffs and the putative class and collective members "has been jointly managed and supervised by BluSky and One Source." (*Id.* ¶ 46.) The Complaint alleges that Defendants fabricate, manipulate, and fraudulently reduce the number of hours worked by Plaintiffs and the putative class and collective members, resulting in the underpayment of wages and unreported hours worked. (*Id.* ¶ 32.) At times, Plaintiffs and the putative class and collective members allegedly received paychecks even though BluSky had not submitted their time sheets to One Source. (*Id.*)

Additionally, Defendants require Plaintiffs and the putative class and collective members to incur numerous work-related expenses normally covered by an employer, including "toll costs, gas, equipment, food, hotel, and other travel expenses for the benefit of Defendants' businesses." (*Id.* ¶ 33.) Defendants allegedly do not reimburse Plaintiffs and the putative class and collective members for travel, equipment, lodging, and other business-related expenses. (*Id.*)

---

[2]     The Complaint's allegations use both the past and present tense. The Court recites the allegations using the tense used in the Complaint.

Plaintiffs also assert that Defendants make improper deductions from Plaintiffs and the putative class and collective members' wages. (*Id.* ¶ 34.) For example, Plaintiffs claim that Defendants deducted "approximately $7 to $20 per week per workers [sic] from the workers' pay for 'travel,' and up to $130 per week for lodging." (*Id.*) With respect to lodging, Plaintiffs and the putative class and collective members are required to stay in a nearby hotel adjacent to the work site, often with 5 to 8 people sleeping per room, and Defendants deduct between $120 and $130 per week from each manual laborer who is required to stay in a hotel, regardless of the actual hotel rate. (*Id.*)

According to the Complaint, Plaintiffs and the putative class and collective members are not compensated for the drive from Chicago to a work site in the St. Paul, Minnesota area (*id.* ¶ 35), time spent before and after their shifts donning and doffing the personal protective equipment BluSky required them to wear (*id.* ¶ 36), meetings held after their shifts end (*id.* ¶ 37), and "waiting time," including time spent waiting to be directed to the work site and also time spent waiting on site for others to arrive (*id.* ¶ 38).

The Complaint asserts that Plaintiffs and the putative class and collective members worked and continue to work unrecorded and uncompensated hours and were underpaid for hours actually worked, "resulting in hourly rates that fall well below minimum wage rates and overtime rates required by law." (*Id.* ¶ 39.) Defendants compensate Plaintiffs and the putative class and collective members with "iPay," a debit card system which deposits funds onto a debit card. (*Id.* ¶ 40.) "Plaintiffs and Class and Collective Members were not and are not made aware they would be paid through this iPay system until after their first pay period, where instead of receiving a physical pay check or a

direct deposit, they receive the iPay debit cards and are told this is how wages are going to be paid." (*Id.*)  Further, Defendants allegedly inconsistently provide pay stubs or wage statements and often withhold wage statements. (*Id.* ¶ 41.)  Plaintiffs and the putative class and collective members are allegedly required to pay a fee to view their wage statements through an online subscription. (*Id.*)  "When pay stubs are actually provided," the wage statements are allegedly inaccurate, incomplete, and do not itemize all deductions. (*Id.*)

According to the Complaint, "Plaintiffs were supposed to be paid a rate of $10 to $19 per hour." (*Id.* ¶ 43.)  When assigned to a work site, Plaintiffs consistently worked 12 hours per day, six-to-seven days a week until the job was completed. (*Id.*)  When assigned to a work site, Plaintiffs worked approximately 75 to 80 hours per week. (*Id.*)  However, "[d]ue to Defendants' time-reduction and improper expense deduction schemes," Defendants "jointly do not pay hourly rates that meet the minimum wage requirement and do not pay a premium rate of time-and-a-half for hours worked over 40 in a work week" to Plaintiffs and the putative class and collective members. (*Id.* ¶ 42.)  The Complaint alleges, on information and belief, that the putative class and collective members worked and continue to work similar hours and are paid similar wages. (*Id.* ¶ 43.)

With respect to the collective action allegations, the Complaint alleges that Defendants employ "dozens, and potentially hundreds, of such employees who work in Minnesota, Illinois, Kansas, Texas, Florida, and elsewhere during the last three years, who were and are subject to the time reduction and improper wage reduction schemes

described" in the Complaint.  (*Id.* ¶ 52.)  The Complaint defines a "Collective" of similarly situated Plaintiffs as "[a]ll current and former non-exempt workers employed by Defendants in the United States in the three years prior to filing this Complaint through the present."  (*Id.* ¶ 53.)  The Complaint alleges that Defendants denied the putative collective members minimum wage and overtime pay for all hours worked over 40 per week.  (*Id.* ¶ 50.)

Plaintiffs alleged that they worked with and communicated with other manual laborers, including those later promoted to a "lead" position, "with knowledge of the existence of Collective Members' status as Defendants' employees, improper time reduction scheme, minimum wage and overtime violations, as well as the other statutory violations discussed" in the Complaint.  (*Id.*)  Plaintiffs allege that other employees similarly situated to Plaintiffs who work for Defendants in a similar capacity are not paid minimum wage and overtime at the rate of one and one-half times their regular rate for all hours worked during the week.  (*Id.*)  The Complaint asserts that Plaintiffs are representative of the putative collective members because they performed similar job duties, "were subjected to the same company-wide time reduction scheme and wage deductions, and were similarly subjected to wages below the minimum wage requirement on the basis of uniform company policies and practices."  (*Id.* ¶ 55.)  Similarly, the Complaint alleges that the putative collective members were not and are not exempt from receiving minimum wage or overtime pay under the Fair Labor Standards Act ("FLSA").  (*Id.* ¶ 60.)

Turning to the Minnesota class allegations, the Complaint defines the "Minnesota Class" as "[a]ll current and former non-exempt workers employed by Defendants in Minnesota at any time starting three years prior to the filing of this Complaint through the present." (*Id.* ¶ 69.) As to numerosity, the Complaint alleges that the number of members in the putative Minnesota class is believed to exceed forty. (*Id.* ¶ 70.) As to typicality, the Complaint asserts that Plaintiffs' claims are typical of the putative Minnesota class because Plaintiffs were subject to Defendants' uniform policies and compensated in the same manner. (*Id.* ¶ 71.) As to adequacy, the Complaint asserts that Plaintiffs will "fairly and adequately protect the interests of the Minnesota Class because it is in their interest to effectively prosecute the claims herein alleged in order to obtain the unpaid wages and penalties required under Minnesota law." (*Id.* ¶ 72.) As to commonality, the Complaint alleges various reasons why the common issues of fact and law predominate over any individual questions in this case. (*Id.* ¶¶ 73-74.) Finally, the Complaint alleges that a class action is superior relative to other means. (*Id.* ¶¶ 75-77.)

The Complaint sets forth four causes of action, comprising ten separate counts alleging violations of state and federal wage-and-hour laws and recordkeeping requirements. (*Id.* ¶¶ 78-180.)

Plaintiffs' First Cause of Action is comprised of two counts arising under the FLSA. (*Id.* ¶¶ 78-99.) Count I alleges that Defendants violated the FLSA by failing to compensate Plaintiffs and the putative collective for all hours worked, failing to pay the legally mandated overtime premium for such work, and failing to provide compensation that is free of deductions. (*Id.* ¶ 82.)

Count II alleges that Defendants violated the FLSA by failing to compensate Plaintiffs and the putative collective for all hours worked and by failing to pay the legally mandated minimum wage for such work. (*Id.* ¶ 92.) Specifically, Defendants allegedly "jointly enacted a scheme to dilute Plaintiffs' and the Collective Members' regular hourly rates of pay below the minimum wage by improperly deducting 'expenses' from the workers' wages, as well as fabricating, underreporting or otherwise artificially reducing the total hours reported worked by Plaintiffs and the Collective Members." (*Id.* ¶ 93.) The Complaint asserts that Defendants jointly have not paid and continue to refuse to pay Plaintiffs and the putative collective minimum wage. (*Id.* ¶ 95.)

The Second Cause of Action consists of five counts arising under the Minnesota Fair Labor Standards Act ("MFLSA"). (*Id.* ¶¶ 100-149.) Count I alleges that Plaintiffs and the putative Minnesota class members are not compensated at least at the Minnesota minimum wage rate for all hours worked. (*Id.* ¶ 103.) According to the Complaint, Defendants "willfully fail to pay minimum wages" with their compensation policies and practices. (*Id.* ¶ 109.) Defendants allegedly dilute hourly rates of pay below the minimum wage by improperly deducting expenses from wages, as well as fabricating, underreporting, or otherwise falsely reducing the total hours reported that Plaintiffs and the putative Minnesota class members work. (*Id.*) The Complaint alleges that "[w]hen the remuneration received by Plaintiffs and putative Class members is reduced by unreimbursed out-of-pocket expenses, and then divided by the actual hours worked, Plaintiffs and putative Class members are frequently compensated below the statutory minimum." (*Id.*)

Count II alleges that Defendants violated the MFLSA by willfully failing to pay Plaintiffs and the putative Minnesota class members overtime wages for work performed in excess of 48 hours per week. (*Id.* ¶¶ 113-127.) It alleges that Defendants' "jointly enacted scheme of artificially reducing Plaintiffs and the Minnesota Class Members' reported working hours and failing to account for Plaintiffs and Minnesota Class Members' off-the-clock work had the effect of depriving Plaintiffs and Minnesota Class Members of overtime compensation for all hours worked beyond 48 in a work week." (*Id.* ¶ 116.)

Count III alleges that Defendants violated the MFLSA by failing to reimburse Plaintiffs and putative Minnesota class members for business expenses including food, lodging, and travel while working on work sites. (*Id.* ¶¶ 129-131.)

Count IV alleges that Defendants jointly violated the MFLSA by failing to provide the transaction history showing all deductions to payroll card accounts. (*Id.* ¶ 135.) Defendants allegedly fail to identify the hours they are deducting from time records and the accompanying deduction of wages earned and require Plaintiffs and putative Minnesota class members to pay a fee to access their wage statements. (*Id.*)

Count V alleges that Defendants violated the MFLSA by failing to maintain accurate payroll records for Plaintiffs and the putative Minnesota class members. (*Id.* ¶ 140.) The Complaint alleges that "Defendants jointly violate Minn. Stat. § 177.30 by failing to accurately make and keep a record of the hours actually worked by Plaintiffs and the putative Minnesota Class Members. Instead, Defendants record inaccurate and artificially reduced hours worked by Plaintiffs and putative Minnesota Class Members."

