# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

MARCQUISE MURPHY and
RATANYA ROGERS, individually and
on behalf of all others similarly
situated,

     Plaintiffs,

v.

LABOR SOURCE, LLC d/b/a
CATSTAFF d/b/a ONE SOURCE
STAFFING AND LABOR, and
BLUSKY RESTORATION
CONTRACTORS, LLC,

     Defendants.

Case No. 19-cv-1929 (ECW)


**ORDER**

---

    This matter is before the Court on Plaintiffs' Motion for Conditional Certification
and Court-Authorized Notice Pursuant to 29 U.S.C. § 216(b) (Dkt. 132); Plaintiffs'
Motion to Strike or Void Defendants' Rule 68 Offer (Dkt. 152); and Defendants' Motion
to Dismiss the Claims of Plaintiff Ratanya Rogers (Dkt. 158).  The parties have
consented to the jurisdiction of this Court pursuant to 28 U.S.C. § 636 and Rule 73 of
the Federal Rules of Civil Procedure.

## I.   PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION AND COURT-AUTHORIZED NOTICE (DKT. 132)

### A.   Factual Background

#### 1.   General Background

On July 23, 2019, Plaintiffs Marcquise Murphy ("Murphy") and Ratanya Rogers ("Rogers") (collectively, "Plaintiffs") initiated this putative collective and class action on behalf of themselves and other similarly situated individuals who have worked for Defendants Labor Source, LLC doing business as One Source Staffing and Labor ("Labor Source" or "One Source") and BluSky Restoration Contractors, LLC ("BluSky") (collectively, "Defendants") as non-exempt manual laborers.  (Dkt. 1 ¶ 1.) Plaintiffs and the putative class and collective members "challenge[d] Defendants' minimum wage and overtime violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, et seq. ('FLSA'), as well as the wage, hour, labor, and other applicable laws of the State[ ] of Minnesota, including the Minnesota Fair Labor Standards Act, Minn. Stat. § 177.21 et seq. ('MFLSA') and the Minnesota Payment of Wages Act, Minn. Stat. § 181.01 et seq. ('MPWA')."  (*Id.*)

"BluSky provides commercial, industrial, governmental, residential, and multifamily restoration, renovation, environmental, and roofing services across the United States. . . ."  (Dkt. 136-1 at 1.)

Labor Source hires employees to serve as unskilled and semi-skilled temporary laborers, most commonly in the construction, manufacturing, restoration, and disaster recovery industries.  (Dkt. 170 ¶ 3.)  Labor Source provides temporary labor across the

country, and contracts with its clients to provide temporary labor on a project-by-project basis. (Dkt. 170 ¶¶ 2-3.) By way of example, on or about September 25, 2013, One Source and BluSky (as the customer) entered into a rate agreement ("Rate Agreement") setting the billing rate for the workers supplied by One Source, which included the rates for general labor, leads, vans, worker per diem (including for hotels), worker travel time, and worker stand down time. (Dkt. 136-3.) In addition, the Rate Agreement provided as follows:

> The billing rate above includes all wages, worker's compensation premiums, unemployment Insurance, payroll taxes, and all other employer burdens; recruiting, administration, payroll funding, and liability insurance (…no hidden costs!).

> Customer acknowledges that they have care, custody, and control of the job site. Customer agrees to comply with all applicable laws, regulations, and ordinances relating to health and safety, and agrees to provide any site/task specific training and/or safety devices and protective equipment necessary or required by law.

> Customer agrees to indemnify and hold harmless One Source Staffing and Labor for any and all claims, damages or penalties, together with reasonable attorneys' fees, arising out of any violation of: (a) the Occupational Safety and Health Act (OSHA) of 1970, or any similar state law with respect to workplaces or equipment owned, leased, or supervised by Customer and to which employees are assigned; or (b) any prevailing wage law requirement (e.g. Davis-Bacon Act of 1931, etc.) that was not disclosed in writing by Customer to One Source Staffing and Labor prior to the commencement of work on such project. In the event that a prevailing wage law requirement exists with respect to any particular project, Customer shall notify One Source Staffing and Labor in writing of such requirement and the applicable billing rates will be adjusted accordingly.

> Customer will not, without prior written consent of One Source Staffing and Labor, utilize One Source Staffing and Labor employees to operate machinery, equipment or vehicles. Customer agrees to defend, indemnify and hold harmless One Source Staffing and Labor from any claims and/or

liability arising out of the unauthorized operation of machinery, equipment or vehicles by One Source Staffing and Labor employees.

Commencement of work by dispatched workers, or customer's signature on work ticket serves as confirmation of Customer's agreement to conditions of service listed on back of work ticket.

Customer agrees not to place workers in a supervisory position. Customer agrees that worker shall not work more than twelve (12) feet above the ground, six (6) feet below the ground, or on or in any non-permanent, non-enclosed structure. Customer agrees to supervise workers at all times. Billable time begins at the time workers report to the workplace per your request. Jobs must be cancelled a minimum of one hour prior to start time to avoid minimum billing.

We guarantee our workers will satisfy you or the first two hours are on us. If you are not satisfied with the workers, call us within the first two hours and we will replace them free of charge.

Overtime will be billed at one and one-half times the regular billing rate for all time worked over forty hours in a pay period. At your request, we will be happy to substitute workers to avoid overtime situations.

One Source Staffing and Labor's work week begins on Sunday and ends on Saturday.

Invoices are due 30 days from date of invoice (unless other arrangements have been made).

Rates are subject to change at any time upon thirty days written notice unless you are on a Rate Guarantee Agreement for a period of twelve months.

Customer may hire worker for no fee after individual has completed 960 hours of billing. If hired before 960 hours of billing, there will be a pro-rated fee calculated at $5.00 per hour for every remaining hour to cover administrative and recruiting fees.

One Source Staffing and Labor reserves the right to waive any fee in connection with the hiring process.

Customer shall not, directly or indirectly, either by itself or through any other temporary staffing agency, solicit, hire, employ or endeavor to employ One Source Staffing and Labor's workers if such worker has performed

services at Customer's job site while employed by One Source Staffing and Labor. Each breach of this covenant shall result in Customer paying One Source Staffing and Labor an amount equal to the hours worked by each such employee multiplied by the stated hourly rate contained herein, plus $1,000 per incident.

(*Id.*)

As a temporary staffing company, the main source of Labor Source's revenue is the rate paid by its clients for each hour worked by Labor Source employees.  (Dkt. 170 ¶ 50.)

### 2.    Plaintiff Marcquise Murphy

Murphy asserts in his Declaration as follows: that he was employed by One Source and BluSky Restoration as a manual laborer and non-commercial driver from approximately August 2017 through January 2018 for the Weyerhaeuser remediation project in Minnesota ("Weyerhaeuser Project").  (Dkt. 137-8 ¶ 2.)  Labor Source asserts that Murphy was hired on August 28, 2017, and started working on the Weyerhaeuser Project on August 29, 2017.  According to Labor Source's records, Murphy's final day of work was September 2, 2017, and he has not worked for Labor Source since that date. (Dkt. 170 ¶ 51.)  Murphy was classified as non-exempt and was paid on an hourly-rate basis at $10 per hour.  (Dkt. 137-8 ¶ 3.)  Murphy worked, on average, approximately 15-16 hours per day on the Weyerhaeuser Project.  (*Id.* ¶ 4.)  At a minimum, he worked 12 hours per day and at most he worked upwards of 18-19 hours per day. (*Id.*)  He and others worked six-to-seven days per week until the project was finished.  (*Id.*)  Murphy worked more than 40 hours per week virtually every week, sometimes upwards of 80-90 hours per week.  (*Id.*)

Murphy claimed that his primary job duties included providing manual labor services, remediation work, driving/transporting crew members to and from the worksite, and logging/stocking materials. (*Id.* ¶ 5.)

With respect to timekeeping, Murphy claims as follows: BluSky had a daily timekeeping system that consisted of paper timesheets. (*Id.* ¶ 6.) BluSky, through their project manager and/or team leads over the Weyerhaeuser Project, would uniformly fill out the time sheets for the workers before the workers even saw the timesheets, stating the workers arrived at a certain time and stopped working at a certain time. (*Id.*) BluSky would then require the workers to sign their name to the daily time sheet, even though the times were not accurate. (*Id.*) BluSky's team leads threatened to withhold pay unless workers signed their names to the inaccurate daily time sheets. (*Id.*) By way of example, Murphy asserts that during the Weyerhaeuser Project, laborers would regularly work upwards of 15-16 hours per day, however, BluSky would only show that the laborers worked approximately 11 or 12 hours per day and also inaccurately reflected that laborers received fully off-duty meal breaks, which also resulted in him losing dozens of hours' worth of compensable work time and hundreds of dollars in overtime wages every week. (*Id.* ¶ 7.) BluSky's project manager would then submit those fabricated and inaccurate time sheets to One Source, so that One Source could pay the workers for the under-reported time. (*Id.* ¶ 8.) One Source did not issue a paycheck with a written wage statement showing the total hours worked and total wages earned for a given pay period and instead, One Source would issue a debit card to each laborer

at the beginning of a project, and would load funds onto that debit card at the end of the pay periods for their payment of wages.  (*Id.* ¶ 9.)

Murphy also asserts that BluSky and/or One Source deducted various amounts from his pay for "living expenses," hotel rooms, shuttle fees, and other expenses, and was told that One Source deducted these amounts directly from his pay.  (*Id.* ¶¶ 10-11, 13.)  This included being required to pay for tolls and gas on the way to the job site in Minnesota.  (*Id.* ¶ 11.)  At the end of a given week, those deductions amounted to upwards of $75 per week.  (*Id.* ¶ 13.)  Murphy claims that based on his observations and speaking with other BluSky workers, these practices applied equally to other manual laborers, including: BluSky used the same timekeeping practices at each project regardless of specific location, BluSky bussed people in from out of town, made them stay at a hotel/motel during the pendency of the project, regularly manipulated and fabricated time sheets to reduce the total hours recorded for their laborers, and deducted amounts from the workers' pay for various expenses.  (*Id.* ¶ 14.)

One Source's terms of employment agreement for out-of-town workers/drivers provides that the employment is with One Source.  (Dkt. 136-4; *see also* Dkt. 171-4.)  This agreement provides the rate of pay and that One Source will pay the employee per hour worked and time and a half for any work performed over 40 hours per week.  (*Id.*)  The employment agreement included that the employee was responsible to reimburse One Source for transportation home after the work was done, and between the work site and the hotel.  (*Id.*)  The agreement also provides for a fee for staying in a hotel if the worker missed work for any reason other than a workplace injury.  (*Id.*)

During his deposition, Murphy testified that he started to work for Labor Source in August 2017.  (Dkt. 171-1 ("Murphy Dep.") at 43.)  Murphy asserted that all the work he did for Labor Source was in Minnesota.  (*Id.* at 64.)  Murphy understood that the job he worked for Labor Source in Minnesota was for BluSky as part of the Weyerhaeuser Project.  (*Id.* at 64-65.)  He also assumed that BluSky was paying a certain wage for his service to One Source on top of the hourly wage he was earning based on his previous experience with staffing services.  (*Id.* at 234.)  He also represented that other than the Weyerhaeuser Project in Minnesota, he had not worked on another BluSky project.  (*Id.* at 238.)

Murphy asserted when he arrived at Labor Source's office in Chicago, he had to turn in a sheet and application, and then they gave him a card that he was told that he was going to be paid on.  (*Id.* at 93-94.)  Murphy did not know if he was charged fees for using the card, but noted that he believed he had to pay ATM fees.  (*Id.* at 173.)  The paperwork only had Labor Source's name and did not mention BluSky, and Murphy testified that he did not fill out separate paperwork for BluSky.  (*Id.* at 134, 238-39.)  Indeed, his application only mentions Labor Source and Cat Staff.  (Dkt. 171-4.)  Murphy claimed that he and others were happy after applying because they were getting jobs, going to be paid, they were going out of town, and getting a free ride.  (Dkt. 171-1 at 93.)  Murphy testified that he and others were told in Chicago that transportation and gas would be paid for until they reached the job site, that their hotel would be reimbursed, and that they would receive $40 per week for food.  (*Id.* at 96-97.)

However, the reality was that he had to pay for his hotel room, that not everyone received the $40 promised for food, and he was told by Cleveland Raggs, the lead on the ground in Minnesota (referred to by Murphy as "Blue"), and the other "Chicago Managers" on the ground in Minnesota that there was supposed to be a deduction from their pay for their hotel. (*Id.* at 96-97, 283, 296.) Murphy claimed that he complained to the Chicago office about this, to no avail. (*Id.* at 98-100.)

Murphy claims that he was also told he would be paid $17 per hour, plus extra for being a driver. (*Id.* at 103-04.) While he acknowledged that the employment agreement provided for $10 per hour, he testified that he was told by the Chicago office manager that he would be paid $17 per hour and that this was also communicated to the other drivers. (*Id.* at 102, 149.)

Murphy also testified that he and others had to pay for tolls and gas on the way to Minnesota because of a lack of money on a card provided. (*Id.* at 116-23.) Eventually the gas card had money placed on it and they were able to pay for the remainder of the gas. Murphy did not have to pay for gas for everyday trips and only had to pay money to get back home after leaving the job. (*Id.* at 129-30.) While his name was taken down for reimbursement of the gas and tolls, he did not know if he was ever reimbursed for the amount. (*Id.* at 132-33.) Murphy acknowledged that Labor Source, not BluSky, organized the transportation from Chicago to Minnesota. (*Id.* at 240.)

According to Murphy, he was only paid for one week of work, even though he worked at the Weyerhaeuser Project for approximately two additional months. (*Id.* at 164-65.) Murphy claimed that he had talked to other employees, not just from Chicago,

who had been complaining that they had not been paid in a long time.  (*Id.* at 166.)

Murphy asserted that he and a group of other employees complained to management in

the Chicago office about the fact that they were not being paid and were not provided

breaks, but they were only provided excuses by the Chicago office about having lost

their information.  (*Id.* at 98-99, 167-68.)  Murphy claimed he called 3-4 times a week

with his complaints, and claimed that he never talked to the same person.  (*Id.* at 99-

100.)

With respect to transportation to and from the work site, Murphy testified that he

knew of only one person who drove their own vehicle from Chicago to Minnesota.  (*Id.*

at 178-79.)

When they initially arrived on the work site, BluSky employees gave him and

other workers tutorials on the work to be done, including one regarding the use of

personal protective equipment.  (*Id.* at 187-90, 278.)  Murphy complained to BluSky

regarding their treatment of not being allowed to sleep, not having anything to eat, nor

any compensation.  (*Id.* at 243-44.)  Murphy also contends that he complained to a

BluSky manager again that he was not being paid for his work and other complaints

regarding violations of law and was told by BluSky project manager Patrick Hebeler[1]

that it was out of his hands and that Murphy would need to talk with the "Chicago

guys," which he did.  (*Id.* at 259-61.)

---

[1]     The Court notes that Hebeler does not contest this testimony in his declaration
submitted in support of BluSky's opposition to the motion for conditional certification.

The "Chicago Managers," including "Blue," took over after the initial tutorials and would tell them where they would be working and where to obtain tools. (*Id.* at 192-93, 245-46.) Murphy further testified that BluSky managers approved the work he was doing insofar as they approved Labor Source's plans on how to proceed, that it was the One Source Chicago managers who directed their work on the houses, and that he did not have personal knowledge on how BluSky directed the work on other projects. (*Id.* at 242-43.)