(*Id.* ¶ 142.)  Additionally, the payroll records allegedly inaccurately portray actual hours worked and the actual rate of pay.  (*Id.* ¶ 147.)

The Third Cause of Action is made up of a single count named "Failure to Pay for All Hours Worked Under Minnesota Law."  (*Id.* ¶¶ 150-162.)  The Complaint alleges that "Defendants willfully engaged and continue to engage in a policy and practice of not compensating Plaintiffs and putative Class members for all hours worked or spent in their control."  (*Id.* ¶ 151.)  Plaintiffs and the putative Minnesota class members allegedly work shifts exceeding 12 hours, yet Defendants allegedly falsify and fabricate time records indicating they work fewer than the actual number of hours worked per shift.  (*Id.* ¶ 152.)  Further, the Complaint cites to various Minnesota statutes and rules the Defendants allegedly violated in connection with unpaid wages.  (*Id.* ¶¶ 153-159.)

The Fourth Cause of Action consists of two counts and relates to the Minnesota Payment of Wages Act ("MPWA").  (*Id.* ¶¶ 163-180.)  Count I alleges that Defendants violated and continue to violate the MPWA by "failing to pay any wage whatsoever to Plaintiffs and putative Minnesota Class members when they work off-the-clock, are deprived of correct overtime compensation, or are subjected to improper deductions of wages."  (*Id.* ¶ 171.)  Additionally, Defendants allegedly require Plaintiffs and putative Minnesota Class members to pay out-of-pocket for work expenses and fail to fully reimburse them for those expenses.  (*Id.*)  Count II alleges that Defendants willfully violated the MPWA by failing to provide freely accessible wage statements in a timely manner.  (*Id.* ¶¶ 176-177.)

Plaintiffs seek several forms of relief, including declarations that Defendants' pay practices violate the FLSA and Minnesota wage laws, reimbursement of business-related expenses, unpaid wages and liquidated damages, civil penalties, and litigation costs, expenses, and attorneys' fees.  (*Id.* at 43-44.)

On September 30, 2019, Defendants filed their Partial Motion to Dismiss pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure.  (Dkt. 33.)  The Court heard oral argument on the Motion on November 11, 2019, and took the Motion under advisement.  (Dkt. 46.)  On February 6, 2020, One Source filed a letter submitting supplemental authority in support of Defendants' Partial Motion to Dismiss.  (Dkt. 52.)  Plaintiffs have also filed four Notices of Filing of Consent to Join Collective Action.  (Dkts. 25, 53, 54, 55.)

## II.   <u>LEGAL STANDARD</u>

### A.   **Rule 12(b)(2) Standard**

 "To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that personal jurisdiction exists, which is accomplished by pleading sufficient facts 'to support a reasonable inference that the defendant[] can be subjected to jurisdiction within the state.'"  *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011) (quoting *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004)) (alteration in original).  Although the evidentiary standard is "minimal," the "showing must be tested, not by the pleadings alone, but by the affidavits and exhibits' supporting or opposing the motion."  *Id.* at 592 (quoting *Dever*, 380 F.3d at 1072).  "The plaintiff bears the burden of proof on the issue of personal jurisdiction, and

must establish jurisdiction by a preponderance of the evidence at trial or when the court holds an evidentiary hearing." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (citing *Dakota Indus., Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384, 1387 (8th Cir. 1991)). But the Court must "view the evidence in the light most favorable to the plaintiff and resolve all factual conflicts in the plaintiff's favor." *Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996). Accordingly, "the action should not be dismissed for lack of jurisdiction if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper." *Creative Calling Sols.*, 799 F.3d at 979.

"A district court may exercise specific jurisdiction over an out-of-state defendant only to the extent permitted by the state's long-arm statute and the Constitution's due process clause." *Federated Mut. Ins. Co. v. FedNat Holding Co.*, 928 F.3d 718, 720 (8th Cir. 2019) (citing *Coen v. Coen*, 509 F.3d 900, 905 (8th Cir. 2007)). "Because Minnesota's long-arm statute extends as far as the Constitution allows," the only issue is whether the exercise of personal jurisdiction comports with due process. *Id.* A court may exercise personal jurisdiction over litigating parties either under a theory of specific or general jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

Regardless of which analysis is used, the Eighth Circuit employs "a five-factor test to determine whether asserting personal jurisdiction over a party comports with due process: (1) the nature and quality of the contacts with the forum state; (2) the quantity of those contacts; (3) the relationship of those contacts with the cause of action; (4) [the

forum state's] interest in providing a forum for its residents; and (5) the convenience or inconvenience to the parties." *Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1136 (8th Cir. 2015) (quoting *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 911 (8th Cir. 2012)). "Although 'the first three factors are primary factors, and the remaining two are secondary factors,' [the Court] look[s] at all of the factors and the totality of the circumstances in deciding whether personal jurisdiction exists." *K-V Pharm.*, 648 F.3d at 592-93 (quoting *Johnson v. Arden*, 614 F.3d 785, 794 (8th Cir. 2010)).

## B.     Rule 12(b)(6) Standard

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the pleadings are construed in the light most favorable to the non-moving party, and the facts alleged in the complaints must be taken as true. *See Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). In addition, when deciding a Rule 12(b)(6) motion, a court must afford the plaintiff all reasonable inferences from those allegations. *See Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). At the same time, to withstand a motion to dismiss under Rule 12(b)(6), litigants must properly plead their claims under Federal Rule of Civil Procedure 8.

Under Rule 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "This short and plain statement must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Gomez v. Wells Fargo Bank, N.A.*, 676 F.3d 655, 666 (8th Cir. 2012) (cleaned up). The pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an

unadorned, the-defendant-unlawfully-harmed-me-accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[T]he plausibility standard, which requires a federal court complaint to 'state a claim for relief that is plausible on its face, . . . asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Ritchie v. St. Louis Jewish Light*, 630 F.3d 713, 717 (8th Cir. 2011) (internal quotation and citation omitted). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

Following *Twombly* and consistent with *Iqbal*, the Eighth Circuit explained:

While a plaintiff need not set forth "detailed factual allegations," or "specific facts" that describe the evidence to be presented, the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," and it need not "conjure up unpled allegations" to save a complaint.

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) (citations and internal quotation marks omitted).

While matters "outside the pleadings" may not be considered in deciding a Rule 12(b)(6) motion to dismiss, documents "necessarily embraced by the complaint are not matters outside the pleading." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017). Thus, while courts primarily consider the allegations in the complaint in determining whether to grant a Rule 12(b)(6) motion, courts additionally consider matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned, without converting the motion into one for summary judgment. *Id.*; *see also Miller v. Redwood Toxicology Lab, Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012).

## III.   DEFENDANTS' PARTIAL MOTION TO DISMISS

Defendants move to dismiss (1) the claims of any putative collective plaintiffs who did not work in Minnesota for lack of personal jurisdiction (general and specific); (2) Plaintiffs' federal collective claims for failure to state a claim (as a whole and, alternatively, as to employees outside Minnesota); (3) Plaintiffs' state and federal minimum wage claims for failure to state a claim; and (4) Plaintiffs' state and federal recordkeeping claims for failure to state a claim. (Dkt. 33.) The Court first considers the issue of personal jurisdiction before turning to Defendants' Rule 12(b)(6) arguments.

A.    **Personal Jurisdiction**

Defendants argue that this Court does not have personal jurisdiction over One Source and BluSky with respect to claims that do not have a connection to Minnesota. (Dkt. 35 at 2.)

1.    **General Jurisdiction**

The Court first addresses whether it has general jurisdiction over One Source and BluSky. In Defendants' Partial Motion to Dismiss, they argue that Plaintiffs cannot establish that Defendants are "at home" in Minnesota, and therefore, this Court lacks general jurisdiction over Plaintiffs' claims. (Dkt. 35 at 12.) Defendants offer evidence that One Source does not have an office, a permanent location, or permanent employees in Minnesota and that the restoration job described in the Complaint (the "Minnesota Project") is the only project that One Source and BluSky have ever collaborated on in Minnesota. (Dkt. 36 ¶¶ 4-5.) In their response, Plaintiffs first argue that BluSky consented to general jurisdiction in Minnesota by: (1) registering an agent for service in Minnesota; and (2) registering with the Minnesota Secretary of State ("SOS") to conduct business in Minnesota. (Dkt. 41 at 6.) Next, Plaintiffs argue that One Source (1) waived any jurisdictional challenge by generally appearing in the case and (2) availed itself of the privilege of conducting activities in Minnesota because it knowingly sent its employees to work in Minnesota. (Dkt. 41 at 8, 10.) In their reply, Defendants maintain that Plaintiffs have failed to demonstrate that this is an "exceptional case" in which Defendants' contacts with Minnesota render them "at home" in this forum. (Dkt. 45 at 1-2.) Defendants also contend that their appearances do not waive personal jurisdiction

16

challenges and that BluSky did not consent to general jurisdiction in Minnesota.  (*Id.* at 3, 6.)

>    a.    **Legal Principles**

 "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 317 (1945)).

>    In *Daimler AG v. Bauman*, the U.S. Supreme Court recognized:

>    [O]nly a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there . . . .  [F]or a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home. With respect to a corporation, the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction.  Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable.  These bases afford plaintiffs recourse to at least one clear and certain forum in which a corporate defendant may be sued on any and all claims.

571 U.S. 117, 137 (2014) (internal quotations, punctuation, and citations omitted).

>    However, the Supreme Court was clear that it "did not hold that a corporation may be subject to general jurisdiction **only** in a forum where it is incorporated or has its principal place of business; it simply typed those places paradigm all-purpose forums." *Id.*  Nevertheless, the Supreme Court declined to approve the exercise of general jurisdiction in every state in which a corporation "engages in a substantial, continuous, and systematic course of business," describing that approach as "'unacceptably

grasping.'" *Id.* at 138. The general jurisdiction inquiry "is not whether a foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic, it is whether that corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." *Id.* at 138-39 (cleaned up). Only in an "exceptional case" could a "corporation's operations in a forum other than its formal place of incorporation or principal place of business [ ] be so substantial and of such a nature as to render the corporation at home in that State." *Id.* at 139 n.19.

The Supreme Court, however, has recognized that personal jurisdiction can be waived in various ways. *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982) ("Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived."). For example, "the Court has upheld state procedures which find constructive consent to the personal jurisdiction of the state court in the voluntary use of certain state procedures." *Id.* at 704 (citing *Adam v. Saenger*, 303 U.S. 59, 67-68 (1938)).