With respect to keeping time, Murphy testified that employees did not punch in their time, as they just signed in since there was no actual time clock. (*Id.* at 185.) While his name and signature were listed on time sheets, Murphy testified that in some instances he did not put his name down nor was it his signature on time sheets, although he did concede that in some cases, he had signed the sheets. (*Id.* at 206-07, 214, 218-19.) He testified that the Chicago managers threatened to withhold his pay unless he signed the sign-in sheets, but that based on his belief, BluSky could not threaten him because they were not the company who was paying him. (*Id.* at 251-52, 265.) The time sheets would be handled by Blue or other managers under him, Murphy never entered the time, and after a while the time sheets were not around. (*Id.* at 213-14, 216.) Murphy also stated that it was typical not to see the timesheet at the end of the day. (*Id.* at 215.) He noted that an employee never knew how many hours were going to be put down on the sign-in sheet. (*Id.* at 249.) He also did not know whether BluSky was tracking his and other employees' hours worked. (*Id.* at 250.) Murphy testified that BluSky would make them stay on for meetings after work every day (led by Labor

Source employees), averaging a half hour, that were not reflected in the time sheets.  (*Id.* at 257-59.)

As to the first day, Murphy testified that the 7:00 a.m. start time on the time sheet appeared to be correct and guessed that the 6:30 p.m. stop time on that day also appeared to be correct.  (*Id.* at 204.)  While the second day job start time on the sheet seemed correct, with a start of 7:00 a.m., which was "pretty much" the start time each day, Murphy testified that they needed to be up and out earlier, given that it took 30-40 minutes to get to the job site.  (*Id.* at 208-09.)  Murphy also stated that end time was typically 8:00 p.m., but that sometimes it would be later.  (*Id.* at 205.)  On the second day, the time sheet listed that end time was 9:00 p.m., which was a longer day.  (*Id.* at 210.)  Murphy did not state one way or another if this time was correct.  (*Id.*)

The third day's start time of 7:00 a.m. also appeared to be correct.  (*Id.* at 212.)  While the end time of 6:30 p.m. on that day seemed correct, he was not sure given the passage of time.  (*Id.* at 214.)  On the fourth day, while the 7:00 a.m. start time on the sheet seemed correct, Murphy could not speak to the purported 5:30 p.m. stop time.  (*Id.* at 216.)

Although Murphy's name was not on the time sheet starting on September 5, 2017, he claimed it was because of a vendetta the Chicago managers—Blue and his managers—had against him.  Specifically, Murphy claimed that he and Blue had gotten into a personal argument, which continued through his employment.  (*Id.* at 226-27, 229-30.)  Murphy claimed that Blue was targeting him after their incident.  (*Id.* at 280-81.)  Murphy claimed that the Labor Source leads fabricated the timesheets based on

favoritism, but he did not have any basis to believe, as far as he knew, that BluSky was involved with paying him incorrectly.  (*Id.* at 264-66.)

Murphy claimed that he stopped working on the project sometime between the end of October 2017 and January 2018.  (*Id.* at 231.)  Opt-in Plaintiff Ledon Brown confirmed in his reply affidavit that he remembered seeing Murphy working on the Weyerhaeuser Project as late as approximately November-December 2017.  (Dkt. 176-2 ¶ 3.)

While Murphy asked Blue for a printout of his hours, he was told that he was going to a get a check stub, which he never received.  (Dkt. 171-1 at 262-63.)  Murphy was shown a check stub for his first week during his deposition, which he had claimed he had never seen before, and while there were no deductions, except for his advance, Murphy testified that the first week was a clean week to "bait" workers, but also noted they did not reimburse him for the gas and tolls he had to pay on that pay stub.  (*Id.* at 295-97.)  The pay stub does have categories for deductions related to hotel, gas, tolls, and fines.  (Dkt. 171-1.)  A shuttle fee in the amount of $35.00 was deducted from his paycheck.  (*Id.*)

Murphy noted that he believed that he was not being properly paid, the use of debit card for payment, the transportation issues, and deductions were done by Labor Source, and he had been told by other employees at the Weyerhaeuser Project about One Source's practices on other BluSky projects.  (*Id.* at 270-276.)

### 3.     Plaintiff Ratanya Rogers

On June 22, 2021, Plaintiffs' counsel filed a suggestion of death for Rogers

occurring on June 15, 2021, pursuant to Federal Rule of Civil Procedure 25(a).  (Dkt.

195.)  On September 15, 2021, Plaintiff's counsel moved for a sixty-day extension of the

deadline under Federal Rule of Civil Procedure 25(a)(1) for filing a motion to substitute

a proper party to represent and pursue the claims of Rogers.  (Dkt. 213.)  The Court

granted the Motion, and gave Plaintiffs until November 19, 2021 to substitute a

representative for the estate of Rogers.  (Dkt. 217.)  No such substitution has been made

for Rogers as of the date of this Order.  Given that the Court has ordered dismissal of

Rogers in Section III of this Order, the Court does not consider her declaration.

Regardless, the Court notes that Rogers' assertions are almost identical to those in

Murphy's Declaration, as they only pertain to the Weyerhaeuser Project (*compare* Dkt.

137-7, *with* Dkt. 137-7), and would not have in any way changed this Court's decision

with respect to the Motion for Conditional Certification.

### 4.     Assertions Regarding Opt-In Plaintiffs

Opt-In Plaintiffs Cynthia Hodo ("Hodo"), Devin Pettis ("Pettis"), Laquon

Blackmon ("Blackmon"), Agwu Mong, Jr. ("Mong"), and Ledon Brown ("Brown"),

similar to Murphy, all claimed to have been employed by One Source and BluSky from

August 2017 through January 2018 (Mong and Norris worked until December 2017 and

Brown worked until February 2018) at the Weyerhaeuser Project in Minnesota.  (Dkt.

137-1 ¶ 2; Dkt. 137-2 ¶ 2; Dkt. 137-3 ¶ 2; Dkt. 137-5 ¶ 2; Dkt. 137-5 ¶ 6; Dkt. 176-1

¶ 3.)  Labor Source claims that: Hodo only worked for Labor Source in Minnesota from

14

August 29, 2017 to September 11, 2017; Blackmon worked on the Weyerhaeuser Project from August 29, 2017 to August 31, 2017, which was the only time he worked in Minnesota, and has not worked since with Labor Source; Mong worked for Labor Source on the Weyerhaeuser Project from August 29, 2017 to December 7, 2017, which is the only time he worked for Labor Source in Minnesota, and he has not worked for Labor Source since December 7, 2017; Pettis worked for Labor Source on the Weyerhaeuser Project from August 29, 2017 to September 11, 2017, which was the only time he worked for Labor Source in Minnesota, and has not worked for Labor Source since September 11, 2017; and Brown worked for Labor Source on the Weyerhaeuser Project from August 29, 2017 to January 11, 2018, which was the only time he worked for Labor Source in Minnesota, and has not worked for Labor Source since January 11, 2018.[2]  (Dkt. 170 ¶¶ 62, 63, 65, 66, 67.)

Hodo's primary job duties included providing manual labor services, remediation work, driving/transporting crew members to and from the worksite, and logging/stocking materials.  (Dkt. 137-1 ¶ 5.)  Pettis' primary job duties included providing manual labor services, remediation work, driving/transporting crew members to and from the worksite, and logging/stocking materials.  (Dkt. 137-2 ¶ 5.)  Blackmon's primary job duties included providing manual labor services, remediation work, and

---

[2]     According to Labor Source, opt-in Plaintiffs Brandy Julien and Marquan Coleman both worked for Labor Source in Minnesota from August 29, 2017 to September 11, 2017 on the Weyerhaeuser Project, and were hired out of the Chicago regional office.  (Dkt. 170 ¶¶ 64, 68.)  Opt-in Plaintiff DeAntwone Norris worked for Labor Source in Minnesota from August 16, 2017 to November 16, 2017.  (*Id.* ¶ 61.)

logging/stocking materials.  (Dkt. 137-3 ¶ 5.)  Mong's primary job duties included providing manual labor services, remediation work, scrapping/cutting duct work, operating machinery, and logging/stocking materials.  (Dkt. 137-5 ¶ 5.)  Brown's primary job duties included providing manual labor services, remediation work, driving/transporting crew members to and from the worksite, cleaning, maintenance, demolition, concealment/containment, scraping formaldehyde, and logging/stocking materials.  (Dkt. 137-6 ¶ 5.)

The allegations from the opt-in Plaintiffs at the Weyerhaeuser Project are largely the same as Murphy's.  They allege that they were classified as non-exempt and were paid hourly rates ranging between $9 and $11 per hour, worked more than 40 hours per week almost every week, and sometimes worked upwards of 80-90 hours per week (upwards of 90-100 hours per week as to Brown).  (Dkt. 137-1 ¶¶ 3-4; Dkt. 137-2 ¶¶ 3-4; Dkt. 137-3 ¶¶ 3-4; Dkt. 137-5 ¶¶ 3-4; Dkt. 137-6 ¶¶ 4-5.)  They also asserted, similar to Murphy, that: BluSky, through their project manager and/or team leads over the Weyerhaeuser Project, would uniformly fill out the time sheets for the workers before the workers even saw the timesheets, stating the workers arrived at a certain time and stopped working at a certain time; that BluSky significantly underreported the actual hours worked by the laborer, and would require them to sign their name to the daily time sheet under threat even though they were not correct, which were then submitted to One Source for payment for the under-reported time; that One Source did not issue a paycheck with a written wage statement showing the total hours worked and total wages earned for a given pay period and instead, One Source would issue a debit card to each

laborer at the beginning of a project, and would load funds onto that debit card at the end of the pay periods for their payment of wages; and that BluSky and/or One Source deducted various amounts from pay for living expenses such as hotel rooms, shuttle fees, and other expenses, and were told that One Source deducted these amounts directly from their pay.  (Dkt. 137-1 ¶¶ 6-14; Dkt. 137-2 ¶¶ 6-13; Dkt. 137-3 ¶¶ 6-13; Dkt. 137-5 ¶¶ 6-14; Dkt. 137-6 ¶¶ 6-14.)

Opt-In Plaintiff Nikia Maye ("Maye") claims she was employed by One Source and BluSky as a manual laborer and non-commercial driver from approximately October 2018 through the early part of 2020 on various projects in North Carolina.  (Dkt. 137-4 ¶ 2.)  From approximately October 2018 to December 2018, Maye worked for BluSky and One Source on a project in Surf City, North Carolina, and during this project she was classified as non-exempt and was paid approximately $14 per hour, and on average worked 70-77 hours per week on this project.  (*Id.* ¶ 3.)  In addition, Maye also worked on other projects in February 2019 and early 2020 for BluSky and One Source.  (*Id.* ¶¶ 4-5.)  Maye's primary job duties included providing manual labor services, remediation work, driving/transporting crew members to and from the worksite, and logging/stocking materials.  (*Id.* ¶ 6.)  According to Maye, for all of the projects she worked on for BluSky, BluSky had a daily timekeeping system that consisted of paper timesheets or manually-entered timesheets on an electronic tablet device (like an iPad).  (*Id.* ¶ 7.)  BluSky, through their project manager and/or team leads, would uniformly fill out the time sheets for the workers before the workers saw the timesheets, stating the workers arrived at a certain time and stopped working at a certain time, that did not

reflect the actual hours worked by the laborers, and BluSky would require the workers to sign their name to the daily time sheet, even though the times were not accurate. (*Id.*) On numerous occasions, she claimed she would sign her name at the beginning of the day but would not sign anything or be able to verify the end-of-day time was accurate at all. (*Id.*) BluSky's project manager would then submit those fabricated and inaccurate time sheets to One Source, so that One Source could pay the workers for the under-reported time. (*Id.* ¶ 9.) Similar to the Minnesota opt-ins, One Source did not issue a paycheck to Maye with a written wage statement showing the total hours worked and total wages earned for a given pay period and instead, One Source would issue a debit card to each laborer at the beginning of a project and would load funds onto that debit card at the end of the pay periods for their payment of wages. (*Id.* ¶ 10.) Further, Maye claims that BluSky and/or One Source deducted various amounts from her pay for lodging and travel expenses or other penalties. (*Id.* ¶¶ 11-13.) However, Labor Source asserts that Maye, along with opt-in Plaintiffs Montavias Battle, Billy Speight, and Ronnie Battle, did not work on the Weyerhaeuser Project and Labor Source has no record of them ever working in Minnesota. (Dkt. 170 ¶¶ 70-71.)

On reply, Norris asserted in his declaration that he was employed by One Source and BluSky on multiple BluSky projects as a laborer, non-commercial driver, and crew leader.[3] (Dkt. 176-1 ¶ 2.) Norris was employed by Defendants from approximately

---

[3]     Defendants objected to Norris' Declaration on Reply, or asked that they at least be given the opportunity to depose him and file a sur-reply. (Dkts. 179 and 180.) Given that Norris' Declaration largely addresses BluSky's exhaustive allegations that it had nothing

August 2017 through December 2017 for the Weyerhaeuser Project in Minnesota and

claimed he also worked for Defendants in Kansas City, Missouri from approximately

February to March 2017 on a different BluSky project.  (*Id.* ¶¶ 3-4.)  After the Kansas

City job, Norris worked for One Source in Nebraska as a noncommercial driver, and he

worked for Defendants at a BluSky project in Illinois for two weeks.  (*Id.* ¶¶ 5-6.)

During each of the separate BluSky projects in Minnesota, Missouri, and Illinois, Norris

was classified as non-exempt and was paid on an hourly-rate basis.  (*Id.* ¶ 7.)  Norris

asserts in his declaration that he was promoted to crew leader, or team lead, in

approximately September 2017 during the Weyerhaeuser Project.  (*Id.* ¶ 10.)  In his role

as a non-exempt crew leader/team lead on the Weyerhaeuser project, Norris claimed that

BluSky's project manager Hebeler directed his work, supervised his day-to-day tasks,

provided him and the other manual laborers with protective gear, trained him and the

other workers on the site, and directed Norris on how to delegate tasks to the manual

laborers that Norris oversaw during that project.  (*Id.*)  While Norris conceded he was

not directly employed by BluSky while on these various projects, he performed his job

on their behalf, for BluSky's benefit, at BluSky's direction, and while under BluSky's

control.  (*Id.* ¶ 11.)  BluSky's project manager Hebeler informed him that in this role as

team lead:

---

to do the timekeeping practices, as opposed to Labor Source, the Court finds the
Declaration to be appropriate.  *See Harris v. Chipotle Mexican Grill, Inc*., No. 13-CV-
1719 SRN/SER, 2014 WL 4449670, at *3 (D. Minn. Apr. 10, 2014), *R. & R. adopted in
relevant part*, 49 F. Supp. 3d 564 (D. Minn. 2014).  Defendants will have the opportunity
to depose Norris and move for decertification of the collective if appropriate.

> BluSky's normal practice is to under-report the hours worked by manual laborers. That is because, as Mr. Hebeler explained to me in so many words, the more hours recorded for the manual laborers, the more money that leaves BluSky's pocket, so my job as a team lead was to make sure the total number of hours recorded was as low as possible. As Mr. Hebeler instructed me and the other team leads on the Weyerhaeuser project, part of our job was to make sure the recorded hours did not exceed 11 or 12 hours a day, regardless of whether the workers actually accrued more work hours than that. As Mr. Hebeler told me, and as I learned from my direct experience working on multiple BluSky projects, this was just the way that BluSky operates to reduce its labor costs.