Under Minnesota's Foreign Corporation Act, "[n]o foreign corporation shall transact business in this state unless it holds a certificate of authority so to do." Minn. Stat. § 303.03. Additionally, a foreign corporation is required to "have a registered office and . . . a registered agent." Minn. Stat. § 303.10. A foreign corporation must set forth that it "**irrevocably consents** to the service of process," Minn. Stat § 303.06(4) (emphasis added), and "shall be subject to service of process . . . by service on its registered agent . . . ," Minn. Stat. § 303.13. Once a foreign corporation has satisfied all

requirements, the Minnesota Secretary of State will issue a certificate of authority to

transact business in Minnesota. *See id.* § 303.08. With a certificate of authority, "the

corporation shall possess . . . the same rights and privileges that a domestic corporation

would possess if organized for the purposes set forth in the articles of incorporation of

such foreign corporation pursuant to which its certificate of authority is issued, and shall

be subject to the laws of [Minnesota]." *Id.* § 303.09.

When faced with determining whether a foreign corporation irrevocably consents

to service of process and to personal jurisdiction by registering as an agent in Minnesota,

the Minnesota Supreme Court held that:

> It is the legislature's province to assess the burden on the state's business
> climate of the assertion of jurisdiction by Minnesota courts. For our part, we
> find no constitutional defect in the assertion of jurisdiction based on consent
> to service of process . . . . We consider the consent of the defendant to service
> of process, exacted as a condition of doing business in Minnesota, to be one
> of the time-honored bases of personal jurisdiction and not constitutionally
> suspect.

*Rykoff-Sexton, Inc. v. Am. Appraisal Assocs., Inc.*, 469 N.W.2d 88, 90-91 (Minn. 1991)

(internal quotations and citations omitted).

Along the same lines, the Eighth Circuit has recognized that "[o]ne of the most

solidly established ways of giving such consent [to the exercise of jurisdiction] is to

designate an agent for service of process within the State." *Knowlton v. Allied Van Lines*,

900 F.2d 1196, 1199 (8th Cir. 1990). In *Knowlton*, the Eighth Circuit found, consistent

with the Minnesota Supreme Court's interpretation of the relevant statutes, that a foreign

corporation had consented to the exercise of jurisdiction by the District of Minnesota by

designating an agent for service of process in Minnesota. 900 F.2d at 1199-200. The

plaintiff was a Minnesota resident and was driving through Iowa when her car collided with a van operated by an agent of the corporate defendant. *Id.* at 1197. Although the corporate defendant was incorporated in Delaware and headquartered in Illinois, it did business in Minnesota and had appointed a registered agent in Minnesota to receive process pursuant to Minn. Stat. § 303.10. *Id.* at 1197-98. The Eighth Circuit "conclude[d] that appointment of an agent for service of process under § 303.10 gives consent to the jurisdiction of Minnesota courts for **any** cause of action, whether or not arising out of activities within the state." *Id.* at 1200 (emphasis added). Indeed, consent under Minn. Stat. § 303.10 "is a valid basis of personal jurisdiction, and resort to minimum-contacts or due process analysis to justify the jurisdiction [wa]s unnecessary." *Id.* The court recognized that while some statutes are limited to in-state activities, Minnesota's law does not provide such limitation. *Id.* The court explained that "[t]he whole purpose of requiring designation of an agent for service is to make a nonresident suable in the local courts." *Id.* at 1199.

The Court recognizes that the decisions in *Rykoff-Sexton* and *Knowlton* precede the Supreme Court's decisions in *Goodyear* and *Daimler*. The question of whether a foreign entity's designation of an agent for service of process under Minnesota's Foreign Corporation Act constitutes consent to the exercise of jurisdiction by Minnesota courts in view of *Daimler* and *Goodyear* has been considered three times by courts in the District of Minnesota. *See Am. Dairy Queen Corp. v. W.B. Mason Co., Inc.*, No. 18-cv-693 (SRN/ECW), 2019 WL 135699 (D. Minn. Jan. 8, 2019); *Ritchie Capital Mgmt., Ltd. v. Costco Wholesale Corp.*, No. 17-cv-1664 (DWF/FLN), 2017 WL 4990520 (D. Minn.

Oct. 30, 2017); *Ally Bank v. Lenox Fin. Mortg. Corp.*, No. 16-cv-2387 (DSD/DTS), 2017

WL 830391 (D. Minn. Mar. 2, 2017).  In all three instances, the court concluded that

*Knowlton* remains controlling authority.  *See, e.g.*, *Am. Dairy Queen*, 2019 WL 135699,

at *6 ("The Court finds that, although persuasive arguments can be made that the holding

of *Knowlton* is not reconcilable with the narrowing of the boundaries of due process that

govern an analysis of minimum contacts and general personal jurisdiction under

*Goodyear* and *Daimler*, this Court nonetheless remains bound by *Knowlton* which is

controlling in this case.  The Supreme Court in *Goodyear* and *Daimler* did not consider

'the limits of a defendant's capacity to consent to general personal jurisdiction.'  It is for

the Supreme Court to address consent by registration statutes in light of its new

jurisprudence on general personal jurisdiction and/or for the Eighth Circuit to reconsider

*Knowlton* in light of this changing view of the law.") (quoting *Ally Bank*, 2017 WL

830391, at *3); *Ritchie Capital Mgmt.*, 2017 WL 4990520 at *2 n.2 ("Costco does not

dispute that Eighth Circuit precedent dictates this result.  Instead, Costco contends that

recent Supreme Court precedent overrules *Knowlton*.  Costco cites *BNSF Ry. Co. v.

Tyrrell*, but the Supreme Court in *BNSF* explicitly declined to consider whether BNSF

consented to jurisdiction by operating in the state because that issue was not argued to the

lower court.  Thus, *BNSF* does not overrule *Knowlton*.")[3]; *Ally Bank*, 2017 WL 830391,

---

[3]      In *BNSF*, the Supreme Court applied *Daimler* and *Goodyear* when deciding that
Montana courts could not exercise general jurisdiction over BNSF, which was not
incorporated in Montana and whose principal place of business was not in Montana.  137
S. Ct. at 1558-60.

at *3 ("Lenox next argues that *Knowlton* should be limited in light of *Daimler AG v. Bauman*, 134. S. Ct. 746 (2014). . . . *Daimler*, however, is inapplicable here. The *Daimler* court addressed the limits of general jurisdiction over a foreign corporation, not the limits of a defendant's capacity to consent to personal jurisdiction. Therefore, the court remains bound by *Knowlton*.") (citation omitted).

> As explained in *American Dairy Queen*:
>
> As *Knowlton* makes clear, consent is an independent basis for jurisdiction, wholly separate from the due process considerations that govern an analysis of minimum contacts. **A company that could not otherwise be subject to the general personal jurisdiction of this Court, because it lacks systematic and continuous contacts and cannot be said to be "at home" in this forum, may nonetheless consent to jurisdiction in the forum**. *Knowlton* has been good law since 1991, alerting any foreign corporation who registers under Minn. Stat. § 303, that by doing so, they are consenting to general personal jurisdiction in the forum.

2019 WL 135699, at *6 (emphasis added).

The Court finds the opinions in *American Dairy Queen*, *Ally Bank*, and *Ritchie Capital Management* to be well-reasoned. While "persuasive arguments can be made that the holding of *Knowlton* is not reconcilable with the narrowing of the boundaries of due process that govern an analysis of minimum contacts and general personal jurisdiction under *Goodyear* and *Daimler*, this Court nonetheless remains bound by *Knowlton* which is controlling in this case." *Id.* The Court therefore applies *Knowlton* to the question of whether BluSky's registration with the Minnesota Secretary of State and appointment of an agent for service of process constituted consent to the exercise of jurisdiction by Minnesota courts.

### b.    Whether BluSky Consented to the Exercise of Jurisdiction by Minnesota Courts

Here, the record establishes that BluSky registered with the Minnesota Secretary of State and appointed an agent for service of process.  (Dkt. 1 at 5-6; Dkt. 42 ¶ 4; Dkt. 42-1, Exs. 1-2.)[4]  On February 8, 2017, BluSky filed a Certificate of Authority to Transact Business in Minnesota pursuant to Minnesota Statute, Chapter 322C.  (Dkt. 42-1 at 2.)  It also appears BluSky was personally served with process on its registered agent in Edina, Minnesota.  (Dkt. 27.)  Defendants contend that "[t]here is no binding precedent in the Eighth Circuit or Minnesota since *Daimler* and *Goodyear* on whether registering to do business or registering an agent for service constitutes consent for personal jurisdiction.[5]  (Dkt. 45 at 7.)  As explained above, the Court finds that *Knowlton* remains controlling authority on this Court.  Thus, the Court finds that BluSky consented to the exercise of jurisdiction by this Court by registering with the Minnesota Secretary of State and by appointing an agent for service of process.[6]  The Court therefore recommends

---

[4]    As to One Source, Plaintiffs concede that One Source has not appointed an agent for receipt of process within Minnesota.  (Dkt. 41 at 11.)

[5]    Defendants argue that Plaintiffs do not allege "consent" as a basis for personal jurisdiction over BluSky in their Complaint and rather allege that Defendants have the requisite contacts with Minnesota through conducting business activities in Minnesota. (Dkt. 45 at 6.)  They cite no case, however, where the failure to allege consent in a complaint consisted a waiver of the argument that a defendant had in fact consented to the exercise of jurisdiction, and the Court declines to find waiver here.

[6]    "Typically, the constitutional analysis for personal jurisdiction involves determining whether a defendant has 'minimum contacts' with the forum state.  **But if a defendant consents to jurisdiction, then the minimum-contacts analysis is unnecessary**." *Ritchie Capital Mgmt.*, 2017 WL 4990520, at *2 (citing *Knowlton*, 900

denial of the Partial Motion to Dismiss to the extent it seeks dismissal of the claims of any putative FLSA collective plaintiffs against BluSky who did not work in Minnesota based on lack of personal jurisdiction.