(*Id.*)  To this end, Norris claimed that BluSky has a timekeeping system that consists of paper timesheets.  (*Id.* ¶ 12.)  BluSky (primarily Hebeler) trained Norris and instructed him, as well as the other team leads, to uniformly fill out the time sheets before the workers even saw the timesheets, showing the workers arrived at a certain time and stopped working at a certain time, that did not reflect the actual hours worked by the laborers.  (*Id.*)  Norris and the other team leads such as Raggs, at BluSky's direction and in compliance with BluSky's standard practices, would then require the workers to sign their name to the time sheet, even though the times were not accurate.  (*Id.*)  According to Norris, BluSky told him and other team leads to "just get it signed" and to "encourage" the workers to sign off on the time sheets, meaning they were supposed to tell the workers that Labor Source would withhold their pay unless the workers signed their names to the time sheets.  (*Id.*)  Norris claimed that workers would regularly work upward of 17 hours per day, but the records would only show approximately 12 hours a day.  (*Id.* ¶ 13.)  According to Norris, this practice was consistent with the standard practices that BluSky instructed him, and the other team leads to follow, and that from working on more than one BluSky project, in both a manual laborer and team lead

position, he learned that this was a common practice instituted by BluSky as a way to reduce and control labor costs. (*Id.* ¶¶ 13, 16.) He also claimed that One Source did not issue a paycheck with a written wage statement showing the total hours worked and total wages earned for a given pay period, and instead, would issue a debit card to each laborer at the beginning of a project, and would load funds onto that debit card at the end of the pay periods for their payment of wages. (*Id.* ¶ 15.) Norris maintains that this same timekeeping and payroll system was in place for each BluSky project he worked, regardless of location. (*Id.* ¶ 16.) Similar to the other Plaintiffs, Norris asserts that One Source made deductions for hotel rooms, shuttle fees, and other expenses that were never explained by One Source. (*Id.* ¶¶ 17, 19.) Because Defendants did not furnish a wage statement, Norris asserts that most people did not realize the time was being under-reported or that other deductions were being made from their wages. (*Id.* ¶ 20.) Norris claims to have spoken with other workers during his time working on various BluSky projects in different states, and that from these conversations and from what he has observed as a crew lead with BluSky, he maintains that the standard operating procedure for BluSky around the country is to artificially reduce the recorded hours of manual laborers regardless of specific location. (*Id.* ¶ 21.) Norris also maintains that BluSky regularly instructs team leads to "doctor" the time sheets to reduce the total hours recorded for their laborers, and that One Source deducts amounts from the workers' pay for lodging and other expenses that further reduces the workers' pay. (*Id.* ¶ 21.)

### 5.    Assertions by Labor Source

Beginning in August 2017, BluSky engaged Labor Source to provide temporary laborers for a project in Minnesota for BluSky's client, Weyerhaeuser. (Dkt. 170 ¶ 5.) Labor Source's involvement with the Weyerhaeuser Project lasted seven months, from August 2017 to March 2018. (*Id.* ¶ 7.) The last date any Labor Source employees performed work on the project was March 10, 2018, and the last possible payday was March 15, 2018. (*Id.*) The Weyerhaeuser Project is the only BluSky project Labor Source staffed in Minnesota from July 2016 through the date of the present Motion. (*Id.* ¶ 8.) From August 2017 to March 2018, Labor Source employed approximately 410 laborers (including crew leads) on the Weyerhaeuser Project. (*Id.* ¶ 72.)

Employees were divided into a crew upon starting the project. (*Id.* ¶ 10.) Each crew was assigned a crew lead, who served as a liaison between their crew members and their Labor Source regional office. (*Id.* ¶ 11.) They also had administrative duties of tracking hours worked, reimbursable expenses, and certain deductions for their crew members and then providing that information to the respective regional office. (*Id.*) In addition, they served as liaisons between clients and Labor Source. (*Id.*) This included having crew leads collect daily sign-in sheets from the client's project manager, having the client manager approve Labor Source's weekly timesheets, and then sending the daily sign-in sheets and weekly timesheets to the Labor Source regional office. (*Id.*)

According to Labor Source, as to the Weyerhaeuser Project, the leads for the named Plaintiffs and the opt-in Plaintiffs were either Raggs or Kevin Houston. (*Id.* ¶¶ 52, 58-59, 61-68.)

22

Because the Weyerhaeuser Project was outside driving distance from its office locations, Labor Source offered optional, free group transportation from the regional office to the job location. (*Id.* ¶ 18.). Labor Source designated van drivers and provided gas cards to cover the cost of fuel. (*Id.* ¶ 20.) Any other travel expenses were reimbursed upon submitting a receipt. (*Id.*) Labor Source also offered free lodging for out-of-town projects. (*Id.* ¶ 21.) After workers arrived in the job location, Labor Source provided an optional shuttle between the hotel and worksite for a fee, which was agreed to upon hire in employees' terms of employment. (*Id.* ¶ 22.) Although workers were permitted to use other transportation for the daily commute, the majority took advantage of the shuttle. (*Id.*)

Labor Source's policies required employees to correctly report their hours worked and to inform Labor Source of pay discrepancies, unrecorded, or improperly recorded work hours. (Dkt. 170-4 at 13.) Employees are not allowed to complete the timesheet of another employee and falsification of time records could result in discipline. (*Id.* at 14.)

With respect to entering employee time at the Weyerhaeuser Project, BluSky provided a daily sign-in sheet that tracked the start and end times, and lunch breaks, for each worker each day. (Dkt. 170 ¶ 32.) Generally, either the crew lead or the client's (BluSky's) project manager marked the start and end times and laborers were required to sign the sheets each day to verify that the times recorded were accurate. (*Id.*) Crew leads collected the daily sheets from BluSky. (*Id.*) In addition to the daily sign-in sheets, Labor Source's crew leads were required to maintain weekly time sheets for each individual worker in their specific crews, and to reconcile any difference. (*Id.* ¶ 33.)

Crew leads were also expected to track certain deductions and all reimbursable expenses for the workers in their crew on a weekly basis through a separate weekly crew activity sheet. (*Id.* ¶ 34.) At the end of each workweek, the crew leads emailed/faxed the weekly time sheets, daily sign in sheets, and weekly crew activity sheets, along with any expenses and supporting documentation, to their regional office managers. (*Id.* ¶ 35.)

One Source laborers were paid in iPay cards during the Weyerhaeuser Project. (*Id.* ¶ 47.) There does not appear to be a requirement in the laborer employment agreement to be paid in this manner. (Dkt. 136-4.) Labor Source would generate a pay statement each pay period that would reflect the amount of regular time and overtime hours worked, as well as any deductions or reimbursements, and the total amount would be deposited onto the pay card. (Dkt. 170 ¶ 49.) Statements were sent to the respective regional office manager, who was then responsible for distributing the statements to workers. (*Id.*) Reprinted pay statements were also always available upon request of the employee. (*Id.*)

### 6. Assertions by BluSky

In the last three years, BluSky projects have involved over 100 different temporary labor companies and thousands of different subcontractors on these projects. (Dkt. 167-2 at 6.) In dealing with projects, BluSky uses subcontractors to work on part of a project or engages a temporary labor company, including One Source, to supply temporary workers of various skill levels, depending upon the unique scope of work, to assist on projects. (*Id.* at 11, 60.) BluSky maintains that the temporary labor company, such as One Source, invoices BluSky an hourly rate for each temporary worker, and BluSky pays the

temporary labor company, but that BluSky does not hire or fire, does not determine pay, and does not maintain employment records for these workers. (*Id.* at 11, 60, 75, 87, 93-94.)

In the summer of 2017, Weyerhaeuser, a building products manufacturer, engaged BluSky, among others nationally, to assist in Colorado, the Midwest, and the Northeast in an abatement and rebuild project in order to deal with product that was gassing formaldehyde, which it treated like removing an environmental contaminate like asbestos or lead. (*Id.* at 26-27, 38, 52-53, 75.) BluSky offered training and equipment to workers, which it claims were unique to the project given the type of workers necessary to complete the project. (*Id.* at 28, 38, 53, 61, 75.)

BluSky provided little to no supervision or control of the temporary workers as far as being on site with them while they completed the work. (*Id.* at 29.) BluSky had multiple personnel who were tracking the progress of the overall production on the project and coordinating the various subcontractors and temporary workers on the project, but these BluSky individuals were not overseeing or directing the temporary workers once on their job sites, as the temporary labor company provided teams or crews of temporary workers, one of whom acted as a leader in their crew. (*Id.* at 29, 61.) BluSky project managers would check in on crews working in houses throughout the day to make sure that the work was on-track and milestones were being completed. (*Id.* at 39.) BluSky project managers also monitored for safety. (*Id.*) BluSky project managers typically stopped at each worksite where One Source crews were working two times each day. (*Id.*) BluSky would also usually briefly meet with the temporary workers once they

arrived on the work site to discuss safety issues and generally outline the amount of work expected to be completed in a specific house or neighborhood that day or week. (*Id.* at 76.) According to BluSky, One Source provided teams or crews of temporary workers, one of whom acted as a leader for their crew. (*Id.* at 94.) Crew leads would oversee eleven or more temporary workers. (*Id.*) The crew leads knew the capabilities of their team members and would assign them to work on certain tasks or projects accordingly. (*Id.*) BluSky did not give instructions to One Source crews other than to tell the crew lead the phase of the work to be handled by the crew. (*Id.*)

BluSky concedes that it provided a sign-in and sign-out sheet that temporary workers signed in on when they arrived at the Minnesota warehouse before they dispersed to the houses they would be working in for the day, and BluSky required temporary workers to sign-in before they engaged in any work, including before any safety or general meetings. (*Id.* at 29, 38.) BluSky sometimes held a brief meeting before the temporary workers signed out for the day. (*Id.* at 29-30, 41, 96.) According to BluSky, it "sent this sign-in sheet to the temporary labor company and also used the sign-in sheets to confirm the temporary labor provider's invoices were accurate. BluSky does not control nor does it know whether the temporary labor provider uses the same sign-in sheet to track their workers' time for pay purposes." (*Id*. at 30, 39.) It asserts that it did not change any of time for the Weyerhaeuser Project. (*Id*. at 30, 40, 78, 97.)

Further, BluSky claims that it did not know what the temporary labor company's policies or practices were with respect to reimbursement for the temporary workers' various travel and hotel expenses. (*Id*. at 30, 54.)

### 7.      Class Definition and Proposed Notice

Along with seeking conditional certification of this matter as a collective action

under the FLSA, Plaintiffs move for Court-authorized notice to putative class members.

(Dkt. 135.)  Plaintiffs seek to conditionally certify two collectives of individuals as

follows:

### National Collective:

All current and former hourly, non-exempt employees, including but not
limited to laborers, non-exempt team leads/crew leaders, non-commercial
drivers, technicians, carpenters, apprentices, cleaning crew, plumbers,
welders, and other laborers with similar job duties employed by Defendant
BluSky Restoration Contractors, LLC throughout the United States at any
time from July 23, 2016 through the present.

### Minnesota Collective:

All current and former hourly, non-exempt employees, including but not
limited to, laborers, non-exempt team leads/crew leaders, non-commercial
drivers, technicians, carpenters, apprentices, cleaning crew, plumbers,
welders, and other laborers with similar job duties employed by Defendant
Labor Source, LLC either individually or jointly with Defendant BluSky
Restoration Contractors, LLC and who worked on any BluSky projects in the
State of Minnesota at any time from July 23, 2016 through the present.

(Dkt. 135 at 4.)

Plaintiffs also seek an order from the Court setting a ninety-day notice period;

approving the form of Plaintiffs' proposed notice; authorizing Plaintiffs' counsel to mail,

email, and text message the notice at the beginning of the ninety-day notice period;

authorizing Plaintiffs' counsel to mail, email, and text message a reminder notice at the

sixtieth day of the notice period; ordering BluSky to post the Court-approved notice in a

conspicuous location at all active jobsites in the United States; ordering BluSky to

27

produce a list of all persons employed by BluSky as a manual laborer in the United States, at any time from July 23, 2016 to the present, including each person's name, last known mailing address, last known email address (whether work or personal), last known telephone number(s), dates and location(s) of employment, and identification of the staffing agency used by BluSky to hire the worker; ordering Labor Source to produce a list of all persons employed by Labor Source as a manual laborer on any BluSky project in Minnesota from July 23, 2016 through the present, including each person's name, last known mailing address, last known email address (whether work or personal), last known phone number(s), and the dates and locations of employment in Minnesota; and granting equitable tolling for the putative Collective members from May 21, 2020 until the close of the opt-in period.  (Dkt. 132.)

## B.    Legal Standard

Under the FLSA, "any one or more employees" may bring a collective action against an employer for unpaid overtime.  29 U.S.C. § 216(b).  Unlike a class action under Federal Rule of Civil Procedure 23, no person becomes a party to a collective action unless "he gives his consent in writing to become such a party and such consent is filed in the court in which [the] action is brought."  *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005) (quoting § 216(b)).  "Courts have discretion, in appropriate cases, to facilitate the opt-in process by conditionally certifying a class and

authorizing court-supervised notice to potential opt-in plaintiffs."[4] *Chin v. Tile Shop, LLC*, 57 F. Supp. 3d 1075, 1082 (D. Minn. 2014) (cleaned up).

To proceed with a collective action, plaintiffs must demonstrate that they are similarly situated to the proposed FLSA class in a two-step inquiry. *Id.* (citing *Brennan v. Qwest Commc'ns Int'l, Inc.*, No. 07-cv-2024 (ADM/JSM), 2008 WL 819773, at *3 (D. Minn. Mar. 25, 2008); *Burch v. Qwest Commc'ns Int'l, Inc.*, 500 F. Supp. 2d 1181, 1186 (D. Minn. 2007)). "First, the court determines whether the class should be conditionally certified for notification and discovery purposes." *Id.* (citing *Burch*, 500 F. Supp. 2d at 1186). "Determination of class status at the notice stage is granted liberally because the court has minimal evidence for analyzing the class." *Id.* (citing *Ray v. Motel 6 Operating, Ltd. P'ship*, No. 3-95-828(RHK), 1996 WL 938231, at *2 (D. Minn. Mar. 18, 1996)). "The plaintiffs need only establish at that time a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan." *Id.*

---

[4]     BluSky argues that this Court should reject the ongoing viability of the two-tier approach to FLSA collective action claims, and instead adopt a holding of the Fifth Circuit in *Swales v. KLLM Transport Services, L.L.C.*, 985 F.3d 430, (5th Cir. 2021). (Dkt. 167 at 6-7.)  In *Swales*, the Fifth Circuit rejected the two-tier approach and instead found that a district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of employees is similarly situated and then it should authorize preliminary discovery accordingly.  985 F.3d at 442 (internal quotations omitted).  BluSky has not presented any persuasive reason why this Court should deviate from its well-established two-step process within the District of Minnesota and although the burden of proof is low at the first stage of the two-stage approach, it is not non-existent, and the Court rejects any assertion that the two-tier approach leads courts to grant conditional certification without reviewing if potential opt-in plaintiffs are similarly situated.  Moreover, the Court finds that the decision in *Swales* undermines the discretion afforded to district Court in implementing section 216(b).  *See Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (holding that district courts have discretion to implement § 216(b)).