### c.    Whether One Source Waived Its Personal Jurisdiction Defense

Next, the Court turns to whether One Source waived its personal jurisdiction defense.  In their response to Defendants' Partial Motion to Dismiss, Plaintiffs argue that One Source voluntarily consented to this Court's jurisdiction by generally appearing in the case before filing its Partial Motion to Dismiss.  (Dkt. 41 at 8-9.)  In particular, they argue that One Source's counsel "filed a general appearance on behalf of Defendant Labor Source, stipulated to extend Defendant Labor Source's time to answer the lawsuit, and filed a Rule 7.1 disclosure statement."  (*Id.* at 9-10 (citing Dkts. 14, 15, 24).)  Additionally, Plaintiffs assert that One Source did not specify its intention to challenge personal jurisdiction in any of its appearances before filing the Partial Motion to Dismiss.  (*Id.* at 10.)  In their reply, Defendants argue that the Federal Rules of Civil Procedure have abolished the distinction between general and special appearances and thus, they preserved their right to challenge personal jurisdiction.  (Dkt. 45 at 4.)

Under Federal Rule of Civil Procedure 12(b), a party may assert a defense of lack of personal jurisdiction by motion "before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b).  The defense of lack of personal jurisdiction is waived if not made by motion or included in a responsive pleading.  *See* Fed. R. Civ. P. 12(h); *see also Willis*

---

F.2d at 1199) (emphasis added).  Having found BluSky consented to jurisdiction, the Court does not reach the minimum-contacts analysis for BluSky.

*v. Tarasen*, 2005 WL 1705839, at *3 (D. Minn. July 11, 2005) (citing Fed. R. Civ. P.

12(h)) ("Rule 12 contemplates the lodging of certain defenses at the earliest point in a

lawsuit, and mandates a waiver of those defenses if not presented at the first available

opportunity.").  However, "[t]his defense 'may be lost by failure to assert it seasonably,

by formal submission in a cause, or by submission through conduct.'"  *Yeldell v. Tutt*,

913 F.2d 533, 539 (8th Cir. 1990) (quoting *Neirbo Co. v. Bethlehem Shipbuilding Corp.*,

308 U.S. 165, 168 (1939)).

Here, One Source's counsel filed a Notice of Appearance on behalf of One Source

(Dkt. 14), stipulated to extend One Source's time to answer the lawsuit (Dkt. 15), and

filed a Rule 7.1 disclosure statement (Dkt. 24).  Plaintiffs rely on several cases in support

of their argument that this conduct waived One Source's personal jurisdiction defense.

(Dkt. 41 at 9-10 (citing *Nationwide Eng'g & Control Sys., Inc. v. Thomas*, 837 F.2d 345

(8th Cir. 1988), *Gerber v. Riordan*, 649 F.3d 514 (6th Cir. 2011), *Carlson v. Hyundai

Motor Co.*, 164 F.3d 1160 (8th Cir. 1999), and *Hines v. Green Tree Servicing, LLC*, 554

F. App'x 534 (8th Cir. 2014).)  However, these cases are distinguishable from the

circumstances in the present case.

First, relying on *Nationwide Engineering*, Plaintiffs assert that "[i]f the appearing

party discloses a purpose that goes beyond challenging the jurisdiction of the court over

the subject matters of the parties, the appearance will be considered general, and all

jurisdictional challenges will be deemed waived."  (Dkt. 41 at 9.)  However, in

*Nationwide Engineering*, the Eighth Circuit considered whether the defendants'

appearance in Iowa state court prior to removal to federal court constituted a "general

appearance" **under Iowa law**, such that the defendants failed to preserve any personal jurisdiction defense while in state court and therefore could not assert it in federal court following removal. 837 F.2d at 347-48. Accordingly, Plaintiffs' reliance on *Nationwide Engineering* is unpersuasive.[7]

In *Gerber*, the Sixth Circuit found that "Defendants' filing of a general appearance with the district court constituted a voluntary acceptance of the district court's jurisdiction." 649 F.3d at 520. *Gerber* is not binding on the Court. Moreover, the Sixth Circuit later emphasized that, notwithstanding the *Gerber* decision, a "written appearance filed by [defendant's] counsel one month before [defendant] moved for dismissal on the basis of lack of service does not constitute forfeiture," and explicitly rejected the notion that *Gerber* suggested otherwise. *See King v. Taylor*, 694 F.3d 650, 660 n.7 (6th Cir. 2012).

In *Carlson*, the plaintiff argued that the district court erred in dismissing a Korean defendant because the Korean defendant was never served and thus the court lacked personal jurisdiction to grant a judgment in its favor. 164 F.3d at 1163. The Eighth Circuit found the Korean defendant had waived the defense by voluntarily appearing in the district court and joining in other defendants' Rule 12(b)(6) motion "without contesting the court's personal jurisdiction, thereby waiving that issue." *Id.* Here, One

---

[7]    Moreover, the Eighth Circuit noted that the Iowa rule requiring a "special appearance" was "abolished" by the time the Eighth Circuit issued its decision in favor of new rules that, like the Federal Rules, permit the defense of lack of personal jurisdiction to be "asserted by pre-answer motion, in the answer, or in an amendment to the answer." *Nationwide Eng'g*, 837 F.2d 345, 347 & n.2 (8th Cir. 1988).

Source raised its personal jurisdiction defense in its Rule 12 motion.

As to *Hines*, Plaintiffs contend that the Eighth Circuit cited *Insurance Corp. of Ireland Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982), "for the proposition that an individual may submit to personal jurisdiction of court by making a general appearance."  (Dkt. 41 at 9.)  On the contrary, the Eighth Circuit cited *Insurance Corp. of Ireland* for the proposition  that an "individual may submit to personal jurisdiction of court by appearance," 554 F. App'x at 534, and said nothing about the concept of a "general appearance" or "special appearance" (likely because, as discussed below, the Federal Rules eliminated the concept of a "special appearance").

It is unclear whether Plaintiffs are contending that One Source waived its personal jurisdiction defense simply by filing a Notice of Appearance, or is relying on the Notice of Appearance in combination with the Stipulation for extension of time and Rule 7.1 Statement.  To the extent Plaintiff is relying solely on the Notice of Appearance because it was not a "special" appearance for purposes of challenging jurisdiction, the Eighth Circuit recognized shortly after the Federal Rules of Civil Procedure were enacted that:

> It is now generally held that the prior practice as to waiver was changed by these [new Rules of Civil Procedure] so that a defendant may without a special appearance join a plea of wrong venue . . . and preserve his right to raise the question of jurisdiction on appeal in event of an adverse ruling.

*Davis v. Ensign-Bickford Co.*, 139 F.2d 624, 627 (8th Cir. 1944) (citations omitted) (emphasis added).[8]

---

[8]    Although this quotation uses the word "venue," the contention rejected by the Eighth Circuit was "[t]hat the District Court had jurisdiction of the person of the defendant because it voluntarily entered its appearance in the case by moving to dismiss

As explained in Wright & Miller:

Prior to the federal rules, the practice was for counsel to appear specially for the purpose of objecting by motion to the jurisdiction of the court over the defendant or its property, venue of the action, or insufficient process or service of process; a failure to follow the correct procedure for doing so often resulted in a waiver of the defense. As many judicial opinions have made clear, it no longer is necessary to appear specially or employ any particular set of words to challenge a federal court's personal jurisdiction, venue, or service of process.

5B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* § 1344 (3d ed. 2008) (footnotes omitted). The Court rejects the argument that One Source's filing of a so-called "general" Notice of Appearance waived its jurisdictional defenses.

The Court therefore considers whether One Source waived its jurisdictional defense by the combination of entering an appearance, filing a stipulation to extend time to answer or otherwise respond to the complaint, and filing a Rule 7.1 statement. *See Ins. Corp. of Ireland*, 456 U.S. at 703 ("[R]egardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance. A variety of legal arrangements have been taken to represent express or implied consent to the personal jurisdiction of the court."). Here, the Court finds that these limited actions do not amount to a failure to seasonably submit the personal jurisdiction challenge to the Court or to "comply with the spirit of the rule, which is to expedite and simplify proceedings in the Federal Courts." *See Yeldell*, 913 F.2d at 539 (quotation marks omitted); *see also Willis*, 2005 WL 1705839, at *3 ("Having timely asserted his

---

the complaint, thereby waiving its objection to the jurisdiction of the court." 139 F.2d at 626-27.

insufficient process defense [in his answer, defendant did not] waive that defense by participating in the pretrial scheduling conference.").  Filing a stipulation to extend the time "answer, plead or otherwise respond to" a complaint is not a failure to seasonably submit a personal jurisdiction challenge to the Court, and the Rule 7.1 statement is required to be filed with a nongovernmental corporate party's first appearance.  Fed. R. Civ. P. 7.1.  Accordingly, the Court concludes that One Source did not waive its personal jurisdiction challenge.

### d.    One Source's Contacts with Minnesota

Next, the Court turns to whether One Source had sufficient minimum contacts in Minnesota that would allow this Court to exercise general jurisdiction over One Source. Defendants argue that "the project at issue in the Complaint is the only one Defendants have ever collaborated on in the state" and thus, they are not "at home" in Minnesota and general jurisdiction cannot serve as the basis for establishing personal jurisdiction.  (Dkt. 35 at 13.)  In their response, Plaintiffs contend that "[by] offering up its services to clients, including BluSky, to perform work in Minnesota, Labor Source held itself out as doing business in the state or otherwise offering its services for work to be done in Minnesota, albeit on a project-by-project basis."  (Dkt. 41 at 12.)  Plaintiffs also argue that while One Source is not incorporated in Minnesota and has not appointed an agent for receipt of process within Minnesota, other factors suggest One Source has consented to general jurisdiction in Minnesota.  (Dkt. 41 at 11.)[9]  In their reply, Defendants argue

---

[9]    In support of their argument that One Source availed itself of the privilege of conducting activities in Minnesota, Plaintiffs rely on a general jurisdiction standard from

that the contacts at issue in this case are significantly less than those found insufficient by the Supreme Court in *BNSF* when applying *Daimler* and *Goodyear* to the question of whether BNSF had sufficient minimum contacts with Montana to render it "at home" in that state and that Plaintiffs provide no support for finding such limited contacts are sufficient to render Defendants "at home" in Minnesota.  (Dkt. 45 at 2.)