(citing *Burch*, 500 F. Supp. 2d at 1186).  If there is contrary evidence presented by the parties, the Court does not make credibility determinations or find facts at this stage.  *Id.* at 1083 (citing *Brennan*, 2008 WL 819773, at *3).  "[C]ourts usually rely on the pleadings and any affidavits submitted by the plaintiff to determine whether to grant conditional certification."  *Id.* at 1082-83 (citing *Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1164 (D. Minn. 2007)).  The plaintiffs bear the burden of showing class members are similarly situated, but the "burden at the first stage is a light one."  *Vallone v. CJS Sols. Grp., LLC*, 437 F. Supp. 3d 687, 689 (D. Minn. 2020) (citing *Smith*, 404 F. Supp. 2d at 1149).

In addition to showing class members are similarly situated, "this Court has consistently held that a plaintiff must demonstrate some interest from others who are similarly situated."  *Chin*, 57 F. Supp. 3d at 1090.  "[I]n order for a case to be appropriate for collective-action status under the FLSA, the Court must be satisfied that there are other employees who desire to opt in."  *Id.* (quoting *Lyons v. Ameriprise Fin., Inc.*, No. 10-cv-503 (RHK/JJK), 2010 WL 3733565, at *4 (D. Minn. Sept. 20, 2010)).  "[A]n FLSA plaintiff is not entitled to conditional certification simply to seek out others who might wish to join the action."  *Parker*, 492 F. Supp. 2d at 1166.  Still, a "plaintiff's burden to demonstrate interest is not particularly onerous."  *Chin*, 57 F. Supp. 3d at 1091.

"After discovery is completed, the court conducts an inquiry into several factors if there is a motion to decertify the class."  *Chin*, 57 F. Supp. 3d at 1082 (citing *Burch*, 500 F. Supp. 2d at 1186).  Since the parties here have not completed discovery, this case is at the first step of the two-step inquiry.  *See Brennan*, 2008 WL 819773, at *3.  "Even in

30

cases where the parties have engaged in some discovery, plaintiffs must show only a colorable basis to achieve conditional certification under the first stage of review." *Lyons*, 2010 WL 3733565, at *3 (citations and quotation omitted).

## C.   BluSky

### 1.   Similarly Situated Putative Class Members

"The term 'similarly situated' is not defined by the FLSA, but it typically requires a showing that an employer's commonly applied decision, policy, or plan similarly affects the potential class members, and inflicts a common injury on plaintiffs and the putative class." *Chin*, 57 F. Supp. 3d at 1083 (cleaned up). "[P]laintiffs need only establish . . . a colorable basis for their claim that the putative class members were the victims of a single decision, policy, or plan." *Id.* at 1082 (citing *Burch*, 500 F. Supp. 2d at 1186). "A colorable basis means that plaintiffs must come forward with something more than the mere averments in their complaint in support of [their] claim." *Lyons*, 2010 WL 3733565, at *3 (cleaned up). "Determining whether Plaintiff's showing meets this standard lies within the Court's sound discretion." *Chin*, 57 F. Supp. 3d at 1083 (cleaned up).

Plaintiffs argue that under the fairly lenient standard applicable at the notice stage, the pleadings and declarations submitted in support of this Motion sufficiently establish a colorable basis that manual laborers were and are subject to BluSky's timekeeping system and are victims of BluSky's standard practices of failing to record and failing to pay manual laborers for all of their hours worked.  (Dkt. 125 at 12.)  Plaintiffs point to the eight declarations from former manual laborers and non-commercial drivers who

31

worked for BluSky and Labor Source at numerous project locations around the country, which they claim establish that workers on BluSky projects (1) performed the same basic job duties, (2) were subject to the same or substantially similar timekeeping system, (3) were not paid for all hours worked due to BluSky's common practice of fabricating time sheets, and (4) were not paid their full wages because of Defendants' common practice of making improper wage deductions for categories such as hotel, and other expenses.  (Dkt. 135 at 13.)  BluSky counters that Plaintiffs' putative collective includes workers who worked on projects staffed out of over 30 BluSky offices in at least 40 states, including over 12,000 different projects involving over 100 different temporary labor providers, and that Plaintiffs fail to present any evidence, let alone establish, that all of the workers employed by these labor providers were subject to the same allegedly unlawful Labor Source policies that Plaintiffs were; and as a result, Plaintiffs are not "similarly situated" to the putative collective they seek to certify.  (Dkt. 167 at 17.)  BluSky also points to Murphy's deposition where he testified he was unaware of the practices with respect to any of the alleged unlawful pay practices in this case at any other BluSky projects.  (*Id.*)

There is no challenge to BluSky's written policies, and in such a situation the question becomes "how much evidence must a plaintiff submit in order to establish a 'colorable basis' that all members of the putative class were harmed by the same unlawful policy."  *Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 940 (D. Minn. 2009).  The decision in *Saleen* is instructive where there is no direct evidence that BluSky has adopted a company-wide policy with respect to timekeeping and under recording time of non-exempt laborers on its projects in order to save money:

Of course, the mere fact that some employees of a large corporation were not properly compensated under the FLSA does not provide a "colorable basis" to infer the existence of an unlawful companywide policy. In any large corporation, mistakes are going to be made. Innocent human error—such as computation mistakes, or records being accidentally misplaced—will inevitably result in some employees being underpaid. Moreover, in any large corporation, there are going to be local managers who are ignorant of corporate policies, or who misunderstand corporate policies, or who intentionally violate corporate policies in order to make their own performance look better. Thus the mere fact that a small fraction of employees allege that they did not receive the compensation to which they were entitled provides almost no evidence that the reason that these employees were underpaid was because of an unlawful companywide policy.

At the same time, as the fraction of employees who allege that they were shortchanged grows, it becomes less likely that the employees are the victims of innocent mistakes or local managers, and more likely that they are the victims of an unlawful companywide policy. At some point—and courts struggle to identify this point—the percentage of employees who complain of being improperly compensated grows large enough to establish a "colorable basis" to infer that they were victimized by a companywide policy. When that happens, a class should be conditionally certified, and court-supervised notice should be ordered.

649 F. Supp. 2d at 941.

Here, Plaintiffs do not contest BluSky's assertion that it has over 30 corporate and regional office locations nationwide, that it typically has active projects in at least 40 states at any given time, or that in the last three years it has worked on over 12,000 projects involving 100 different temporary labor providers. (Dkt. 167-2 at 6.) Indeed, Plaintiffs rely on BluSky's website, which states that it provides its services throughout the United States, confirms that it has 33 corporate and reginal offices, and that it is typically working in over 40 states at any given time. (Dkt. 136-2 at 1.) In support of seeking a nationwide class, Plaintiffs have offered the following:

- Murphy's Declaration that in speaking to other unidentified persons at the Minnesota Weyerhaeuser Project, he learned that the same unlawful timekeeping and under-reporting of time practices occurred at each of BluSky's projects regardless of the specific location.  (Dkt. 137-8 ¶ 14.)

- Opt-in Plaintiffs Hodo, Pettis, Blackmon, Mong, and Brown's Declarations, in which they do not assert that they have worked on a BluSky project outside of Minnesota, but nevertheless assert, that based on talking with other employees, they learned that BluSky uses the same unlawful timekeeping and under reporting of time practices at each project regardless of the specific location.  (*See*, *e.g.*, Dkt. 137-1 ¶ 15; Dkt 137-2 ¶ 14; Dkt. 137-3 ¶ 14; Dkt. 137-5 ¶ 15; Dkt. 137-6 ¶ 14.)

- Opt-in Plaintiff Maye's assertion that similar unlawful timekeeping and under-reporting of time practices were used by Labor Source and BluSky at projects in North Carolina, and her assertion that, based on talking with other employees, she learned that BluSky uses the same timekeeping practices and payment at each project regardless of specific location.  (Dkt. 137-4 ¶¶ 7-11, 15.)

- Opt-in Plaintiff Norris' assertions that he had worked as a non-exempt worker paid on an hourly basis and that at each project he worked at for Labor Source and BluSky, they implemented the same unlawful timekeeping and under-reporting of time practices at BluSky projects in Missouri, Illinois, and Minnesota.  (Dkt. 176-1 ¶¶ 3-6, 16.)

- Opt-in Plaintiff Norris' assertion that Hebeler at BluSky informed him, once Norris became a team lead on the Minnesota Weyerhaeuser Project, that it is BluSky's normal practice to under-report the hours worked by manual laborers in order to save money and that it was Norris' job as a team lead to make sure the total number of hours recorded were as low as possible by uniformly filling out time sheets, even before employees saw them, and getting the employees to sign their name to the time sheets, even though the times were not accurate.  (*Id.* ¶¶ 10-13, 16.)

The Court finds that Plaintiffs' evidence is insufficient to establish a colorable basis for a nationwide collective action even under the lenient conditional certification standard.  Out of the initial eight declarations supplied by Plaintiff, seven of them only applied to the Weyerhaeuser Project in Minnesota.  Only Maye's Declaration dealt with

any actions by BluSky outside of Minnesota on three BluSky projects in North Carolina. It is true that each of these declarations professes that Plaintiffs learned by talking with other employees that BluSky uses the same timekeeping and payment practices at each project regardless of specific location. However, assertions not based on personal knowledge will not show that employees are similarly situated. *See Brooks v. C.H. Robinson Int'l, Inc.*, No. 16-CV-0939-CV-W-BP, 2018 WL 5818377, at *3 (W.D. Mo. July 6, 2018); *see also Jones v. Corporate Bank Transit of Kentucky, Inc.*, No. 13-0484-CV-W-BP, Doc. 69 at 2-3 (W.D. Mo. June 18, 2014); *Simmons v. Valspar Corp.*, 2011 WL 1363988, at *3 (D. Minn. 2011); *Wacker v. Personal Touch Home Care, Inc.*, 2008 WL 4838146, at *1 (E.D. Mo. Nov. 6, 2008) (plaintiffs made no showing of a national policy, and "the former employee who signed plaintiffs' affidavit has no personal knowledge of what goes on at other offices around the country"); *Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003). The only other evidence is Norris' declaration on Reply. It is unclear to the Court whether Norris is asserting in his declaration that he was underpaid while he was working at the Missouri and Illinois projects as a non-exempt laborer. Norris does assert that the same timekeeping and payroll system in Minnesota "was in place for each BluSky project I worked, regardless of location. At each location, BluSky systematically instructed the team leads to under-report and fabricate the time sheets so that BluSky's labor costs would be reduced and so the workers would be under-paid." (Dkt. 176-1 ¶ 16.) However, he only became crew lead on the Weyerhaeuser Project towards the end of his work with Labor Source and BluSky, during which he claims he was told by then BluSky project manager Hebeler

about BluSky's practices with respect to time keeping and under reporting hours of

laborers.  Again, the Declaration is devoid of his first-hand knowledge regarding his

claim that BluSky systematically instructed the team leads at projects outside of

Minnesota to under-report and fabricate time sheets.

Regardless, even assuming the Court takes Norris' assertion at face value,

Plaintiffs seek to support a nationwide class based on one project in Minnesota, three

projects in North Carolina, one in Illinois, and one in Missouri, for a total of six projects

in four states, all involving the same temporary labor provider, despite the fact that

BluSky typically has projects going in at least 40 states at any given time, and that during

the relevant period, had over 12,000 projects using 100 different temporary labor

providers.  Such a small sample size does not support a nationwide class involving

widespread violations resulting from a common policy or plan.  *See Harris v. Chipotle*

*Mexican Grill, Inc.*, 49 F. Supp. 3d 564, 578-79 (D. Minn. 2014) (rejecting a nation-wide

class where five of the six declarations concerned conduct only at the defendant's

Crystal, Minnesota restaurant, the other declaration's locations were limited to a few

restaurants in Colorado; and the other supporting evidence involved Internet postings

from individuals located in Victorville, California and Chicago, Illinois); *see also Saleen*,

649 F. Supp. 2d at 942 (denying conditional certification because plaintiffs only provided

evidence from 112 declarants at 71 facilities out of a proposed class of 30,000 employees

at 820 facilities); *Bredbenner v. Liberty Travel, Inc.*, No. CIV. 09-CV-00905WJMM,

2009 WL 2391279, at *3 (D.N.J. July 31, 2009) (denying without prejudice a motion for

nationwide certification based on practices set forth in five declarations as to travel

agents operating in three states); *West v. Border Foods, Inc*., Civ. No. 05-2525

(DWF/RLE), 2006 WL 1892527, at *6 (D. Minn. July 10, 2006) (citations omitted).  The

Court acknowledges that in *Burch,* relied on by Plaintiffs (Dkt. 135 at 13), the Court

conditionally certified a nationwide collective of approximately 8,000 workers based on

declarations from nineteen plaintiffs.

> Although the percentage of potential class members submitting affidavits is
> smaller than in *West v. Border Foods, Inc.*, Civil No. 05-2525 (DWF/RLE),
> 2006 WL 1892527 (D. Minn. July 10, 2006), **Plaintiffs have submitted
> evidence of a common scheme <u>in which all workers</u> are monitored by a
> nationwide monitoring system** rather than only by individual managers.
> Also, although Plaintiffs have not submitted affidavits covering every call
> center . . . , the record contains . . . evidence of a common nationwide
> monitoring system, and evidence that job duties do not significantly vary
> from call center to call center.

*See Burch*, 500 F. Supp. 2d at 1189 (cleaned up) (emphasis added).  However, unlike

*Burch*, Plaintiffs provided no evidence of a nationwide practice on the part of BluSky as

to all projects (as compared to the "nationwide monitoring system" in *Burch*), or for that

matter, any evidence that this practice is happening in Minnesota outside of the

Weyerhaeuser Project.

Moreover, as argued by BluSky (Dkt. 167 at 24), this is further complicated by its

use of 100 labor providers across the country, and the fact that Plaintiffs have only

provided evidence as to BluSky and Labor Source.  *See Gibbs v. MLK Express Servs*.,

LLC, No. 218CV434FTM38MRM, 2019 WL 2635746, at *6-8 (M.D. Fla. June 27, 2019)

("A common policy is particularly relevant here because Gibbs alleges a nationwide joint

employer theory, seeking to hold Amazon liable for overtime violations at an unknown

number of DSPs.  As Amazon notes, there must be some 'glue' that holds the case

together, and a common Amazon policy leading to nationwide FLSA violations would help bind the claims. . . .  The evidence demonstrates that, even if the Court ultimately determined Amazon is a joint employer, it would still need to examine every DSP's payment scheme individually for FLSA violations.  In other words, Gibbs cannot prove with common evidence that the Nationwide Class is similarly situated on Amazon's policy of FLSA violations.").  In this case, there is no evidence that the conduct alleged by Plaintiffs is happening with any other labor provider and BluSky.  That said, Plaintiffs' evidence supports the assertions of violations resulting from a common policy at the Weyerhaeuser Project.

BluSky points to Murphy's testimony, claiming that Murphy admitted that he only alleged that BluSky played any role in the allegedly unlawful practices because he was "confused" about who worked for BluSky and who worked for Labor Source, but that it was clear to him that he is only alleging that Labor Source failed to pay him and others correctly, and that it was only Labor Source who fabricated time sheets.  (Dkt. 167 at 10.)  While Murphy's belief as to who was ultimately responsible for paying him and others incorrectly may be relevant, it is not necessarily determinative, especially on a motion for conditional certification.  This is especially true here where Norris, who was privy to BluSky's conduct in conjunction with Labor Source as a crew leader at the Weyerhaeuser Project (as opposed to a laborer such as Murphy and other opt-in Plaintiffs) provided evidence to the contrary as set forth above.  Moreover, the situation in this case is different than that in *Emonds v. Amazon.com, Inc.*, No. C19-1613JLR, 2020 WL 5993908 (W.D. Wash. Oct. 9, 2020), cited by BluSky (Dkt. 167 at 26), where the court concluded

that even if it were to credit the plaintiff's claims that Amazon acted as a joint employer for the delivery drivers in the proposed collective, the plaintiff failed to plausibly assert a material similarity among the potential plaintiffs with regard to the denial of overtime payment beyond Amazon's alleged status as their joint employer. *Id.* at *5. Here, Plaintiffs' declarations are evidence that BluSky used and directed the use of the sign-in sheets though Labor Source crew leaders as a means to underreport the time of the laborers working at the Weyerhaeuser Project to save money.