Here, it is undisputed that One Source conducted at least some business in Minnesota.  (*See* Dkt. 36 ¶ 5.)  The Complaint alleges that "Defendants employ dozens, and potentially hundreds, of such employees who work in Minnesota, Illinois, Kansas, Texas, Florida, and elsewhere" (Dkt. 1 ¶ 52); that One Source contracted with BluSky to provide manual laborers for restoration projects in various work sites, including in Minnesota (*id.* ¶ 29); and that work in Minnesota was overseen by a "lead" boss employed by One Source (*id.* ¶ 31).  However, it is clear from *Daimler* that "doing business" in a state is not synonymous to being "at home" in the state.  571 U.S. at 139 n.20.  One Source is a Kansas limited liability company with its principal place of business in Kansas and no office, permanent location, or permanent employees in Minnesota.  (Dkt. 1 ¶¶ 18-19; Dkt. 36 ¶¶ 2, 4.)  The restoration job described in the Complaint is the only project that One Source and BluSky have ever collaborated on in Minnesota.  (Dkt. 36 ¶ 5.)  The record does not suggest that One Source's contacts with Minnesota are so continuous and systematic as to render it essentially at home in

_____

*Database America, Inc. v. Bellsouth Advertising & Publication Corp.*, 825 F. Supp. 1195, 1209 (D.N.J. 1993).  However, this decision predates the Supreme Court precedent in *Goodyear* and *Daimler*, and consequently is not persuasive.

Minnesota, nor is this an "exceptional case" where One Source's operations in Minnesota are so substantial and of such a nature to render One Source "at home" in Minnesota. *Daimler*, 571 at 139 & n.19. Accordingly, the Court finds that this Court may not exercise general jurisdiction over One Source.

### 2. Specific Jurisdiction Analysis

The Court next considers whether it has specific jurisdiction over One Source with respect to the claims of the non-Minnesota putative collective members.

"Specific jurisdiction is proper only if the injury giving rise to the lawsuit occurred within or had some connection to the forum state, meaning that the defendant purposely directed its activities at the forum state and the claim arose out of or relates to those activities." *Johnson v. Arden*, 614 F.3d 785, 795 (8th Cir. 2010) (quotation marks omitted). "The due process clause requires that 'the defendant purposefully established "minimum contacts" in the forum State.'" *Federated Mut. Ins.*, 928 F. 3d at 720 (quoting *Burger King*, 471 U.S. at 474). "Sufficient minimum contacts requires some act by which the defendant purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* (quoting *Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 821 (8th Cir. 2014)).

Defendants contend that the U.S. Supreme Court's holding in *Bristol-Myers Squibb Co. v. Superior Court of Cal., S.F. Cty.*, 137 S. Ct. 1773, 1780 (2017), precludes the Court from exercising specific jurisdiction over the FLSA claims of non-resident plaintiffs with respect to work performed outside Minnesota because "any collective member's claim based on work performed outside of Minnesota has no connection to this

forum." (Dkt. 35 at 15.) In response, Plaintiffs first argue that "[u]nlike *Bristol Myers*, the present case is a single federal lawsuit asserting a **federal** cause of action under the FLSA, which uniformly applies to all employers nationwide." (Dkt. 41 at 14 (citing 29 U.S.C. § 201 *et seq.*).) Plaintiffs also ask the Court to "adopt the reasoning in [*Knotts v. Nissan North America, Inc.*, 346 F. Supp. 3d 1310, 1333 (D. Minn. 2018)] and the majority of courts to address this issue, and hold that *Bristol Myers* does not operate to deprive putative FLSA collective members who worked for Defendants outside of Minnesota the opportunity of joining the suit prior to certification." (Dkt. 41 at 18.) Finally, Plaintiffs argue that finding otherwise "would be unworkable, . . . runs the risk of establishing incompatible standards of conduct for Defendants[,] . . . would also unduly burden the federal court system, would magnify the expenses to all parties, and would require numerous differing management schedules and discovery orders." (*Id.* at 16-17.) In their reply, Defendants reiterate that the holding in *Bristol-Myers* extends to FLSA claims and controls the Court's analysis of specific jurisdiction. (Dkt. 45 at 9.) Specifically, Defendants stress the differences between Rule 23 class actions and FLSA collective actions and argue that opt-in plaintiffs are similar to the plaintiffs in the mass tort action considered in *Bristol-Myers*, and therefore, this Court should follow its framework. (*Id.* at 9-12.)

In *Bristol-Myers*, over 600 plaintiffs brought eight separate lawsuits in California state court asserting that the drug Plavix, manufactured and sold by Bristol-Myers Squibb ("BMS"), injured them. *See* 137 S. Ct. at 1777. Only 86 of those plaintiffs were California residents, while the non-resident plaintiffs were from 33 other states. *Id.* at

1778.  The non-resident plaintiffs did not allege their injuries were connected to BMS's conduct in California.  *Id.*  BMS, which was incorporated in Delaware and headquartered in New York, contested the California courts' jurisdiction.  *Id.*  The California Supreme Court determined that California could constitutionally exercise specific jurisdiction over BMS using a "sliding-scale approach to specific jurisdiction."  *Id.*  Under the "sliding-scale" approach, "the more wide ranging the defendant's forum contacts, the more readily is shown a connection between the forum contacts and the claim."  *Id.* (internal citation and quotations omitted).  The California Supreme Court concluded that "BMS's extensive contacts" with California permitted the court to exercise specific jurisdiction over BMS due to the similarities between the claims of residents and non-residents, even though there was no claim that Plavix was designed or developed there.  *Id.* at 1779.

The U.S. Supreme Court reversed the California Supreme Court and found a lack of specific jurisdiction over the non-residents' claims.  *Id.* at 1781.  The U.S. Supreme Court concluded that "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'"  *Id.* (quoting *Goodyear*, 564 U.S. at 919).  The U.S. Supreme Court explained that:

> Under the California approach, the strength of the requisite connection between the forum and the specific claims at issue is relaxed if the defendant has extensive forum contacts that are unrelated to those claims.  Our cases provide no support for this approach, which resembles a loose and spurious form of general jurisdiction.  For specific jurisdiction, a defendant's general connections with the forum are not enough.

*Id.* Because the non-residents were not prescribed Plavix in California, did not purchase Plavix in California, did not ingest Plavix in California, and were not injured by Plavix in California, the U.S. Supreme Court found no connection between California, as the forum, and the specific claims at issue. *Id.*

Since *Bristol-Myers*, district courts have disagreed over whether its holding divests federal courts of personal jurisdiction in nationwide federal class or collective actions. Some district courts have dismissed putative FLSA collective claims of employees for failing to establish a connection between their claims and the forum state. *See, e.g.*, *Maclin v. Reliable Reports of Tex.*, 314 F. Supp. 3d 845, 850 (N.D. Ohio 2018) (finding that *Bristol-Myers* applies to FLSA claims and divests courts of specific jurisdiction over FLSA claims of non-resident plaintiffs); *Roy v. FedEx Ground Package Sys., Inc.*, 353 F. Supp. 3d 43, 56 (D. Mass. 2018) ("[T]he court concludes that *Bristol-Myers* applies to FLSA claims, in that it divests courts of specific jurisdiction over the FLSA claims of non-[Massachusetts employed] plaintiffs against [FedEx Ground].") (internal citation and quotations omitted); *Rafferty v. Denny's, Inc.*, 2019 WL 2924998, at *7 (N.D. Ohio July 8, 2019) (concluding that "exercising personal jurisdiction over Denny's for claims of any out-of-state putative collective member would violate due process").

Other district courts have chosen not to extend *Bristol-Myers* to federal class actions, *see, e.g.*, *Knotts v. Nissan N. Am., Inc.*, 346 F. Supp. 3d 1310, 1333 (D. Minn. 2018) (declining to extend *Bristol-Myers* to Rule 23 class actions); *Casso's Wellness Store & Gym, L.L.C. v. Spectrum Lab. Prods., Inc.*, No. 17-2161, 2018 WL 1377608, at

*5 (E.D. La. Mar. 19, 2018) (noting that other district courts have "declined to extend the

holding in *Bristol-Myers* to class actions" and highlighting the "material differences

between mass tort actions [like the claims in *Bristol-Myers*] and class actions");

*DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18,

2018) (concluding that extending *Bristol-Myers* to a class action was "a close question"

but ultimately dismissing the claims of the out-of-state plaintiff classes), or collective

actions, *see, e.g.*, *Swamy v. Title Source, Inc.*, 2017 WL 5196780, at *2 (N.D. Cal. Nov.

10, 2017) ("This order finds that *Bristol-Myers* does not apply to divest courts of personal

jurisdiction in FLSA collective actions."); *Garcia v. Peterson*, 319 F. Supp. 3d 863, 880

(S.D. Tex. 2018) (declining to extend the *Bristol-Myers* to analyze personal jurisdiction

with regards to each individual plaintiff to the FLSA collective action jurisdictional

analysis).

　　　　While the Eighth Circuit has not specifically addressed the impact of *Bristol-*

*Myers* on federal class action or collective action litigation, one court in this District has

applied *Bristol-Myers* in the context of an FLSA collective action.  *See Vallone v. CJS*

*Sols. Grp., LLC*, Civ. No. 19-1532 (PAM/DTS), 2020 WL 568889 (D. Minn. Feb. 5,

2020).[10]  In *Vallone*, U.S. Senior District Judge Paul A. Magnuson found:

> The weight of authority is that the strictures of [*Bristol-Myers*] apply in the
> FLSA conditional certification context.  Plaintiffs must establish that there is
> a connection between Minnesota and their individual claims against HCI.
> Here, that means that the Court has jurisdiction only over the claims of HCI
> workers who were assigned to the Mayo Clinic project or workers who are
> Minnesota residents.  To the extent that Plaintiffs seek certification of a

---

[10]　　　*Vallone* issued after the hearing on Defendants' Partial Motion to Dismiss.

collective action that involves individuals other than Mayo Clinic workers or Minnesota residents, that request must be denied.

2020 WL 568889, at *3.

Relying on *Knotts*, Plaintiffs argue this Court should not extend the holding in *Bristol-Myers* to this case because this District has declined to extend it in the context of Rule 23 class actions. *See Knotts*, 346 F. Supp. 3d at 1333. However, the present case is a FLSA collective action, not a Rule 23 class action. The decision in *Knotts* rested on the "meaningful differences" between certified class actions, supported by the due-process safeguards of Rule 23's requirements, and the mass tort action presented in *Bristol-Myers*. *Id.* at 1333-34 (citation omitted) ("Given these safeguards, due process concerns for the defendant in the class action context are far less compelling than in a mass tort such as BMS, where each joined plaintiff may make different claims requiring different responses."). *Knotts* did not address whether extending the decision in *Bristol-Myers* is appropriate in the context of an FLSA collective action.