The Court also rejects any assertion by BluSky that it must make a determination at this point as to whether a joint employment relationship exists as to BluSky and Labor Source. This goes to the merits of the case, which is for the decertification stage of a FLSA action, especially where most of this information is in Defendants' control. *See Chin* 57 F. Supp. 3d at 1085 (explaining that "courts in the Eighth Circuit have consistently held that merits based inquiries, including whether an FLSA exemption applies, are appropriate for the second, decertification stage of FLSA actions.") (citations omitted). The Court notes that a labor broker and its client may serve as a joint employer for purposes of the FLSA. *See Padilla v. Caliper Bldg. Sys., LLC*, No. 20CV00658SRNKMM, 2020 WL 5629837, at *2-4 (D. Minn. Sept. 21, 2020); *see also* 29 U.S.C. § 203(d) ("'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee ...."); *id.* § 203(g) ("'Employ' includes to suffer or permit to work.").

Moreover, the Court disagrees with BluSky's argument that "[t]his is an impermissible 'fail-safe' collective because it conditions membership in the collective on

39

Plaintiffs prevailing on the merits of their claim that BluSky employed each member of the putative collective." (Dkt. 167 at 37.)  In the context of a Rule 23 class action, the Eighth Circuit has recognized that a fail-safe class in which the class is defined to preclude membership unless a putative member would prevail on the merits "is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound." *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019) (cleaned up).  "It has been recognized, however, that a fail-safe class is not of concern in a FLSA collective action 'where class membership is readily and objectively ascertainable on the basis of payroll records regardless of whether such evidence also speaks to the strength of individual prospective members' cases." *Feustel v. Careerstaff Unlimited, Inc.*, No. 1:14-CV-264, 2015 WL 13021897, at *2 (S.D. Ohio Mar. 25, 2015) (quoting *Gordon v. Maxim Healthcare Servs.*, No. 13-7175, 2014 U.S. Dist. LEXIS 172054, at *9-10 n. 1 (E.D. Pa. Dec. 11, 2014)); *see also Cummins v. Ascellon Corp.*, No. CV DKC 19-2953, 2020 WL 6544822, at *8 (D. Md. Nov. 6, 2020) ("Plaintiffs define the class to include all technicians who worked for [the defendant] and were not paid one-and-a-half times their regular rate of pay for all hours worked in excess of 40 per workweek and/or the minimum wage for each hour worked.  The facts that define an individual as a class member are knowable without any determination of liability.")  In this case, the Minnesota collective can be identified without a determination of joint employer status because the collective is limited to those employed by Labor Source who worked at the BluSky Weyerhaeuser Project.

The Court therefore concludes that Plaintiffs have established a colorable basis for their claim that they and the putative class members were the victims of a single decision, policy, or plan by BluSky as to the Weyerhaeuser Project to not compensate time that should have properly been considered work time, and are thus similarly situated.

### 2.      Interested Opt-In Plaintiffs

"In order for a case to be appropriate for collective-action status under the FLSA, the Court must be satisfied that there are other employees who desire to opt in." *Lyons*, 2010 WL 3733565, at *4 (cleaned up); *see also Chin*, 57 F. Supp. 3d at 1090. "[T]he plaintiff's burden to demonstrate interest is not particularly onerous." *Id.* at 1091. Plaintiffs did not address interest in their papers. However, there are at least five opt-in Minnesota Plaintiffs (not even including Norris). The facts of this case and Plaintiffs' "not particularly onerous" burden lead the Court to conclude that Murphy combined with five opt-in Plaintiffs demonstrates sufficient interest in the litigation from others on the Weyerhaeuser Project in Minnesota who are similarly situated. *See Chin*, 57 F. Supp. 3d at 1091 (granting conditional certification where there was one named plaintiff and four opt-in plaintiffs).

## D.      Equitable Tolling as to Labor Source

Labor Source argues that potential FLSA claims of putative opt-in members of the proposed Minnesota Collective are time-barred and that Plaintiffs' attempt to rectify their untimely motion through equitable tolling fails to meet the high threshold for such relief. (Dkt. 169 at 17.) Under the FLSA, the statute of limitations is "two years after the cause of action accrued . . . except that a cause of action arising out of a willful violation may

be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).
In this case, Plaintiffs have asserted willfulness on the part of Defendants in their
Complaint.

Under the FLSA, an action is considered commenced on the date when a
complaint is filed, 29 U.S.C. § 256(a), but for a party in a collective action who is not
named on the face of the complaint, the action commences when he or she files a written
consent to join the action, *id.* § 256(b). As a result, the statute of limitations continues to
run until a putative class member elects to join the suit by filing a written consent. *See
Olukayode v. UnitedHealth Grp.*, No. 19-CV-1101 (DSD/HB), 2020 WL 1486058, at *2
(D. Minn. Mar. 27, 2020) (citing 29 U.S.C. § 255). Here, the Complaint was filed on
July 23, 2019, which was the same date the named Plaintiffs filed their written consent
forms. (Dkt. 1) On September 3, 2019, Plaintiffs filed Norris' written consent. (Dkt.
25.) On February 7, 2020, Plaintiffs filed Pettis' written consent. (Dkt. 53.) On March 9
and 10, 2020, Plaintiffs filed Hodo's and Brown's written consents. (Dkt. 54 and 55.)
On April 22, 2020, Plaintiffs filed Blackmon's written consent. (Dkt. 62.) On January
15, 2021, Plaintiffs filed Marquan Coleman's written consent. (Dkt. 118.) On January
20, 2021, Plaintiffs filed Brandy Julien's written consent. (Dkt. 119.) On January 27,
2021, Plaintiffs filed Maye's written consent (Dkt. 121), and on February 3, 2021, they
filed Mong's written consent. (Dkt. 125.) On February 16, 2021, Plaintiffs filed
Speight's written consent. (Dkt. 129.) On March 3 and 4, 2021, Plaintiffs filed Ronnie
Battle and Montavias Battle's written consents. (Dkts. 140 and 141.)

One Source maintains that the Weyerhaeuser Project is the only instance where

Labor Source employees worked on any BluSky project in Minnesota from July 2016 to present.[5]  (Dkt. 170 ¶ 8.)  Labor Source also asserts that its employees worked on the Weyerhaeuser Project from August 2017 to March 2018; that the last day of the workweek that any Labor Source employee performed work on the Weyerhaeuser Project was March 10, 2018; and that the last possible payday for work performed by Labor Source employees on the Weyerhaeuser Project was the following Thursday, March 15, 2018.  (*Id.* ¶ 7.)  Plaintiffs do not contest these facts.

"The doctrine of equitable tolling permits a plaintiff to 'sue after the statutory time period has expired if he has been prevented from doing so due to inequitable circumstances.'"  *Pecoraro v. Diocese of Rapid City*, 435 F.3d 870, 875 (8th Cir. 2006) (cleaned up).  Equitable tolling of a statute of limitations is a "limited and infrequent form of relief."  *Smithrud v. City of St. Paul*, 746 F.3d 391, 396 (8th Cir. 2014). "[E]quitable tolling is an exception to the rule, and therefore should be used only in exceptional circumstances."  *Firstcom, Inc. v. Qwest Corp.*, 555 F.3d 669, 675 (8th Cir. 2009).  "The party who is claiming the benefit of an exception to the operation of a statute of limitations bears the burden of showing that he is entitled to it."  *Wollman v. Gross*, 637 F.2d 544, 549 (8th Cir. 1980).  The party seeking equitable tolling must establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  *Firstcom*, 555 F.3d at 675. (cleaned up); *see also Smithrud*, 746 F.3d at 396.  Courts within this District have applied this standard

---

[5]      This Court notes that unlike BluSky, this Court found it had no jurisdiction over a nationwide collective action against Labor Source.  (*See* Dkt. 61)

to FLSA collective actions.  *See, e.g.*, *Olukayode*, 2020 WL 1486058, at *2; *Gamble v.*

*Minn. State-Operated Servs.*, 16-cv-02720-JRT-KMM, 2018 WL 7254598, at *1 (D.

Minn. Nov. 14, 2018) (applying *Smithrud*), *R. & R. adopted by* 2019 WL 313034 (D.

Minn. Jan. 24, 2019); *Holaway v. Stratasys, Inc.*, Civil No. 12-998 (PAM/JSM), 2012

WL 12895690, at *4 (D. Minn. Oct. 30, 2012).

> With respect to tolling, Plaintiffs argue:
>
> There has been substantial litigation that delayed Plaintiffs' ability to move for conditional certification. This case was originally filed on July 23, 2019, more than one-and-a-half years ago.  *See* Dkt. 1.  After the Defendants initially moved to dismiss at the end of September 2019 (Dkt. 33), the parties did not receive a final ruling on that motion to dismiss until six months and two weeks later, on April 16, 2020. *See* Dkt. 61.  The Court granted Plaintiffs leave to amend their complaint, which was filed shortly after on May 7, 2020. *See* Dkt. 67.  Labor Source filed an answer on June 4, 2020. *See* Dkt. 73. That same day, Defendant BluSky filed yet another motion to dismiss. See Dkt. 68.  The parties briefed that issue, and the Court denied BluSky's second motion to dismiss on October 14, 2020.  *See* Dkt. 78.  BluSky did not respond to Plaintiffs' Amended Complaint until November 13, 2020.  *See* Dkt. 90. During that entire period of time, from the inception of this case through BluSky finally answering the lawsuit, 479 days (1 year, 3 months, and 3 weeks) passed without Plaintiffs having the ability to conduct even the most basic and preliminary discovery to move for conditional certification and issue court-approved notice to the putative collective members.

(Dkt. 135 at 24.)

Based on these events, Plaintiffs ask the Court to equitably toll the limitations

period for the putative Collective members from May 21, 2020 (the date BluSky's

Answer to the Amended Complaint was originally due), through the close of the opt-in

period.  (*Id.* at 26.)

Labor Source argues that Plaintiffs were not prevented from conducting discovery,

since discovery was not stayed pending resolution of the motions to dismiss and that

Plaintiffs could have sought a Rule 26(f) conference and commenced discovery at any time after initiating their lawsuit, thereby making "Plaintiffs' decision to wait until November 24, 2020, to serve any discovery a delay of their own creation that can hardly be considered an extraordinary circumstance beyond their control.'" (Dkt. 159 at 21.)

As a starting point, Plaintiffs stipulated to a number of extensions for Defendants to respond to the Complaint. (Dkts. 15, 19, 29.) While the Court appreciates the courtesy provided by Plaintiffs to Defendants, Defendants made no promises (nor did Plaintiffs seek) an agreement as to tolling in exchange for the extensions. Nothing in the record suggests Defendants misled Plaintiffs into thinking settlement was likely if they agreed to the extensions. Under these circumstances, the Court cannot find that tolling from the date of when the answer was due is appropriate.

That said, on September 20, 2019, Defendants filed a Motion to Dismiss the action, which challenged the personal jurisdiction of this Court and sought dismissal of the putative collective action for failure to state a claim. (Dkts. 33, 35.) The Motion to Dismiss was referred to the undersigned on a Report and Recommendation, which issued on March 12, 2020. (Dkt. 56.) The parties objected to the Report and Recommendation, and United States District Judge Michael J. Davis issued his Order on April 16, 2020, ordering Plaintiffs to file an amended complaint based on his decision. (Dkt. 61.) While Labor Source now argues that Plaintiffs could have conducted discovery and pursued conditional certification while the Motion to Dismiss was pending (Dkt. 169 at 21-26), this argument suggests—quite disingenuously given the history of this matter—that

Defendants would have been amenable to Plaintiffs doing so. The Court finds this argument entirely unpersuasive.

Courts have concluded that equitable tolling is appropriate where a defendant has brought a motion to dismiss. *See*, *e.g.*, *Abrams v. City of Albuquerque*, No. 10-0872 MV/RHS, 2014 WL 11497810, at *10-11 (D.N.M. June 26, 2014) (finding that tolling was appropriate where Plaintiff in balance acted diligently and a motion to dismiss and the decision by the Court delayed the motion for certification); *In re Bank of Am. Wage & Hour Emp. Litig.,* No. 10-MD-2138-JWL, 2010 WL 4180530, at *6 (D. Kan. Oct. 20, 2010) ("As a starting point, the court believes that it is appropriate to toll the statute of limitations against both defendants during the pendency of the Bank's substantive motion to dismiss plaintiffs' consolidated complaint. While the court did not formally stay the proceedings once the Bank filed its motion, the court would not have expected plaintiffs to expend time and valuable resources working to notify putative class members of this MDL in the face of a motion to dismiss all counts of the consolidated complaint and in light of the *Fortner* order. To be sure, then, notification in this case has been delayed, through no fault of plaintiffs or their counsel, by the filing and processing of the motion to dismiss."); *Stickle v. SCI Western Market Support Center, L.P.*, No. CV 08-083-PHX-MHM, 2008 WL 4446539, at *22 (D. Ariz. Sept. 30, 2008) (court denied without prejudice plaintiffs' motion for expedited collective action notification and directing plaintiffs to re-file the motion after the court resolved anticipated motions to dismiss; thereafter, tolling statute of limitations from the date defendants filed their motions to dismiss through the date plaintiffs re-filed their motion for expedited collective action

notification). The Court is cognizant of the delay caused by Defendants' initial Motion to Dismiss, including time spent briefing the Motion and time spent waiting first for the Report and Recommendation and then the final Order. This delay is not Plaintiffs' fault, and the Court finds tolling as to this time period—209 days—appropriate. *See*, *generally*, *Harris*, 49 F. Supp. 3d at 582 (tolling period between issuance of report and recommendation and issuance of final order on motion for certification).

While the 209-day delay caused by the Motion to Dismiss may constitute an external extraordinary circumstance that stood in the way of certification, that does not end the inquiry with respect to whether tolling is appropriate as to the claims against Labor Source. As part of the Court's April 16, 2020 Order on the Motion to Dismiss, Plaintiffs were given until May 7, 2021 to file an amended complaint, and Plaintiffs filed their Amended Complaint on that date. (Dkt. 67.) Labor Source filed its Answer to the Amended Complaint on June 4, 2020. (Dkt. 73.) Yet Plaintiffs inexplicably waited until November 2020 to conduct discovery as to any of the Defendants, almost nine months to file the motion for conditional certification as to Labor Source, and took no other actions in the interim to toll the statute of limitations. The Court is cognizant that BluSky filed another Motion to Dismiss on June 4, 2020 (Dkt. 68), which was not denied until October 14, 2020 (Dkt. 78), and then filed a Motion for Certification for Interlocutory Appeal as to jurisdiction on November 13, 2020 (Dkt. 91), which was denied on February 12, 2021 (Dkt. 128). That said, BluSky—not Labor Source—was the source of this delay, and Plaintiffs chose at their own peril to wait for an answer as to both Defendants to proceed. *See Delgado v. United States*, No. 97-1(4), 2002 WL 1763997, at *2 & n.3 (D. Minn.