"An FLSA 'collective action' differs from a class action under Federal Rule of Civil Procedure 23." *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1163 (D. Minn. 2007). Class action treatment requires additional due process standards for class certification under Rule 23 including an analysis of numerosity, commonality, typicality, adequacy of representation, predominance and superiority. *See Roy*, 353 F. Supp. 3d at 60. In a class action, a potential plaintiff's claim is automatically included in the case unless she expressly "opts out" of the class. *Parker*, 492 F. Supp. 2d at 1163. Conversely, joining a collective action requires an employee to opt into the action. 29

36

U.S.C. § 216(b); *see also Vallone*, 2020 WL 568889, at *3 (citing *Roy*, 353 F. Supp. 3d at 59-60) ("A FLSA collective action, which requires potential plaintiffs to opt in, is more analogous to the individual plaintiffs at issue in the BMS litigation than to members of a certified Rule 23 class who must affirmatively opt out of the litigation.").  Under the FLSA, parties seeking certification must only show they are "similarly situated."  29 U.S.C § 216(b).  While there are some due process protections in FLSA collective actions in the form of the certification process, those safeguards are "less stringent" than the safeguards established by Rule 23.  *See Roy*, 353 F. Supp. 3d at 60.  The Court concludes that an FLSA collective action is more analogous to the mass tort action of *Bristol-Myers* than a class action brought under Rule 23 for purposes of jurisdictional analysis.

Plaintiffs also attempt to distinguish the fact that *Bristol-Myers* was a state law mass tort case and the present case is a single federal lawsuit asserting a federal cause of action under the FLSA.  (Dkt. 41 at 14.)  Plaintiffs argue that extending *Bristol-Myers* to this case would be "unworkable" and essentially undermine federal law.  (Dkt. 41 at 16.).  Defendants reply that these concerns are "overstated" and that Plaintiffs can instead file nationwide collective actions in a state that can exercise jurisdiction over their employer.  (Dkt. 45. at 14.).  While at least one other district court has found this distinction persuasive, *Swamy*, 2017 WL 5196780, at *2, the Court concludes that this distinction is not a basis for finding that *Bristol-Myers* does not apply to FLSA collective actions.  In *Bristol-Myers*, the U.S. Supreme Court noted: "Our decision does not prevent the California and out-of-state plaintiffs from joining together in a consolidated action in the States that have general jurisdiction over BMS."  137 S. Ct. at 1783-84.  The same is true

here.  FLSA plaintiffs may avoid splintering a collective action by suing the defendant in a court that has general jurisdiction over the defendant.

Finally, Defendants argue that the question of personal jurisdiction is better resolved after the opt-in phase of a collective action rather than on a motion to dismiss. (Dkt. 41 at 13 n.5.)  While *Vallone* addressed the impact of *Bristol-Myers* at conditional certification (no Rule 12 motions were brought), 2020 WL 568889 at *2, the majority of courts that have addressed this issue have done so on a Rule 12 motion, *see, e.g.*, *Maclin*, 314 F. Supp. 3d at 848-51; *Roy*, 353 F. Supp. 3d at 52-62; *Rafferty*, 2019 WL 2924998, at *2; *DeBernardis*, 2018 WL 461228, at *1-2.  At the hearing, Plaintiffs conceded that they were not aware of any cases where a court waited until the opt-in process was complete to decide the question of personal jurisdiction.  Because the threshold issue of personal jurisdiction has been raised and fully briefed, and in view of the lack of authority requiring delay until the opt-in process is complete, the Court will not postpone its decision until the opt-in phase.

For all of these reasons, the Court concludes that under the "settled principles regarding specific jurisdiction" expressed in *Bristol-Myers*, Plaintiffs must show that there is a connection between Minnesota and their individual claims against One Source for the Court to exercise specific jurisdiction over One Source with respect to those claims.  The Court therefore recommends granting the Partial Motion to Dismiss to the extent it seeks dismissal of the claims of any putative FLSA collective plaintiffs against One Source who did not work in Minnesota based on lack of personal jurisdiction.

**B.    Failure to State a Claim**

Defendants argue that several of Plaintiffs' claims must be dismissed under Rule 12(b)(6).  They seek dismissal of "Plaintiffs' collective claims for failure to state a claim (as a whole and, alternatively, as to employees outside Minnesota)."  (Dkt. 35 at 1.) Defendants also contend that "Plaintiffs' allegations for violations of the minimum wage provisions of the FLSA and MFLSA are bereft of any factual content allowing an inference that Plaintiffs were actually paid less than the federal or state minimum wage in any workweek" and "Plaintiffs' allegations of purported recordkeeping violations fail to state a viable claim under either the FLSA or MFLSA."  (*Id.* at 17-18.)  The Court addresses each in turn.

**1.    Plaintiffs' Collective Claims**

Defendants' argument that Plaintiffs' collective claims cannot withstand dismissal under Rule 12(b)(6) is two-fold.  First, Defendants argue that the definition of the Collective provides no insight on whether the proposed collective members are similarly situated to Plaintiffs, thus depriving Defendants of "fair notice" of the case they must defend against.  (Dkt. 35 at 18, 19-20.)  Second, Defendants argue that Plaintiffs fail to allege facts that would permit the Court to infer that there are any similarly situated employees outside Minnesota.  (*Id.* at 18, 21-22.)  In their response, Plaintiffs first argue that the collective member's nationwide scope does not impede the "precision" with which the Collective is defined (Dkt. 41 at 20-21) and that Plaintiffs are not required to define the collective members with specificity by reference to job titles, duties, or descriptions (*id.* at 22-23).  Plaintiffs also contend that the Complaint alleges facts

justifying extension of the Collective beyond Minnesota.  (*Id.* at 23-26.)  In addition, Plaintiffs contend that their proposed Collective includes non-exempt workers employed by either Defendant, not just jointly employed by Defendants.  (*Id.* at 21-22.)  In their reply, Defendants argue that Plaintiffs' nationwide Collective of all non-exempt employees is facially deficient (Dkt. 45 at 16), that Plaintiffs fail to allege facts to support a nationwide class (*id.* at 18), and that Plaintiffs' collective claims must be dismissed to the extent the proposed Collective extends beyond non-exempt manual laborers working on the project managed by both Defendants in Minnesota (*id.* at 20).  The Court first addresses Defendants' arguments with respect to Plaintiffs' collective claims generally before turning to the sufficiency of the allegations with respect to projects outside Minnesota.

> **a.    Plaintiffs Have Not Stated a Plausible Claim for Relief as to the Proposed Collective and the Collective Claims Do Not Provide Fair Notice to Defendants**

The FLSA permits a plaintiff to bring a lawsuit "against any employer . . . on behalf of himself . . . and other employees similarly situated."  29 U.S.C. § 216(b).  "The term 'similarly situated' is not defined by the FLSA, but it 'typically requires a showing that an employer's commonly applied decision, policy, or plan similarly affects the potential class members, and inflicts a common injury on plaintiffs and the putative class.'"  *Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075, 1083 (D. Minn. 2014) (quoting *Keef v. M.A. Mortenson Co.*, No. 07-cv-3915 (JMR/FLN), 2008 WL 3166302, at *2 (D. Minn. Aug. 4, 2008)).  "[W]here a plaintiff brings an FLSA claim for and on behalf of himself . . . and other employees similarly situated,' the complaint should indicate who

those other employees are, and allege facts that would entitle them to relief." *Jones v. Casey's Gen. Stores*, 538 F. Supp. 2d 1094, 1102 (S.D. Iowa 2008) (cleaned up).

Here, the Complaint alleges: "Plaintiffs bring this collective and class action on behalf of themselves and other similarly situated individuals who have worked for [One Source], and [BluSky] as non-exempt Manual Laborers." (Dkt. 1 ¶ 1.) The "'Collective' of similarly situated Plaintiffs" defined in the Complaint is nowhere as limited as the first paragraph suggests; it defines the "Collective" as: "All current and former non-exempt workers employed by Defendants in the United States in the three years prior to filing this Complaint through the present." (Dkt. 1 ¶ 53.) At the hearing, Plaintiffs' counsel confirmed that the proposed Collective included all non-exempt employees, including a payroll specialist, a janitor, or someone working in an office.[11] (Dkt. 49 at 43:15-44:7.)

Plaintiffs contend this definition provides the "fair notice" required by Rule 8 because the Collective is defined "in terms so precise that Defendants can easily identify every single Collective member, without error and without needing additional

---

[11] Many of the allegations in the Complaint suggest that Plaintiffs intended a narrower collective that was limited to manual laborers. For example, the Complaint alleges that "[a]s manual laborers, Plaintiffs and the putative Class and Collective Members were and are non-exempt employees" (Dkt. 1 ¶ 2), "Plaintiffs sue on behalf of themselves and other similarly situated laborers who have worked and are currently working for Defendants" (*id.* ¶ 3), "[t]he national FLSA Collective ("Collective") . . . is comprised of all people who are or have been employed by Defendants as manual laborers" (*id.* ¶ 4), "[t]he Collective Members are all people who are or have been employed by Defendants as manual laborers in the United States within the Class Period" (*id.* ¶ 16), and Plaintiffs and collective members "perform manual labor services for Defendants, at various work sites for restoration projects" (*id.* ¶ 30). Nevertheless, the definition of the Collective, as confirmed by Plaintiffs' counsel at the hearing, is not limited to manual laborers.

41

information." (Dkt. 41 at 20.) According to Plaintiffs, this is because membership is tied to non-exempt status in the United States for the three years before the Complaint was filed to present. (*Id.*) Even if each such employee is identifiable, as explained below, there are no facts alleged in the Complaint from which the Court could reasonably infer that each such employee is "similarly situated" to Plaintiffs, and thus the collective claims do not state a plausible claim for relief.

The Complaint alleges that "Plaintiffs were both manual laborers." (Dkt. 1 ¶¶ 14-15.) The allegations of improper deductions and expenses which diluted wages relate to manual laborers (*i.e.*, deductions for lodging near the work site, deductions for travel, failure to reimburse for travel expenses such as gas and tolls, failure to compensate for donning and doffing personal protective equipment and "waiting time" on the work site before and after shifts, and failure to reimburse for obtaining necessary personal protective equipment such as steel-toed shoes). (*Id.* ¶¶ 34-38, 44.) But there are no facts in the Complaint plausibly suggesting, for example, that a janitor, an office worker, or a payroll specialist would be subject to the same travel and lodging deductions, travel expenses, donning and doffing of personal protective equipment, requirement to obtain personal protective equipment such as steel-toed shoes, or "waiting time" that Plaintiffs, as manual laborers, are alleged to have been subjected.