July 26, 2002) (noting that "equitable tolling is proper only when extraordinary circumstances beyond a party's control make it impossible to file . . . on time, despite the party's due diligence," or when the defendant has engaged in conduct that has "lulled the plaintiff into inaction") (cleaned up).  While Plaintiffs may have had a tactical reason, including conserving resources, the Court cannot find that Plaintiffs acted diligently as a whole after the April 16 Order on the first Motion to Dismiss so as to warrant equitable tolling with respect to the claims against Labor Source.

"The sole consequence of conditional certification is the sending of court-approved written notice to employees. . . ."  *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75, (2013) (citation omitted).  Here, more than three years and 209 days have passed since the last work and payment on the Weyerhaeuser Project in March 2018, meaning that any remaining opt-in plaintiff's claim is time-barred.  The Court therefore denies the Motion for Conditional Certification with respect to Labor Source.  However, as Labor Source concedes (Dkt. 168 at 18-19), the parties that have already opted-in as Plaintiffs remain parties to this action.

**E.      Equitable Tolling as to BluSky**

BluSky does not challenge Plaintiffs' request for equitable tolling in its written submissions.  As described above, BluSky filed a second Motion to Dismiss (Dkt. 68) and a Motion for Certification for Interlocutory Appeal (Dkt. 91), and the time it took to rule on these Motions was outside of Plaintiffs' control.  The Court finds that Plaintiffs acted diligently on the whole to file their Motion for Conditional Certification once the Court ruled on BluSky's Motions.  BlueSky's continued motion practice caused much of

the delay, and as noted by the Eighth Circuit, there may be instances when equitable

tolling is appropriate even though the defendant was not the cause of the time bar. *See*

*Redman v. U.S. W. Bus. Res., Inc.*, 153 F.3d 691, 695 n.5 (8th Cir. 1998) (citation

omitted). The Court will not punish unidentified opt-ins because BluSky filed multiple

motions and because the Court took some time to rule on those motions, including the

Motion for Conditional Certification. *See Waters v. Kryger Glass Co.*, No. 09-1003-CV-

W-SOW, 2011 WL 13290713, at *7 (W.D. Mo. Jan. 12, 2011) ("The Court is persuaded

by the lack of notice to potential plaintiffs and will not penalize plaintiffs or other

putative members for its own docket-management determinations.") (citation omitted).

As such, the Court tolls the statute of limitation for the period from September 20, 2019,

the date Defendants filed the first Motion to Dismiss (Dkt. 33), through the date of this

Order. While Plaintiffs sought additional tolling through the conclusion of the opt-in

period, the Court will deny this request without prejudice. *See Fa Ting Wang v. Empire*

*State Auto Corp.*, No. 14-CV-1491 (WFK) (VMS), 2015 WL 4603117, at *13 (E.D.N.Y.

July 29, 2015) (denying plaintiff's motion for equitable tolling finding "plaintiff's

application is premature; in that the Court will not speculate as to the effect of

defendants' actions on opt-in plaintiffs who have not, as of yet, appeared, and whose

knowledge of their rights at the time of any violations is unknown.").

**F.      Notice**

Having determined that Plaintiffs have met their burden of showing this case is

appropriate for conditional certification as to BluSky, the only remaining issue is the

proposed notice.  Plaintiffs request that the Court conditionally certify a collective action

defined as follows:

> All current and former hourly, non-exempt employees, including but not
> limited to, laborers, non-exempt team leads/crew leaders, non-commercial
> drivers, technicians, carpenters, apprentices, cleaning crew, plumbers,
> welders, and other laborers with similar job duties employed by Defendant
> Labor Source, LLC either individually or jointly with Defendant BluSky
> Restoration Contractors, LLC and who worked on any BluSky projects in the
> State of Minnesota at any time from July 23, 2016 through the present.

(Dkt. 135 at 4.) (Dkt. 35 at 1.)  Given this Court's ruling as to the scope of the collective,

as set forth above, the collective is modified to include the following:

> All current and former hourly, non-exempt employees, including but not
> limited to, laborers, non-exempt team leads/crew leaders, non-commercial
> drivers, technicians, carpenters, apprentices, cleaning crew, plumbers,
> welders, and other laborers with similar job duties employed by Defendant
> Labor Source, LLC **jointly** with Defendant BluSky Restoration Contractors,
> LLC and who worked on the BluSky Weyerhaeuser project in the State of
> Minnesota at any time from July 23, 2016 through the present.

Plaintiffs further request that the Court approve the Court-Authorized Notice (Dkt.

136-6, Ex. 6 at 3-6) and Consent to Sue form (*id.* at 7-8).  The Court grants Plaintiff's

request for a 90-day notice period.  Plaintiffs propose to send the Notice and Consent by

mail (with skip-tracing to ensure the intended recipient receives the notice), email, by

electronic signature on a website that contains the notice, and through a posted copy in a

conspicuous location at all current BluSky projects.  (Dkt. 135 at 17.)  In addition,

Plaintiffs ask that an abbreviated version of the notice be sent via text message, but do

not provide the specifics as to what that abbreviated notice would entail.  (*Id.* at 19-21.)

Plaintiffs also request the Court authorize Plaintiffs' counsel to send a reminder

notice, by email (with the notice attached as an Adobe pdf document) and mail, to the

putative Collective members at the 60th day of the 90-day notice period, for which

Plaintiffs provided a proposed communication.  (*Id.* at 17-19; *see also* Dkt. 136-9.)

With respect to the Minnesota employees, Plaintiffs seek the production within ten

days of this Order of the names and contact information of all manual laborers who have

worked on BluSky projects within three years of the initiation of this lawsuit, which

contains the following information relevant to the Minnesota Collective:

> All current and former hourly, non-exempt employees including laborers, non-exempt team leads, non-exempt crew leaders, non-commercial drivers, technicians, carpenters, apprentices, cleaning crew, plumbers, welders, and other laborers with similar job duties employed by Labor Source and who worked on any BluSky projects in the State of Minnesota from July 23, 2016, including each individual's (1) name, (2) last known mailing address, (3) last known email address (whether work or personal) and phone number(s), and (4) dates and locations of employment in Minnesota.

(Dkt 135 at 21.)  Plaintiffs contend that BluSky has access to this information, either

through its own records, or through the staffing companies, such as Labor Source, which

BluSky uses for projects.  (*Id.* at 22.)

Outside of the scope of the collective, BluSky did not object to any aspect of

Plaintiffs' proposed class definition, scheme for notice, or request for an order

compelling production of information regarding employees.

"District courts have discretion in appropriate cases to implement 29 U.S.C.

§ 216(b) by facilitating notice to potential plaintiffs."  *Chin*, 57 F. Supp. 3d at 1094

(citing *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 169 (1989)) (reviewing

benefits of court involvement with notice).

The Court exercises its discretion to facilitate notice in this case and approves the plan proposed by Plaintiffs subject to the following modifications:

The initial "TO" line in the proposed notice shall read: "**ALL CURRENT AND FORMER MANUAL LABORERS WHO HAVE WORKED ON THE WEYERHAEUSER PROJECT IN THE STATE OF MINNESOTA FOR BLUSKY RESTORATION CONTRACTORS, LLC FROM <u>JULY 23, 2016</u> TO THE PRESENT.**"

The Court also removes the phrase "Labor Source, LLC (also known as One Source Staffing and Labor or CATSTAFF)" in paragraph 1 "Introduction" of the proposed notice. (Dkt. 136-6 at 3.)

As to paragraph 2, this portion of the notice is modified to read:

A lawsuit was filed against BluSky by Marcquise Murphy ("Plaintiff") on behalf of himself and all other similarly situated individuals. Specifically, the lawsuit contends that BluSky, either on its own or jointly with Labor Source, LLC (also known as One Source Staffing and Labor or CATSTAFF), failed to properly record all hours worked and made improper deductions from workers' pay over the three-year period before the lawsuit was filed, and that these individuals are owed minimum wages and overtime for time they worked in excess of 40 hours per week. BluSky denies the allegations and contends that it properly paid all manual laborers.

Paragraph 3 of the proposed notice is modified as follows to remove the reference to Labor Source and to reflect the restricted scope of the collective to the Minnesota Weyerhaeuser Project:

Plaintiff has sued BluSky to recover minimum wage and/or overtime compensation on behalf of themselves, and on behalf of all hourly-paid manual laborers who worked on the Minnesota Weyerhaeuser Project. Plaintiff also seeks an additional amount for liquidated damages equal to the

amount of the minimum wages and/or overtime compensation owed, as well as attorneys' fees and costs to be paid by BluSky.

Paragraph 10 of the proposed notice is also modified to omit "This Notice is only a summary. For more detailed information, you may review the Lawsuit and other documents for this case at the Notice website, which can be accessed at [INSERT URL]." The Court omits this portion as it is unclear from Plaintiffs what information the website would include. A portion in paragraph 5 allowing the opt-in plaintiffs to submit the opt-in form electronically via a website is also omitted for similar reasons. The remainder of the proposed notice shall remain largely the same except insofar as changed to be consistent with this Order, as shown in Attachment A to this Order.

Plaintiffs shall use the proposed notice as modified by the Court, as set forth in Attachment A. The Notice and Consent will be disseminated by U.S. Mail (with skip tracing) and email. While Plaintiffs seek to allow a party to opt-in by electronic signature on a website that contains the notice, there is nothing before the Court as to what information such a site would contain. Moreover, the Court will not require a posted copy in a conspicuous location at all current BluSky projects, in light of the limited scope of the collective and based on the fact that such a notice borders on solicitation beyond the scope of the collective. *See Kapzynski v. Colt Barbeque & Spirits LLC*, No. CV-21-08040-PCT-MTL, 2021 WL 6063533, at *2 (D. Ariz. Dec. 22, 2021). Although the Court is not opposed to notification via text messaging, it is unclear what Plaintiffs propose this notice should include. Plaintiffs may renew this request as part of the reminder notice. To this end, the Court authorizes Plaintiffs' counsel to send a reminder

notice, by email[6] (with the notice attached as an Adobe pdf document) and mail, to the

putative collective members on the 60th day of the 90-day notice period consistent with

the communication at Docket Entry 136-10, minus the reference to Labor Source in the

body of the email.  *See Chin*, 57 F. Supp. 3d at 1094.

The Court also grants Plaintiffs' request for production of the following list of

information:

> All current and former hourly, non-exempt employees including laborers, non-exempt team leads, non-exempt crew leaders, non-commercial drivers, technicians, carpenters, apprentices, cleaning crew, plumbers, welders, and other laborers with similar job duties employed by Labor Source and who worked on the BluSky the Weyerhaeuser project in Minnesota anytime from July 23, 2016 through the present, including each individual's (1) name, (2) last known mailing address, (3) last known email address (whether work or personal) and phone number(s), and (4) dates of employment,

The phone number shall not be used unless the Court allows a further reminder

notice via text messaging.  All of this information shall be provided to Plaintiffs' counsel

within 14 days of this Order.

## II.   MOTION TO STRIKE RULE 68 OFFER (DKT. 152)

### A.   Factual Background

On January 12, 2021, Defendants made the following Rule 68 Offer of Judgment

("Rule 68 Offer ") to the then-named Plaintiffs and existing opt-in Plaintiffs:

> Defendants Labor Source, LLC d/b/a Catstaff d/b/a One Source Staffing and Labor ("Labor Source") and BluSky Restoration Contractors, LLC ("BluSky") (collectively, "Defendants"), by and through the undersigned counsel, and pursuant to Rule 68 of the Federal Rules of Civil Procedure, hereby offer the following to Plaintiffs Marcquise Murphy, Ratanya Rogers,

---

[6]   The proposed email at Docket Entry 136-9, shall be modified consistent with the modifications to the proposed notice.

Cynthia Hodo, DeAntwone Norris, Devin Pettis, Laquon Blackmon, and Ledon Brown ("Plaintiffs") as a compromise of the above-referenced case as it pertains to Plaintiffs' claims against Defendants, with no admission of wrongdoing by the Defendants.

The terms and conditions of this Offer of Judgment are as follows:

1. That Judgment be entered in Plaintiffs' favor in the above-captioned case for a total sum of $76,000.00 in backpay and liquidated damages, and reasonable attorney fees and costs up to an additional $76,000, in full and final resolution of all issues raised in Plaintiffs' Amended Complaint and asserted against Defendants in this action.

2. The backpay and liquidated damages portion of the Offer of Judgment is intended to be apportioned as follows:

Marcquise Murphy: $8,500.00
Ratanya Rogers: $9,000.00
Cynthis Hodo: $9,000.00
DeAntwone Norris: $13,000.00
Devin Pettis: $9,000.00
Laquon Blackmon: $8,500.00
Ledon Brown: $19,000.00

3. This Offer of Judgment is a total obligation offer and includes all accrued prejudgment interest, costs and disbursements, and any applicable attorney fees under any theory or basis whatsoever. Thus, the amounts offered in this Offer of Judgment are inclusive of any attorney fees or costs and, if accepted, Plaintiffs' counsel has no rights to petition the Court for any additional remedies including but not limited to interest, attorney fees, or costs.

4. This Offer of Judgment is conditioned on the unanimous acceptance of all seven (7) Plaintiffs.

5. This Offer of Judgment applies to all claims between all Plaintiffs and Defendants under federal and state law arising from the facts, events, transactions, and series thereof that form the subject matter of this action and, if accepted, acts as a complete bar to any further claims arising from such facts, events, transactions, and series thereof.

6. This Offer of Judgment is made for the purposes specified in Federal Rules of Civil Procedure 68, and is not to be construed either as an admission that Defendants are at fault or liable in this action, or that Plaintiffs have suffered

damages or are otherwise entitled to any relief. This Offer of Judgment is not a waiver or relinquishment of Defendants' defenses in this action. A judgment entered upon acceptance of this Offer of Judgment shall not be deemed to have determined or adjudicated any issue relevant to the merits of Plaintiffs' claims, or the claims of others, and shall instead be construed as effecting the settlement of this case.

7. This Offer of Judgment is conditioned upon the entry of final judgment as to all counts in Plaintiffs' Complaint against Defendants in this action.

8. Acceptance of this offer must be made by service of a written notice of acceptance within fourteen (14) days after service of this offer. Such written notice must accept the offer as stated, without qualification or variation. If this offer is not accepted within fourteen (14) days, it shall be deemed automatically withdrawn.

9. Neither this Offer of Judgment nor any evidence thereof shall be filed or otherwise used in any manner in any court, action, or proceeding of any kind except under the following conditions: this Offer of Judgment may be filed in this action if (1) accepted, then solely for purposes of entering judgment in this action on the terms specified herein as set forth in Fed. R. Civ. P. 68(a); or (2) not accepted, then solely for purposes of determining attorney fees and costs in this action.

(Dkt. 155.)

The Rule 68 Offer was not accepted. There is no evidence in the record that any of the named Plaintiffs or the opt-in Plaintiffs wanted to accept their respective offers but could not do so based on a lack of unanimity of the Plaintiffs. Furthermore, there have been additional opt-in plaintiffs since the date of the Rule 68 Offer. (*See*, *e.g.*, Dkts. 118 and 119.)

**B.      Analysis**

Rule 68 provides in relevant part as follows:

At least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued. If, within 14 days after being served, the

> opposing party serves written notice accepting the offer, either party may
> then file the offer and notice of acceptance, plus proof of service

Fed. R. Civ. P. 68(a).