The Court does not mean to suggest that Plaintiffs must prove the members of its proposed Collective were subject to "the same policies and procedures and practices" outlined in the Complaint at the pleading stage. But where the Complaint does not contain any factual allegations suggesting that any other non-exempt employee in the

United States for the three years before the Complaint was filed was subjected to injuries common with those alleged by Plaintiffs, and the proposed Collective includes <u>all</u> non-exempt workers employed by Defendants in the United States in the three years before the Complaint was filed, the Complaint does not state a plausible claim for relief as to the proposed Collective. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). The implausibility of the collective claims is only exacerbated by the fact that the Complaint describes Defendants as "joint employers" who "jointly managed and supervised" "the work performed by Plaintiffs and the Class and Collective Members" and "jointly do not pay hourly rates that meet the minimum wage requirement and do not pay a premium rate of time-and-a-half for all hours worked over 40 in a work week to Plaintiffs and the Class and Collective Members" (Dkt. 1 ¶¶ 27, 42, 46), yet the proposed Collective encompasses non-exempt employees of either One Source or BluSky (Dkt. 41 at 3). For these reasons, the Court recommends dismissal of Counts I and II of Plaintiffs' First Cause of Action for failure to state a claim.

In the alternative, the Court recommends dismissal of Counts I and II because they do not provide fair notice of Plaintiffs' collective claims. *See Gomez*, 676 F.3d at 666 ("This short and plain statement [required by Rule 8] must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (cleaned up). Plaintiffs contend the proposed Collective gives fair notice because every person could be identified. (Dkt. 41 at 23.) Defendants contend the proposed Collective does

not provide fair notice and cite several cases in support of this argument.  *See, e.g.*, *Flores v. Act Event Services, Inc.*, 55 F. Supp. 3d 928, 940 (N.D. Tex. 2014); *Dyer v. Lara's Trucks, Inc.*, Civil Action File No. 1:12-CV-1785-TWT, 2013 WL 609307, at *3 (N.D. Ga. Feb. 19, 2013); *Shann v. Durham Sch. Servs.*, L.P., 182 F. Supp. 3d 1044 (C.D. Cal. 2016).

In *Flores*, employees brought a putative collective action against a staffing agency and company, alleging violations under the FLSA.  *See* 55 F. Supp. 3d at 940.  With respect to the putative class's claims, the complaint stated that "[n]amed Plaintiffs seek to represent a nationwide class of all persons who worked or work for Defendants and who were/are subject to Defendants' unlawful pay practices and policies at any point from three years prior to the filing of the instant matter to the present . . . ."  *Id.*  The district court explained that while this allegation provided defendants with some notice, it failed to provide defendants with fair notice.  *Id.*  Plaintiffs failed to provide sufficient details about the proposed parties who were alleged to be similarly situated.  *Id.*  While the complaint in *Flores* noted a list of services and job duties that the plaintiffs provided, plaintiffs did not use those job duties to define a more specific putative class.  *Id.*  Ultimately, the district court concluded that such broad notice is insufficient to survive a Rule 12(b)(6) motion.  *Id.*

*Dyer* involved an action for overtime wages under the FLSA.  *See* 2013 WL 609307, at *1.  The district court in *Dyer* stated that:

> The collective action cause of action does not give the Defendants fair notice of the Plaintiff's putative class.  The Plaintiff states that she held a secretarial and collections position, and another position in the Defendants' financing

> department.  The Court cannot discern which employees the Plaintiff seeks
> to include. All of the Defendants' employees? All of the Defendants'
> employees that share the same or similar job duties?  If the latter, similar to
> what? (The position in the financing department is not given a job title or job
> description.)  Furthermore, the Plaintiff may have other job duties to report
> later that are not listed in the Complaint.

*Dyer*, 2013 WL 609307, at *4.  The district court found that the assertions supporting the

collective failed to provide defendants with fair notice under *Iqbal* and *Twombly*.  *Id.*

Finally, in *Shann*, employee school bus drivers filed a putative class and collective

action against their employer alleging wage and hour violations under California law and

the FLSA.  *Shann*, 182 F. Supp. 3d. at 1044.  In that case, Plaintiffs alleged that they

were employed by the Defendant as bus drivers or "related positions."  *Id.* at 1046.

Additionally, plaintiffs defined one of their classes as persons previously or currently

employed by Defendant "as non-exempt hourly bus aides, bus drivers, and *other related

positions*."  *Id.*  The district court stated that "without useful descriptions of Plaintiffs' job

positions or the job positions Plaintiffs intend to include in [the class], the Court is unable

to determine whether Plaintiffs and the individuals represented in [the class] were

subjected to the same unlawful employment practices and were similarly affected by

them."  *Shann*, 182 F. Supp. 3d. at 1047.  The district court dismissed the FLSA national

collective action because Plaintiffs only provided "mere conclusory assertions [] that they

[we]re similarly situated to the pertinent class they intend to represent."  *Id.* at 1046-47.

Here, the proposed Collective is defined as every non-exempt worker employed by

either Defendant in the United States in the three years before the Complaint was filed.

But at the hearing, Plaintiffs' counsel stated with respect to the payroll specialist, janitor,

and others working in an office: "if they're subject to the same policies and procedures and practices that we've outlined, which they may very well be, then they would be part of the collective, but we don't know that until we can do some discovery and determine the policies, practices and procedures that are applicable." (Dkt. 49 at 44:9-14.) The fact that Plaintiffs have proposed a Collective where they themselves do not know which policies, practices, and procedures are applied to the various proposed members without discovery suggests that the proposed Collective does not give Defendants fair notice.

Indeed, Plaintiffs' suggestion that they would look at the policies, practices, and procedures applicable to all of those non-exempt employees to identify collective members provides less notice that the deficient allegation in *Flores* that "[n]amed Plaintiffs seek to represent a nationwide class of all persons who worked or work for Defendants and who were/are subject to Defendants' unlawful pay practices and policies at any point from three years prior to the filing of the instant matter to the present . . . ." 55 F. Supp. 3d at 940 ("Based on the pleadings, the court concludes this broadly defined class fails to provide the defendants with *fair* notice. The complaint notes that the plaintiffs 'provided services such as assisting in setting up and taking down of the rentals for the events, final construction clean, power washing, fencing, barricade, crowd control, field and logo painting, sweeping, mopping, picking up trash and cleaning restroom facilities.' The plaintiffs should have used these job duties to assist in defining a more specific putative class.") (citation omitted). Accordingly, the Court recommends dismissing Counts I and II of Plaintiffs' First Cause of Action because they do not provide "fair notice" of the collective claims.

46

### b.    Plaintiffs Have Not Stated a Plausible Claim for Relief as to the Employees Located Outside Minnesota

Defendants argue that even if this Court finds that Plaintiffs' collective claim allegations are not facially deficient, "as a whole, their national collective FLSA claims must, at a minimum, be dismissed with respect to employees located outside Minnesota because Plaintiffs fail to plead facts demonstrated they are similarly situated to such employees." (Dkt. 35 at 21.)  In their response, Plaintiffs argue that there are no grounds to limit the Collective only to Minnesota employees because the Complaint provides specific allegations regarding Defendants' policies and procedures and their effects on Collective members who reside outside Minnesota.  (Dkt. 41 at 23-24 (citing Dkt. 1 ¶¶ 32, 34-38, 43).)  In their reply, Defendants argue that "Plaintiffs assume a nationwide definition first, then assume the Minnesota-specific practices apply elsewhere because Defendants employ people in other states." (Dkt. 45 at 18.)  Although the Court need not reach this issue because Plaintiffs have not stated a plausible claim for relief as to the proposed Collective and because the collective claims fail to provide fair notice, the Court considers this argument in the alternative.[12]

The factual allegations in the Complaint appear limited to work sites in Minnesota. (Dkt. 1 ¶¶ 32-38, 40-41, 43-44.)  Both Plaintiffs reside in Chicago and travelled to Minnesota when working for Defendants.  (*Id.* ¶¶ 14-15.)  The paragraphs cited by

---

[12]    As discussed in Section III.A.2, the Court has concluded that it lacks specific jurisdiction over One Source with respect to the claims of the non-Minnesota putative collective members.  Because the Court has concluded that BluSky has consented to the Court's exercise of jurisdiction over it, the Court addresses the sufficiency of the allegations as to employees who did not perform work in Minnesota.

Plaintiffs as supporting the inclusion of non-Minnesota workers—paragraphs 32, 34-38, and 43—do not allege any facts plausibly suggesting that the alleged unlawful conduct occurred anywhere but at the work sites in Minnesota.  In fact, the alleged facts relate to what Murphy witnessed at his Minnesota work site, travel and lodging for workers from the Chicago area to a work site in St. Paul, and conduct occurring at Minnesota work sites.  (*See id.* ¶¶ 32, 34-38.)  The allegation that "Class and Collective members worked and continue to work similar amounts of time per week as Plaintiffs, and are paid similar wages" is made on information and belief.  (*Id.* ¶ 43.)  Plaintiffs have not alleged a single instance of any employee of either Defendant being subjected to the same practice while working at a site outside of Minnesota.  In sum, Plaintiffs' allegations that the experiences of the Collective are similar to the experiences of Plaintiffs amount to conclusory allegations that do not state a claim for relief.  Accordingly, this provides another basis for dismissing Plaintiffs' collective claims with respect to employees who did not perform work in Minnesota.

### 2.    Plaintiffs' Minimum Wage Claims

The Court turns to Plaintiffs' minimum wage claims under the FLSA and MFLSA. Defendants argue that the Complaint fails to allege facts plausibly suggesting Defendants violated the FLSA and MFLSA.  (Dkt. 35 at 23.)  In their response, Plaintiffs argue that the allegations in the Complaint, when taken together, demonstrate that Defendants violated the minimum wage provisions of the FLSA and MFLSA.  (Dkt. 41 at 26.)  In their reply, Defendants argue that "Plaintiffs' allegations of uncompensated time and expenses create only a **possibility** of misconduct," but fail to sufficiently show that

Plaintiffs received a total weekly wage less than the minimum wage in a single workweek. (Dkt. 45 at 21.)