Plaintiffs argue that Defendants' Rule 68 Offer, which seeks to extinguish this class action before a ruling on class certification, is improper, noting that courts in this District have reasoned that allowing class action defendants to "pick off" plaintiffs with settlement offers prior to obtaining an affirmative ruling on class certification would frustrate the objectives of class actions, would invite waste of judicial resources, and because it seeks to extinguish the class claims before the court has decided class certification creates a conflict of interest. (Dkt. 154 at 6-11.) However, the United States Supreme Court has rejected this type of concern in the FLSA context:

> While settlement may have the collateral effect of foreclosing unjoined claimants from having their rights vindicated in respondent's suit, such putative plaintiffs remain free to vindicate their rights in their own suits. They are no less able to have their claims settled or adjudicated following respondent's suit than if her suit had never been filed at all.

*Symczyk*, 569 U.S. at 77. Moreover, "[b]y its terms, Rule 68 does not create an exception for class or mass actions." *Borup v. CJS Sols. Grp., LLC,* 333 F.R.D. 142, 145 (D. Minn. 2019).

Plaintiffs also argue that the Rule 68 Offer should be stricken or invalidated in order to relieve the Class Representatives of the burden of shouldering the conflict between their duty to pursue class certification with the risk of having costs shifted back to them. (Dkt. 154 at 9-10.) However, as noted by the court in *Borup*, Murphy does not

face a meaningfully greater shift in costs than he would have had he brought this action

solely on his own behalf:

> Regardless of how a judgment would be entered in Borup's favor on the collective claim, he would not face a unique liability as the first person to bring the action. If he and any opt-in plaintiffs receive a single judgment for all of their damages, such a judgment would almost assuredly be "more favorable" than the Rule 68 Offer, and he would not face costs as the Rule speaks of a "judgment," not an offeree's share of such. Fed. R. Civ. P. 68(d). If the judgment Borup receives is not more favorable, either because a single judgment for nominal damages is entered or because individual judgments are entered for each party plaintiff, he would then face the cost-shifting provision of Rule 68. But this is subject to two important caveats.

> First, Borup would face only shifting costs—not attorney's fees.

> * * *

> Second, in evaluating any costs to be shifted to Borup as an individual, the Court would almost certainly pro rate the costs to those reasonably attributable to Borup's personal claim. In a FLSA collective action, each opt-in member is a party plaintiff, giving them the same status in the case as the named plaintiff. *Prickett v. DeKalb County*, 349 F.3d 1294, 1297 (11th Cir. 2003). Yet HCI's Offer was made only to Borup. As HCI acknowledges, had Borup accepted the Offer, one of the existing opt-in plaintiffs could continue the action. Logically, then, any reasonable shifting of costs cannot include "any and all costs" of a multi-plaintiff action that HCI concedes it would continue to litigate had Borup accepted its Offer. Rather, Rule 68's reference to costs must be only those properly attributable to the offeree, Borup, who had the chance to receive a better personal judgment but rejected it.

> Of course, Borup may fail to get either the class or collective actions certified (Scenario 3), but may still obtain a judgment against HCI on his individual claims. If the judgment is more favorable than the Offer, then costs will not shift. Fed. R. Civ. P. 68(d). If the judgment is not more favorable, then Borup will be liable for costs incurred after HCI served its Offer of Judgment, but subject to the same limitations and pro rata analysis previously discussed.

*Borup*, 333 F.R.D. at 148-49. The Court finds the reasoning in *Borup* persuasive. Here,

even assuming that the named Plaintiffs and opt-ins do not receive a judgment more

favorable than that offered by the Rule 68 Offer, they will only be responsible for their apportionment of costs allowed under 28 U.S.C. § 1920.

In addition, Plaintiffs contend that Defendants' Rule 68 Offer was structured in such a way to stoke conflict between the Offerees themselves by requiring unanimity of acceptance.  (Dkt. 154 at 11.)  Plaintiffs cite to *Tocwish v. Jablon*, 183 F.R.D. 239 (N.D. Ill. 1998), where the court addressed the validity of a Rule 68 offer that was extended to multiple plaintiffs in a Section 1983 action, and was conditioned on unanimous acceptance.  *Id.* at 240.  Only three of the seven plaintiffs accepted the offer. *Id.*  The court found that the Rule 68 Offer was invalid because, "By conditioning acceptance of the judgment on the plaintiffs' unanimous agreement, a defendant could insure that at least one of the Plaintiffs would refuse.  This refusal would subject all of them, including those who were willing to accept the offer of judgment, to the rule's penalty provision."  *Id.* at 241.  There is no indication in this case that any of the Plaintiffs or opt-ins sought to accept the offer, nor do Plaintiffs assert that any of the offers were so low that Defendants knew that one of the offerees would reject the offer.

In any event, to decide whether there has been a valid offer and acceptance for purposes of Rule 68, courts apply the principles of contract law.  *Radecki v. Amoco Oil Co.*, 858 F.2d 397, 400 (8th Cir. 1988) (citations omitted).  There is no preclusion to condition precedents to be performed before an agreement between parties becomes operative.  *See*, *e.g.*, *Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d 876, 887 (8th Cir. 2014); *Lake Co. v. Molan*, 131 N.W.2d 734, 740 (1964); Restatement (Second) of Contracts § 29 (1981) ("The offeror is the master of his offer; just as the making of any

offer at all can be avoided by appropriate language or other conduct, so the power of acceptance can be narrowly limited.").  Moreover, other courts that have considered unanimity with respect to Rule 68 offers have rejected *Tocwish* and concluded that a Rule 68 offer conditioned upon acceptance by all plaintiffs is valid.  *See Amati v. City of Woodstock*, 176 F.3d 952, 958 (7th Cir.), *cert. denied*, 528 U.S. 985 (1999); *Lintz v. Am. Gen. Fin., Inc.*, 76 F. Supp. 2d 1200, 1212 (D. Kan. 1999); *see also Lang v. Gates*, 36 F.3d 73, 75 (9th Cir. 1994) (looking at traditional principles of contract construction with respect to Rule 68).

Plaintiffs further argue that the early nature of the Rule 68 Offer precluded meaningful discovery needed to assess their damages and evaluate the Offer.  (Dkt. 154 at 14-15.)  "A rule of civil procedure should be interpreted in accordance with its plain meaning."  *United States v. $579,475.00 in U.S. Currency*, 917 F.3d 1047, 1049 (8th Cir. 2019) (citing *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 123 (1989)).  The only limitations in Rule 68 with respect to timing is that it the offer be made "[a]t least 14 days before the date set for trial. . . ."  Fed. R. Civ. P. 68(a).  It is important to note that Plaintiffs presumably have some idea of the wages that they may be entitled to even without information from Defendants.  The Court will not read into Rule 68 an equity requirement that a plaintiff must have meaningful discovery before an offer can be made, even if Plaintiffs are correct that they did not have enough information in their possession from Defendants to determine whether the Rule 68 Offer was appropriate.

For all of the reasons stated forth above, the Court denies Plaintiffs' Motion to Strike the Rule 68 Offer.

### III.   <u>MOTION TO DISMISS (DKT. 158)</u>

Defendants seek an order dismissing Rogers from this action under Rules 37 and 41 of the Federal Rules of Civil Procedure in light of this Court's Order directing the two named Plaintiffs, including Rogers, to appear for deposition prior to Defendants responding to Plaintiffs' pending Motion for Conditional Certification, and her repeated failure to appear for her properly noticed depositions.

### A.   **Factual Background**

On March 15, 2021, the Court ordered the named Plaintiffs be deposed by April 15, 2021, prior to Defendants' deadline to respond to Plaintiffs' Motion for Conditional Certification.  (Dkt. 143; Dkt. 147 at 29.)

Defendants noticed the deposition of Rogers for April 6, 2021.  (Dkt. 161-1 at 4.) Because Rogers does not own a computer, after conferring with Rogers' counsel, Defendants' counsel arranged for a laptop to be provided at the court reporter's Chicago office in a separate conference room where Rogers was to appear for her deposition on April 6.  (Dkt. 161-6 at 5:21-6:6.)  Rogers failed to appear at the court reporter's office, informing her counsel that she was ill and experiencing possible Covid-19 symptoms, and the parties agreed to postpone her deposition based on this representation.  (*Id.* at 7:12-8:10.)  Rogers' deposition was rescheduled for April 12, 2021, at 9:00 a.m., again at the court reporter's office in Chicago, assuming her Covid-19 test was negative.  (Dkt 161-3 at 2-3; Dkt. 161-6 at 8:20-24.)  Counsel for Plaintiffs confirmed with Rogers that the date worked for her and that she would appear for her deposition. (Dkt. 161-5.)  On April 12, 2021, Rogers was late to her deposition, due to "unforeseen issues securing

childcare" and saying that she would likely need to bring her child to the deposition.

(Dkt. 161-7.)  The parties agreed to cancel the deposition at 10:30 a.m.  (Dkt. 161-6 at

10:8-11:18.)  As part of this agreement, the parties noted as follows:

> Mr. Hogg, Ms. Rogers' counsel, attempted to reach her several times to find
> out whether she was going to be available to appear for the deposition,
> whether the deposition would -- would need to begin late, and, if so, what
> time it would begin. And he did hear from her that if -- she was trying to
> come with her child, but that if she hadn't appeared by 10:30 a.m. Central,
> that we should cancel the deposition.
>
> Counsel also discussed that if Ms. Rogers was not able to guarantee that she
> would be able to appear another date without her child, that while not ideal,
> that counsel was willing to make due [sic] with the situation and allow her
> child to be present, although, not ideal. However, counsel attempted
> mutually to try to come up with a solution with Ms. Rogers where she would
> be able to appear for her deposition without her child present.
>
> And, ultimately, Mr. Hogg was able to confirm with her that she could
> appear -- that she would have child care secured on April 15th and would
> rearrange her schedule to appear for a third time on April 15th.

(Dkt. 161-6 at 11:10-12:6.)

The parties rescheduled Roger's deposition for April 15, 2021, at 9:00 a.m. at the

court reporter's Chicago office.  (Dkt. 161-4; Dkt 161-6 at 12:3-6.)  Rogers' counsel

indicated that if transportation was an issue for Rogers, his firm would provide her with a

laptop so she could appear for her deposition at a location of her convenience.  (Dkt 161-

6 at 13:7-11.)  In addition, Defendants informed counsel for Rogers that if she failed to

appear, they would pursue a motion to dismiss.  (Dkt. 161 ¶ 5.)  Plaintiffs' counsel

confirmed with Rogers on April 14 that she would appear for her deposition on April 15.

(Dkt. 161-8.)  Rogers failed to appear for a third time, this time without providing her

counsel with any excuse for her failure to appear.  (Dkt. 161-6 at 13:16-14:8, 15:20-16:3.)

Rogers' counsel did represent as follows:

> And as you noted, I spoke with Ms. Rogers last night. She confirmed multiple times that she would be at her deposition today with the caveat that she was going through a very serious family matter issue, and I confirmed with her if -- you know, if we need to postpone it again, you need to let us know today, and she told me that she would be here today.
>
> Throughout the morning, leading up to 9:00 a.m. and following 9:00 a.m., I've been trying to get in touch with her to, you know, confirm the timing, make sure she was going to be there, if she needed any help, if she needed an Uber, whatever it might be. All my calls went unanswered and eventually started going straight to voice mail. And the text messages I was sending to her were also unanswered.

(*Id.* at 15:13-16:3.)

Defendants' opposition to the Motion for Conditional Certification was filed on April 22, 2021.  (Dkts. 167, 169.)  Rogers made no further attempt to comply with the March 15, 2021 Order, and apparently was still not in contact with her counsel when they filed her opposition to the Motion to Dismiss her claims.  (*See* Dkt. 177 (opposition brief)).)  On May 21, 2021, in response to Defendants' Motion to Dismiss her claims for non-prosecution, Rogers filed a declaration dated May 12, 2021 explaining that scheduled babysitter for her eight-year-old son had cancelled the morning of April 12 and that she had missed the April 15 deposition because she learned that her brother had been killed in a violent shooting on April 14.  (Dkt. 184-1 ¶¶ 4-5.)  She explained that as of April 14, she had still intended to appear for her deposition on April 15 notwithstanding her brother's death because she had already rescheduled the deposition, but was unable to do so when she woke up on April 15 because she was overcome by the reality of her

brother's death, and did not answer her phone that morning because she was with her family, which needed her.  (*Id.* ¶ 5.)

Defendants persisted in their Motion to Dismiss Rogers' claims.  (Dkt. 188.) Then, on June 22, 2021, Plaintiffs' counsel filed a Suggestion of Death notifying the Court of Rogers' death on June 15, 2021.  (Dkt. 195.)  Having seen no substitution for Rogers, the Court asked the parties for their positions as to the effect of Rogers' death on the Motion for Conditional Certification and Defendants' Motion to Dismiss Rogers' claims for non-prosecution.  Defendants agreed to withdraw that Motion to Dismiss if Plaintiffs agreed to withdraw Rogers' testimony as support for the pending Motion for Conditional Certification.  (Dkt. 220 at 1.)  Plaintiffs declined to do so.  (Dkt. 221 at 2.) The Court extended the deadline to substitute a representative for Rogers' estate until November 19, 2021.  (Dkt. 217.)  To date, no representative has been substituted.

**B.    Analysis**

Rule 37(d)(1)(A) of the Federal Rules of Civil Procedure provides that the "court where the action is pending may, on motion, order sanctions if . . . a party . . . fails, after being served with proper notice, to appear for that person's deposition. . . ."  Fed. R. Civ. P. 37(d)(1)(A).  "Under Rule 37(d), if a party fails to appear for a deposition after being served with proper notice, the district court "may make such orders in regard to the failure as are just," including an order dismissing the action."  *See Harris v. Unknown Mack*, 221 F.3d 1342 (8th Cir. 2000) (per curium) (quoting Fed. R. Civ. P. 37(b)(2)(C) and (d)).

In addition, under Rule 37(b)(2), "if a party . . . fails to obey an order to provide or permit discovery" a court may issue an order "dismissing the action." Fed. R. Civ. P. 37(b)(2)(A)(v). Dismissal may "be considered as a sanction only if there is: (1) an order compelling discovery; (2) a willful violation of that order; and (3) prejudice to the other party." *Keefer v. Provident Life and Acc. Ins. Co.*, 238 F.3d 937, 940 (8th Cir. 2000) (citing *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000)). The Eighth Circuit "more closely scrutinize[s] dismissal imposed as a discovery sanction because the opportunity to be heard is a litigant's most precious right and should be sparingly denied." *Id.* at 940-41.