The minimum-wage provisions of the FLSA require an employer to pay a minimum wage of $7.25 per hour to its employees "who in any workweek [are] engaged in commerce or in the production of goods for commerce." *See* 29 U.S.C. § 206(a). "To establish a violation of the minimum-wage requirements of the FLSA, a plaintiff 'must demonstrate that he was engaged in compensable activity within the meaning of the statute and that the wages received for that activity, if any, were below the statutory minimum wage.'" *LePage v. Blue Cross & Blue Shield of Minn.*, Civ. No. 08-584 (RHK/JSM), 2008 WL 2570815, at *2 (D. Minn. June 25, 2008) (quoting *Hensley v. MacMillan Bloedel Containers, Inc.*, 786 F.2d 353, 355 (8th Cir. 1986)). There is no violation of the FLSA's minimum wage provisions, however, if "the total weekly wage paid by an employer meets the minimum weekly requirements of the statute, such minimum weekly requirement being equal to the number of hours actually worked that week multiplied by the minimum hourly statutory requirement." *Hensley*, 786 F.2d at 355 (citation omitted).

The minimum-wage provisions of the MFLSA requires an employer to pay its employees $9.50 per hour. *See* Minn. Stat. § 177.24, subd. 1(b)(1)(iii). Additionally, "[t]he minimum wage must be paid for all hours worked," Minn. R. 5200.0120, Subpart 1 (2020), and "[t]he period of time used for determining compliance with the minimum wage rate [and] overtime compensation . . . is the workweek, which is defined as a fixed

and regularly recurring period of 168 hours, seven consecutive 24-hour periods." Minn. R. 5200.0170, Subpart 1.

Here, the Complaint alleges "Plaintiffs were supposed to be paid a rate of $10 to $19 per hour" (Dkt. 1 ¶ 43), that Plaintiffs worked 75 to 80 hours per week each workweek (*id.*), and that Class and Collective members worked and continue to work similar amount of time per week and are paid similar wages (*id.*). The Complaint further alleges that Plaintiffs and the Class and Collective Members' hourly rates "often fell below the minimum wage." (*Id.* ¶¶ 45, 54.) The Complaint does not allege the hourly rate the Plaintiffs were actually paid, nor does it allege Murphy's weekly pay or Rogers' weekly pay for any week when they worked for Defendants.

In their opposition, Plaintiffs provided an example where a collective member who worked 75 hours a week at $10/hour would earn $750 for that week, and if $20 were deducted for travel, and $130 deducted for lodging, and roughly 13.2 hours/week were estimated for "donning/doffing equipment, participating in weekly off-the-clock meetings, and waiting at Defendants' gathering point," the employee would earn the equivalent of $6.80/hour for that week (below the federal and state minimum wages). (Dkt. 41 at 28.) Defendants counter by demonstrating that the same worker, if paid $19/hour, would earn the equivalent of $14.45/hour (above the federal and state minimum wages). (Dkt. 45 at 22.)

While the Complaint here does not allege the hourly wage Plaintiffs were actually paid or the amount of wages Plaintiffs received for any given week, the Complaint does allege that Plaintiffs were supposed to be paid between $10 and $19 per hour, that they

"consistently worked over 12 hours per day, six-to-seven days per week" and that Plaintiffs "generally worked 75 to 80 hours each workweek." (Dkt. 1 ¶ 11.) Although Plaintiffs' weekly wages are not specifically alleged, the Court concludes there is "more than a sheer possibility" that Plaintiffs were not paid the minimum wage for a particular workweek in violation of the FLSA and MFLSA. *See Ritchie*, 630 F.3d at 717. Accordingly, the Court recommends denying Defendants' Partial Motion to Dismiss with respect to Count II of Plaintiffs' First Cause of Action and Count I of Plaintiffs' Second Cause of Action to the extent dismissal is sought on Rule 12(b)(6) grounds.

### 3. Plaintiffs' Recordkeeping Claim

Finally, the Court addresses Plaintiffs' recordkeeping claim under the MFLSA.[13] Defendants argue that Plaintiffs fail to state a viable recordkeeping claim under the MFLSA. (Dkt. 35 at 27-29.) Specifically, Defendants argue they "do not claim Defendants altogether failed to maintain **any** records of their hours of work, but rather that the payroll records Defendants did not maintain were inaccurate because they purportedly do not reflect all hours actually worked by Plaintiffs." (*Id.* at 28.) In support of their argument, Defendants rely on cases from this District that distinguish a claim of inaccurate records from a claim of no records. (*Id.* (citing *Le v. Regency Corp.*, 957 Supp. 2d. 1079, 1091 (D. Minn. 2013); *LePage*, 2008 WL 2570815, at *5).) In their response, Plaintiffs argue that the Complaint adequately pleads a claim for violation of

---

[13]    Defendants moved to dismiss any recordkeeping claim under federal law. (Dkt. 35 at 27.) However, "Plaintiffs have never asserted a recordkeeping claim under the FLSA." (Dkt. 41 at 29.) The Court therefore recommends denial of Defendants' motion as to a federal recordkeeping claim as moot.

MFLSA's recordkeeping requirement.  (Dkt. 41 at 29-30.)  Defendants reply that "Plaintiffs' claim is indisputably one of inaccurate pay records of the precise nature barred by other judges in this District."  (Dkt. 45 at 23.)

MFLSA requires employers to maintain wage and hour records for their employees.  *See* Minn. Stat. § 177.30.  In relevant part, Minn. Stat. § 177.30 requires employers, subject to sections 177.21 to 177.44, to create and keep records of "(1) the name, address, and occupation of each employee; (2) the rate of pay, and the amount paid each pay period to each employee; [and] (3) the hours worked each day and each workweek by the employee . . . ."  *Id.*

Other courts in this District have addressed the requirements for pleading a viable recordkeeping claim.  *See Le*, 957 F. Supp. 2d at 1090-91; *LePage*, 2008 WL 2570815, at *5.  As the Court explained in *Le*,

> In *Milner*, the defendants admitted that they did not keep any time records pursuant to the Minnesota FLSA.  *See* 748 N.W.2d at 610, 618.  That is not the case here.  But more importantly, Plaintiffs have not alleged that [Defendant] failed to keep any time records or that such records were inaccurate based on the time cards Plaintiffs submitted to [Defendant].  Rather, Plaintiffs have alleged that [Defendant] failed to maintain records for certain time before and after their scheduled shift.  In other words, Plaintiffs are claiming that [Defendant] should have maintained records for this off-the-clock time even though they never reported it on their time cards.  The Court fails to understand how this translates into a record-keeping violation.  In the end, Plaintiffs are attempting to take their substantive claim that they were not paid overtime, and bootstrap a record-keeping violation into their Complaint.

957 F. Supp. 2d at 1091.

Here, the Complaint states that "Plaintiffs and the Class and Collective Members worked and continue to work hours for Defendants that are not recorded or for which

Plaintiffs and Class and Collective members are not compensated, despite Defendants having such knowledge that such hours are worked." (Dkt. 1 ¶ 39.) Plaintiffs allege that Defendants maintained inaccurate payroll records because they failed to reflect the number of hours Plaintiffs actually worked. (*Id.* ¶¶ 142, 147.) However, Plaintiffs have not alleged that Defendants have failed to keep any time records for the hours worked, nor have they alleged that Plaintiffs entered time on time cards or otherwise reported their time to Defendants, only to have Defendants reduce or eliminate time from their records. Although Plaintiffs repeatedly allege that Defendants fabricate, manipulate, and fraudulently reduce the hours worked (*id.* ¶¶ 32, 93, 109, 135), the only factual allegations supporting this assertion are the allegations that Defendants did not compensate Plaintiffs for travel time, donning and doffing personal protective equipment, meetings, and "wait time" (*id.* at ¶¶ 35, 36, 37, 38, 39). Thus, Plaintiffs' recordkeeping claim, like the claim in *Le*, is based on time that was not reported by Plaintiffs, not time that was reported by Plaintiffs and then altered by Defendants. For this reason, the Court finds Plaintiffs have failed to state a recordkeeping claim under the MFLSA and recommends dismissal of Count V of Plaintiffs' Second Cause of Action.

## C.    Amendment

Plaintiffs requested that any dismissal be without prejudice to their amending their Complaint and sought leave to amend at the hearing. (Dkt. 41 at 22 n.9; Dkt. 49 at 41:10-12, 47:10-14.)[14] A court "should freely grant leave [to amend] when justice so requires."

---

[14]    Plaintiffs' counsel suggested that most of the issues raised by Defendants could be cured by amendment. (Dkt. 49 at 47:10-14.)

Fed. R. Civ. P. 15(a)(2). Although the Court would be well within its discretion to deny informal requests for leave to amend stated in opposition to a motion to dismiss, *see U.S. ex. rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 822–23 (8th Cir. 2009), the Court believes that providing Plaintiffs leave to amend in this case will fulfill the purposes of the Federal Rules and facilitate a proper decision on the merits, *see Foman v. Davis*, 371 U.S. 178, 182 (1962). For these reasons, the Court recommends that Plaintiffs be given 21 days from the date of this Report and Recommendation, if no objections are filed, to file an Amended Complaint.

## IV.    **RECOMMENDATION**

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Defendants Labor Source, LLC d/b/a Catstaff d/b/a One Source Staffing and Labor and BluSky Restoration Contractors, LLC's Partial Motion to Dismiss (Dkt. 33) be **DENIED IN PART** insofar as it seeks:

   a.    Dismissal of the claims of any putative FLSA collective plaintiffs who did not work in Minnesota as to BluSky for lack of personal jurisdiction.

   b.    Dismissal of Count II of Plaintiffs' First Cause of Action and Count I of Plaintiffs' Second Cause of Action (Plaintiffs' minimum wage claims) as to One Source and BluSky for failure to state a claim.

2. Defendants Labor Source, LLC d/b/a Catstaff d/b/a One Source Staffing and Labor and BluSky Restoration Contractors, LLC's Partial Motion to Dismiss (Dkt. 33) be **GRANTED IN PART** insofar as it seeks:

   a. Dismissal of the claims of any putative FLSA collective plaintiffs who did not work in Minnesota as to One Source for lack of personal jurisdiction.

   b. Dismissal of Counts I and II of Plaintiffs' First Cause of Action (Plaintiffs' FLSA claims) as to One Source and BluSky for failure to state a claim.

   c. Dismissal of Count V of Plaintiffs' Second Cause of Action (Plaintiffs' recordkeeping claim) as to One Source and BluSky for failure to state a claim.

3. Plaintiffs be given 21 days from the date of this Report and Recommendation, if no objections are filed, to file an Amended Complaint.


DATED: March 12, 2020                    *s/Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge



## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).