The Federal Rules of Civil Procedure also authorize district courts to dismiss a case with prejudice when a plaintiff "fails to prosecute or to comply with these rules or a court order." Fed. R. Civ. P. 41(b). Similar to Rule 37(b), dismissal with prejudice under Rule 41 should only be available for "willful disobedience of a court order or where a litigant exhibits a pattern of intentional delay." *Hunt v. City of Minneapolis*, 203 F.3d 524, 527 (8th Cir. 2000). "Although [the Eighth Circuit has] encouraged district courts to warn litigants when they are skating on the thin ice of dismissal, such admonitions are not necessary to sustain a Rule 41(b) dismissal." *Id.* "Nevertheless, 'not every instance of failure to comply with an order of court, however inexcusable, justifies total extinction of a client's cause of action.'" *Mann v. Lewis*, 108 F.3d 145, 147 (8th Cir. 1997) (quoting *Givens v. A.H. Robins Co., Inc.*, 751 F.2d 261, 263 (8th Cir. 1984)). "Dismissal with prejudice is an extreme sanction and should be used only in cases of willful disobedience of a court order or . . . persistent failure to prosecute a complaint." *Id.* (quoting *Givens*,

751 F.2d at 263). "A district court should weigh the court's need to advance its heavy docket against the consequence of irreversibly extinguishing the litigant's claim and consider whether any less-severe sanction could adequately remedy the effect of the delay on the court and the prejudice to the opposing party." *Id.*

Here, there is no dispute that Rogers did not appear for her deposition three times, the first because she was experiencing Covid-19 symptoms, the second because she did not have childcare, and the third because her brother had died the day before. As to the first two instances, Defendants agreed on April 6 that Rogers should not appear for her deposition that day in view of her Covid-19 symptoms (Dkt. 161-6 at 7-8), and while Rogers was willing to appear on April 12 with her eight-year-old son, counsel for BluSky stated that he did not want Rogers to have to sit for her deposition with her child present (Dkt. 194 at 33-34). Moreover, this led to the compromise of not requiring Rogers to appear at her deposition with her child on April 12, and her agreeing to appear on April 15 for her deposition. Consequently, Defendants' complaints about the first two depositions in isolation ring hollow.[7] As to the April 15 instance, the Court would not normally expect a party to appear for deposition the day after a family member or loved

---

[7]     In their reply, Defendants question whether Rogers really had Covid-19 symptoms (*see* Dkt. 188 at 4 ("It was Rogers' **purported illness** that resulted in a cancellation of her first deposition") (emphasis added)), and neglect to mention that BluSky's counsel did not want to depose Rogers with her eight-year-old son in the room (Dkt. 194 at 33-34). Defendants offer no evidence that Rogers was untruthful about either circumstance, and needing to cancel or postpone an event due to Covid-19 symptoms or childcare falling through at the last minute is hardly an unbelievable occurrence.

one died.[8]  Nevertheless, the Court must consider the fact that Defendants warned they would seek Rogers' dismissal if she failed to appear for her third deposition on April 15 and that Rogers said on April 14 that she would still appear on April 15 after learning of her brother's death.  Moreover, the Court had previously ordered Rogers to appear for her deposition before the April 15 due date for Defendants' opposition to the Motion for Conditional Certification (Dkt. 143), Rogers was apparently still out of touch with her counsel as of May 7, 2021 (*see* Dkt. 177), and Rogers did not explain her April 15 absence until May 12, after Defendants filed their opposition to the Motion for Conditional Certification and their Motion to Dismiss her claims (Dkt. 184-1).

Rogers had "affirmative obligations" as a litigant, including participating in the discovery procedures ordered by the Court, and failed to meet those obligations.  *See Brennan v. Qwest Commc'ns Int'l, Inc.*, No. CIV. 07-2024 ADM/JSM, 2009 WL 1586721, at \*9, \*18 (D. Minn. June 4, 2009) (dismissing opt-in plaintiffs' claims with prejudice based on a willful violation of a discovery order).  While the Court is sympathetic to Rogers' circumstances, the fact remains that she was ordered to appear for her deposition by April 15 (Dkt. 143), she did not do so, and she was out of contact with her own lawyers for so long that curing her failure to appear was no longer possible (*see* Dkt. 161-6 at (discussing extending the deadline for Defendants' opposition to permit

---

[8]     At the hearing on Defendants' Motion to Dismiss Rogers' claims, Labor Source's counsel disputed whether the person who died on April 14 was actually Rogers' brother, although they did not dispute that Rogers suffered the "tragic loss" of a "loved one." (Dkt. 194 at 14-15.)  Labor Source did not explain why they disputed the nature of the relationship or offer any evidence calling the relationship into question.

Rogers' deposition and providing her with a laptop to use at the location of her choice)). Rogers gave no explanation for why she did not contact her lawyers any time between April 15 and (apparently) May 12 or thereabouts, and her failure to take any action for several weeks supports the imposition of some sanction. *See Dalton v. Regents of the Univ. of Minnesota*, No. CIV. 10-854 RHK/LIB, 2011 WL 4458764, at *12 (D. Minn. Aug. 25, 2011), *R. & R. adopted in part sub nom.*, No. CIV. 10-854 RHK/LIB, 2011 WL 4436649 (D. Minn. Sept. 23, 2011) ("Significantly, Dalton has failed to explain why she could not have sought the extension prior to the expiration of discovery, nor has she explained why her inability to travel rendered her incapable of at leas[]t responding to written discovery. Dalton's health issues do not excuse her complete failure to communicate with the Court, her attorney, and opposing counsel regarding her inability to travel and her need for an extension.").

The Court also considers the prejudice to Defendants. Plaintiffs may have had a tactical advantage with respect to their Motion for Collective Certification because Defendants could not depose Rogers before their opposition was due, but that prejudice is alleviated by the fact that the Court has not considered Rogers' declaration in connection with the Motion for Conditional Certification. Plaintiffs also originally opposed the Motion to Dismiss because Defendants could depose Rogers when this case moves into fact discovery. (Dkt. 177 at 14.) However, Rogers' death renders that option unavailable, and the Court finds that Defendants would be somewhat prejudiced by this fact with respect to a decertification motion if she remained a named Plaintiff.

Under these facts, the Court finds that Rogers violated the Court's March 15 Order by failing to appear for her deposition before April 15, 2021 and that Defendants are somewhat prejudiced by her non-appearance.  But where Defendants agreed to the first two postponements of Rogers' deposition, given the circumstances around Rogers' April 15 non-appearance, and because Rogers' own death on June 15, 2021 was unexpected, dismissal with prejudice would be a "disproportionately harsh sanction in this case." *Penton v. Green*, 177 F. App'x 526, 527 (8th Cir. 2006) (modifying dismissal with prejudice to be without prejudice where there was "no contemporaneous warning from the district court alerting [the plaintiff] that failure to answer the deposition questions could result in dismissal of his suit" and "the uncooperative conduct occurred on only one occasion").  Rather, a dismissal without prejudice appropriately balances Rogers' violation of the March 15 Order, failure to appear on April 15, and subsequent lack of communication with counsel against the prejudice to Defendants and the circumstances surrounding her non-appearances at her depositions.  *See id.*  For these reasons, the Court grants the Motion to Dismiss the Claims of Plaintiff Ratanya Rogers in part insofar as the Court dismisses her claims without prejudice under Rule 37(b), Rule 37(d), and Rule 41. This dismissal does not prevent a substitute for Rogers from opting into this case consistent with the applicable law.  No other sanction will be awarded to Defendants.

## IV.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**ORDERED** that:

1.      Plaintiffs' Motion for Conditional Certification and Court-Authorized

Notice Pursuant to 29 U.S.C. § 216(b) (Dkt. 132) is **GRANTED** and **DENIED** in part;

2.      Plaintiff's Motion to Strike or Void Defendants' Rule 68 Offer (Dkt. 152)

is **DENIED**; and

3.      Defendants' Motion to Dismiss the Claims of Plaintiff Ratanya Rogers

(Dkt. 158) is **GRANTED**.

4.      Plaintiff Ratanya Rogers' claims are **DISMISSED WITHOUT**

**PREJUDICE**.


DATED: February 8, 2022                         *s/Elizabeth Cowan Wright*
                                                ELIZABETH COWAN WRIGHT
                                                United States Magistrate Judge

# Attachment A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| MARCQUISE MURPHY, individually and on behalf of all others similarly situated, | Case No. 19-cv-01929 (ECW) |
| Plaintiff, | |
| v. | **JUDICIAL NOTICE OF LAWSUIT** |
| LABOR SOURCE, LLC d/b/a CATSTAFF d/b/a ONE SOURCE STAFFING AND LABOR, and BLUSKY RESTORATION CONTRACTORS, LLC, | |
| Defendants. | |

**TO:    ALL CURRENT AND FORMER MANUAL LABORERS WHO HAVE WORKED ON THE WEYERHAEUSER PROJECT IN THE STATE OF MINNESOTA FOR BLUSKY RESTORATION CONTRACTORS, LLC FROM <u>JULY 23, 2016</u> TO THE PRESENT.**

**RE:    FAIR LABOR STANDARDS ACT MINIMUM WAGE AND OVERTIME ACTION**

| 1. | INTRODUCTION |
|---|---|

The purpose of this Notice is to: (i) inform you of the existence of a collective action lawsuit against BluSky Restoration Contractors for minimum wage and overtime compensation alleging violations of the Fair Labor Standards Act ("FLSA"), (ii) to advise you of how your rights might be affected by this lawsuit, and (iii) to instruct you on the procedure for making a claim in this action, if you choose to do so.

| 2. | DESCRIPTION OF THE LAWSUIT |
|---|---|

A lawsuit was filed against BluSky by Marcquise ("Plaintiff") on behalf of himself and all other similarly situated individuals. Specifically, the lawsuit contends that BluSky either on its own or jointly with Labor Source, LLC (also known as One Source Staffing and Labor or CATSTAFF), failed to properly record all hours worked and made improper deductions from workers' pay over the three-year period before the lawsuit was filed, and that these individuals are owed minimum wages and overtime for time they worked in excess of 40 hours per week. BluSky denies the allegations, and contends that it properly paid all manual laborers.

1

### 3. COMPENSATION SOUGHT FOR THE WORKERS

Plaintiff has sued BluSky to recover minimum wage and/or overtime compensation on behalf of himself, and on behalf of all hourly-paid manual laborers who worked on any Minnesota Weyerhaeuser Project. Plaintiff also seeks an additional amount for liquidated damages equal to the amount of the minimum wages and/or overtime compensation owed, as well as attorneys' fees and costs to be paid by BluSky.

### 4. NO RETALIATION PERMITTED

The law prohibits retaliation against current or former employees who exercise their rights under the FLSA. Thus, BluSky and Labor Source are prohibited from retaliating against you in any manner, including reducing hours worked, assigning unfavorable shifts, taking adverse employment action against you, or firing you, because you have joined and/or participated in this lawsuit.

### 5. HOW TO PARTICIPATE IN THIS LAWSUIT

Enclosed you will find a form entitled "Consent to Become a Party Plaintiff" ("Consent Form"). You **must file a Consent Form to join this lawsuit as a party plaintiff**. You may join, or "opt in" to, this lawsuit by submitting your "Opt-in Consent Form to the Claims Administrator by: (1) emailing your completed Consent Form to [email address of Notice Administrator], or (2) mailing your completed Consent Form to the Notice Administrator at the following address:

BLUSKY FLSA LITIGATION
c/o Notice Admin
Notice Admin Address
Notice Admin City, State, Zip

The Consent Form **MUST** be received in sufficient time for Plaintiff's Counsel to file it with the Court on or before [**DATE** 90 days from mailing date].

If you choose to join this lawsuit, you will be bound by the judgment or any settlement of this action. If you choose to file a Consent Form, your continued right to participate in this suit may depend on a later determination by the Court that you and the Plaintiff are actually "similarly situated" in accordance with federal law and that your claim has been filed within the applicable time limits.

If you complete the enclosed Consent Form, you will be designating Plaintiff and his attorneys to act on your behalf and to represent your interests. Plaintiff's counsel has taken this case on a contingency basis and/or statutory basis. This means that if there is no recovery, you will not have to pay attorney's fees out of your own pocket. Should there be a recovery, Plaintiff's Counsel will seek to recover their attorneys' fees and costs from BluSky. Plaintiff's Counsel will also receive a part of any settlement obtained or money judgment entered in favor of the members of the similarly-situated workers, the specific amount of which would be set by the Court.

## 6.        YOUR TIME TO JOIN IS LIMITED

The Consent Form must be returned within ninety (90) days from the date this notice was mailed, *i.e.*, postmarked no later than **[MONTH] [DATE], 2022**.

## 7.        EFFECT OF NOT JOINING THIS LAWSUIT

If you do not file a Consent Form to join this case, you will not participate in this FLSA lawsuit and will not be bound by any judgment or settlement of the FLSA claims. If you so choose, you may pursue your FLSA claim on your own, and you may select your own counsel. The pendency of this current lawsuit, however, will not stop the running of your time limit as to any minimum wage and/or overtime claims you might have under the FLSA unless you join this lawsuit by returning the Consent Form. In other words, you may lose some or all of your rights if you do not act now.

## 8.        NO OPINIONS EXPRESSED AS TO THE MERITS OF THE CASE

This Notice is for the sole purpose of determining the identity of those persons who may be entitled to and wish to participate in this case, and any potential judgment or settlement. The Court has expressed no opinion regarding the merits of Plaintiff's claims or the Defendant's liability, if any, and individual claims may be subject to later dismissal if the Court ultimately finds that the claims lack merit or that they cannot be litigated on a collective basis, or for other reasons. There is no assurance at this time that any relief will be granted, nor if granted, the nature and amount of relief.

## 9.        LEGAL COUNSEL

The Attorneys representing Plaintiff, and the manual laborers who join this case are as follows:

Carolyn H. Cottrell
Ori Edelstein
William M. Hogg
**SCHNEIDER WALLACE COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
Fax: (415) 421-7105
ccottrell@schneiderwallace.com
oedelstein@schneiderwallace.com
whogg@schneiderwallace.com

E. Michelle Drake
**BERGER & MONTAGUE, P.C.**
43 SE Main Street, Suite 505
Minneapolis, Minnesota 55414
Telephone: (612) 594-5999

## 10. Where Can I Get More Information?

If you have questions about this Notice, or if you did not receive this Notice and you believe that you are or may be one of the workers affected, you should contact Plaintiff's Counsel.

**PLEASE DO <u>NOT</u> CONTACT THE COURT, THE CLERK OF THE COURT, OR THE JUDGE FOR INFORMATION ABOUT THE LAWSUIT. THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE COURT, BUT THE COURT HAS MADE NO DECISION IN THIS CASE ABOUT THE MERITS OF PLAINTIFF'S CASE OR BLUSKY'S DEFENSES.**

## <u>CONSENT TO JOIN FLSA COLLECTIVE ACTION</u>
## <u>BLUSKY OVERTIME CLAIM</u>

Court-imposed deadline for filing is [**90 days from mailing**].

Print Name:_____

      1.     I consent, agree, and opt-in to the lawsuit filed against BluSky Restoration Contractors to pursue my claims of unpaid overtime during my employment with the company(s).

      2.     I understand that this lawsuit is brought under the Fair Labor Standards Act, and I consent to be bound by the Court's decision.

      3.     I designate the law firm of Schneider Wallace Cottrell Konecky, LLP as my attorneys to prosecute my wage claims.

      4.     I consent to having the Representative Plaintiff in the Complaint against the Defendant make all decisions regarding the litigation, the method and manner of conducting this litigation, releasing of claims, entering into an agreement with Plaintiff's Counsel regarding attorneys' fees and costs, the terms of any potential settlement of this litigation if such settlement is approved by the Court, and all other matters pertaining to this lawsuit.

      5.     If needed, I authorize Schneider Wallace Cottrell Konecky LLP to use this consent to re-file my claim in a separate lawsuit or arbitration against Defendant.

Signature:_____Date:_____

If you sign the paper version of this form, please return your signed form to:

BLUSKY FLSA LITIGATION
c/o Notice Admin
Notice Admin Address
Notice Admin Phone
Notice Admin Fax

**Information below this sentence will NOT be filed with the court but is needed. Please print clearly.**

Mailing Address: _____

_____

_____

Home Phone: ( _____ ) _____

Cell Phone: ( _____ ) _____

Email: _____

Alt. Email: _____

Estimated dates of employment with BluSky (month/year): _____ to _____.

Work Location(s): _____

_____

_____

_____

Staffing Company (if other than Labor Source): _____

_____

6